NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

KONINKIJKE PHILIPS ELECTRONICS         :
N.V.,                                   :          **Civil Action No. 11-3684 (SRC)(CLW)**
                                        :
        Plaintiff/Counterclaim Defendant, :
                                        :                      **OPINION**
                        v.              :
                                        :
HUNT CONTROL SYSTEMS, INC., AN          :
ASSUMED TRADE NAME FOR CARIBE           :
CORPORATION,                            :
                                        :
        Defendant/Counterclaim Plaintiff. :

_____

**CHESLER**, District Judge

        This matter comes before the Court upon four motions: (1) the motion for summary

judgment filed by Plaintiff/Counterclaim Defendant Koninkijke Philips Electronics N.V.

("Philips") [Docket Entry 189]; (2) the motion for summary judgment filed by

Defendant/Counterclaim Plaintiff Hunt Control Systems, Inc. ("Hunt") [Docket Entry 179]; (3)

Hunt's motion to exclude the expert report and testimony of Michael Barone ("Barone") [Docket

Entry 183]; and (4) Hunt's motion to exclude the expert report and testimony of Alex Simonson

("Simonson") [Docket Entry 186].  All motions have been opposed. The Court has considered

the papers filed by the parties and proceeds to rule on the motions without oral argument,

pursuant to Federal Rule of Civil Procedure 78.  For the reasons discussed below, the Court will

deny both of Hunt's motions to exclude expert reports and testimony.  The Court will deny

Hunt's summary judgment motion, and the Court will grant in part and deny in part Philips's summary judgment motion.

## I.    BACKGROUND

This action is a trademark dispute between Hunt, the owner of the "Simplicity" trademark for goods related to its lighting business, and Philips, who seeks to register the trademark "sense and simplicity" with the United States Patent and Trademark Office ("PTO") for goods related to its lighting business.

### a.    THE PARTIES

Philips is a Dutch company, with its United States lighting headquarters located in New Jersey.  (Philips Statement of Material Facts, Docket Entry 190-1, at ¶ 1 [hereinafter PSMF]; Hunt Responsive Statement of Material Facts, Docket Entry 200, at ¶ 1 [hereinafter HRSMF].) Philips has produced a wide variety of products throughout its history, including two main types of lighting products in the United States until 2008: lamps and ballasts.  (PSMF at ¶¶ 2, 4; HRSMF at ¶¶ 2, 4.)  Philips's Advance business unit has been owned by Philips since 1959; it manufactures ballasts and LED drivers, but does not sell lighting controls.  (PSMF, at ¶¶ 11-12; HRSMF at ¶¶ 11-12.)  Philips sells 60 percent of its ballasts and 80 percent of its LED drivers and modules to the Original Equipment Manufacturer ("OEM") channel.  (PSMF, at ¶ 13; HRSMF at ¶ 13.)  Philips's sales of dimming controls, which account for less than 1 percent of Philips's U.S. lighting sales, go through professional (not individual consumer) channels. (PSMF, at ¶¶ 14-15, 45; HRSMF at ¶¶ 14-15, 45.)

Hunt, a self-described leader in the lighting industry based in Fort Collins, Colorado, is a manufacturer of architectural dimming systems.  (PSMF at ¶¶ 20-22; HRSMF at ¶¶ 20-22.) Hunt is solely owned by its President, Alan J. Glaser ("Glaser").  (PSMF at ¶ 20; HRSMF at ¶

20.)  Hunt sells lighting controls, such as LED controllers and dimming systems, among other goods.  (PSMF at ¶ 30; HRSMF at ¶¶ 30.)  Hunt has used the "Simplicity" mark, sometimes alongside its housemark, for over 22 years.  (PSMF at ¶¶ 25, 28; HRSMF at ¶¶ 25, 28.)  Hunt asserts that its products are well-known in the lighting industry.  (PSMF at ¶ 25; HRSMF at ¶ 25.)  Hunt sells products through electrical distributors and sales representatives to a wide range of consumers.  (PSMF at ¶¶ 36-37; HRSMF at ¶¶ 36-37.)  More than 90 percent of Hunt's dimming systems are used in commercial applications, and Hunt's sales to individual consumers may be less than 5 percent of its overall sales, since Hunt does not sell dimming panels at retail.  (PSMF at ¶¶ 45-47; HRSMF at ¶¶ 45-47.)

### b. Hunt's "Simplicity" Trademark

Hunt filed an application with the PTO to register "Simplicity" as a trademark for industrial and commercial lighting control panels on June 8, 2004.  (PSMF at ¶ 50; HRSMF at ¶ 50.)  The PTO issued Registration No. 3254393 to Hunt for "Simplicity" on June 26, 2007.  (PSMF at ¶¶ 50-52; HRSMF at ¶¶ 50-52.)  Hunt began using the mark on its wallbox dimmers in 2007, and launched its "Simplicity" LED controller wallbox dimmer product in 2008.  (PSMF at ¶¶ 55-56; HRSMF at ¶¶ 55-56.)  Hunt alleges that it sources SIMPLICITY LIGHTING SOLUTIONS lamps and bulbs, and that it has sold light bulbs featuring the mark "Simplicity."  (PSMF at ¶¶ 57-58; HRSMF at ¶¶ 57-58.)  Hunt also operates the website www.simplicitylightingsolutions.com, which functions as a link to online lighting retailer Top Bulb.  (PSMF at ¶¶ 60-61; HRSMF at ¶¶ 60-61.)  This website had generated only 13 orders as of October 2013 (and no orders since 2010), with three of the 13 orders actually for Philips light bulbs.  (PSMF at ¶ 67; HRSMF at ¶ 67.)  Hunt has promoted the compatibility of its products

with Philips products, and Philips has worked with Hunt to ensure that Hunt's dimmers are compatible with Philips's ADVANCE ballasts.  (PSMF at ¶¶ 69-70; HRSMF at ¶¶ 69-70.)

### c. PHILIPS'S "SENSE AND SIMPLICITY" TAGLINE

Philips has used three different global taglines since 1995: "Let's make things better," from 1995 to September 2004; "sense and simplicity," from September 2004 to November 2013[1]; and "innovation + you," from November 2013 to the present.  (PSMF at ¶¶ 3, 72; HRSMF at ¶¶ 3, 72.)   Philips selected the "sense and simplicity" tagline at the global level in its Netherlands headquarters.  (PSMF at ¶ 72; HRSMF at ¶ 72.)  Before the final decision to adopt this tagline was made, on March 26, 2004 Philips commissioned a United States-focused trademark search that did not reveal Hunt's use of its "Simplicity" trademark.  (PSMF at ¶¶ 72-74; HRSMF at ¶¶ 72-74.)  At this time, Hunt had not applied to register "Simplicity" as a trademark with the PTO or with any state trademark office.  (PSMF at ¶ 74; HRSMF at ¶ 74.)

Philips holds an international trademark registration for "sense and simplicity," with a priority date of May 27, 2004.  (Hunt Statement of Material Facts, Docket Entry 181, at ¶ 1-2 [hereinafter HSMF]; Philips Responsive Statement of Material Facts, Docket Entry 197-1, at ¶¶ 1-2 [hereinafter PRSMF]; PSMF at ¶ 75; HRSMF at ¶ 75.)  Philips filed a request for extension of its international registration to the United States, under the Madrid Protocol treaty, on September 3, 2004.  (HSMF at ¶¶ 1-2; PRSMF at ¶¶ 1-2; PSMF at ¶ 76; HRSMF at ¶ 76.)[2] Philips launched its "sense and simplicity" campaign worldwide in September 2004, and began using this tagline for a wide variety of products and services at that time.  (PSMF at ¶ 77;

---

[1] The parties dispute the timing of Philips's transition from "sense and simplicity" to "innovation + you."  (PSMF at ¶ 3; HRSMF at ¶ 3.)
[2] Requests for extension under the Madrid Protocol use the priority date of the underlying international registration, here May 27, 2004.  (PRSMF at ¶ 2.)

HRSMF at ¶ 77.)  Philips typically used the tagline in conjunction with its Philips housemark.

(PSMF at ¶¶ 78-79; HRSMF at ¶ 78-79.)  Philips's brand usage guidelines prohibited the use of

the tagline on products and packaging.  (PSMF at ¶ 80; HRSMF at ¶ 80.)  The tagline typically

appeared at the bottom corner of sales literature and technical sheets, as well as on Philips's

website.  (PSMF at ¶¶ 81-82; HRSMF at ¶¶ 81-82.)

 Philips used the "sense and simplicity" tagline at lighting industry trade shows, including

Lightfair.  (PSMF at ¶ 83; HRSMF at ¶ 83.)  Philips also used the tagline, along with the

"Philips" housemark, on marketing materials and specification sheets in the United States.

(PSMF at ¶ 18; HRSMF at ¶ 18.)  In addition, Philips hosted an invitation-only "Simplicity

Event" in 2006 to show future products, had a five member "Simplicity Advisory Board" to

provide advice on healthcare, lifestyle, and technology issues, and used the term "simplicity"

descriptively in print advertisements.  (PSMF at ¶¶ 84-86; HRSMF at ¶¶ 84-86.)

 Philips spent millions of dollars in the United States on its advertising program, the

"Simplicity Brand Campaign," beginning in 2004.  (PSMF at ¶¶ 88-89; HRSMF at ¶¶ 88-89.)

Philips conducted market research from 2005 to 2006 that revealed that only 1 to 2 percent of

consumers who had seen Philips's advertising knew the full tagline.  (PSMF at ¶¶ 90; HRSMF at

¶¶ 90.)

 Glaser first learned of Philips's "sense and simplicity" tagline in 2005, but did not do

further research into the tagline at that time.  (PSMF at ¶¶ 38; HRSMF at ¶¶ 38.)  Hunt became

aware that Philips was using "sense and simplicity" in connection with lighting at the Light Fair

show in 2006.  (Hunt Supplemental Statement of Facts, Docket Entry 201, at ¶ 168 [hereinafter

HSSF]; Philips Response to Hunt Supplemental Statement of Facts, Docket Entry 207-1, at ¶ 168

[hereinafter PRHSSF].)

In 2008 and 2009, Philips acquired several lighting companies, including Genlyte (producer of the LIGHTOLIER and STRAND brands), Dynalite, and Teletrol. (PSMF at ¶¶ 6-9; HRSMF at ¶¶ 6-9.) Eventually, Philips replaced Genlyte's trademarks with Philips's housemark on some, but not all, products. (PSMF at ¶¶ 17, 19; HRSMF at ¶¶ 17, 19.)

Philips began to phase out its use of "sense and simplicity" in 2012. (HSMF at ¶ 10; PRSMF at ¶ 10.) Philips issued press releases in November 2013 announcing that it was launching the new corporate tagline "innovation and you" on or around November 8, 2013. (HSMF at ¶¶ 7, 14; PRSMF at ¶¶ 7, 14.)

### d. THIRD-PARTY USE OF THE TERM "SIMPLICITY" IN TRADEMARKS

Multiple manufacturers of lighting products, including manufacturers of dimming controls, use the word "Simplicity" as part of their mark or tagline. (PSMF at ¶¶ 94-114; HRSMF at ¶¶ 94-114.) The lighting manufacturers EiKo, Legrand, Eaton/Cooper, and Traxon have testified that they have no record of, and are not aware of, any confusion resulting from use of the word "Simplicity" in their advertising and product marking. (PSMF at ¶¶ 95-96, 98-99, 103-04, 106-07; HRSMF at ¶¶ 95-96, 98-99, 103-04, 106-07.)

### e. PROCEDURAL POSTURE

In response to Philips's application to extend its international registration for "sense and simplicity" under the Madrid Protocol, Hunt filed Opposition No. 91173417 before the Trademark Trial and Appeal Board ("TTAB") on October 13, 2006, alleging that Hunt was the senior user of the mark "Simplicity" on six specific lighting goods. (HSMF at ¶ 3; PRSMF at ¶ 3.) On April 27, 2011, the TTAB sustained Hunt's Opposition as to the six specific goods Hunt outlined, but it did not permit Hunt to extend its Opposition to other goods it had not claimed originally. (HSMF at ¶ 4; PRSMF at ¶ 4.) Philips filed a Complaint with this Court for *de novo*

6

review of the portions of the TTAB decision adverse to Philips, pursuant to 15 U.S.C. § 1071(b), on June 27, 2011 [Docket Entry 1].  Hunt filed its Answer and Counterclaims on September 6, 2011 [Docket Entry 7].

## II.   MOTIONS TO EXCLUDE EXPERT TESTIMONY

Before examining the parties' substantive claims, the Court will first address Hunt's motions to exclude the expert reports and testimony of two experts offered by Philips: Michael Barone [Docket Entry 183], and Alex Simonson [Docket Entry 186].  For the reasons explained below, the Court will deny both motions.

### a.   LEGAL STANDARD

The Court bears an obligation to act as a gatekeeper and ensure that expert testimony is both relevant and reliable.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Furthermore, "the 'proponent of expert testimony must establish his expert is qualified and his testimony is admissible by a preponderance of the evidence.'"  *Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 402 (D.N.J. 2011) (quoting *Poust v. Huntleigh Healthcare*, 998 F. Supp. 478, 490 (D.N.J. 1998)).

Federal Rule of Evidence 702 sets the standard for admissibility of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Framed another way, "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e. must be qualified; (2) the expert must testify about matters requiring scientific,

technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).

*Daubert* articulated various factors that a district court may use to analyze the reliability of expert testimony. That non-exhaustive list of factors is as follows: (1) whether the particular theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community. *Daubert*, 509 U.S. at 593-94. Later, in *Kumho Tire*, the Supreme Court held that the *Daubert* analysis applies to all expert testimony, not only to scientific expert testimony. *Kumho Tire*, 526 U.S. at 141. The Supreme Court has made clear that "the test of reliability is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.*

Philips has submitted expert reports from Barone and Simonson that review the results of consumer surveys showing that (1) Hunt's customers have experienced no actual confusion between Hunt's trademark "Simplicity" and Philips's tagline "sense and simplicity" in certain portions of the market; and (2) there is no likelihood of confusion between these two marks [Docket Entries 183, 186]. Survey evidence is routinely used in trademark infringement cases, and is generally admissible to demonstrate actual confusion in cases involving alleged violations of the Lanham Act. *See, e.g.*, Shari Seidman Diamond, *Reference Guide on Survey Research*, within *the Reference Manual on Scientific Evidence*, 235 (2d ed. Fed. Judicial Ctr. 2000); *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 227-28 (2d Cir. 1999). Whether survey evidence is admissible depends on the qualifications of the witness, how helpful the testimony is to the trier of fact, and the reliability and fit of the testimony. 4 *Weinstein's Federal Evidence* § 702.06[3]

n.61.  "[A]s long as [it is] conducted according to accepted principles . . . survey evidence should ordinarily be found sufficiently reliable under *Daubert*.  Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value."  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997) (internal citation omitted).  The characteristics of a properly conducted survey are as follows:

> A proper universe must be examined and a Representative sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported.  It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. Just as important, the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purpose of the survey or the litigation.

*Pittsburgh Press Club v. United States*, 579 F.2d 751, 758 (3d Cir. 1978) (citation omitted).

"[T]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."  6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:163 (4th ed.) [hereinafter *McCarthy on Trademarks*].  The proponent of a survey bears the burden to show that the universe's sampling conforms to recognized statistical standards; here, Philips bears that burden. *Id.* § 32:159 (citing *Manual for Complex Litigation* § 21.493, p. 102 (3d ed. 1995)).  "In the context of survey evidence, 'mere technical flaws' in methodology go to 'the weight accorded a survey, not its admissibility' . . . [h]owever, 'fatal flaws' in a survey's methodology merit its exclusion."  *Fancaster*, 832 F. Supp. 2d at 402 (quoting *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004)).  A survey may be excluded under Rule 702 if it is invalid or unreliable.  Furthermore, under Federal Rule of Evidence 403, relevant and

9

otherwise admissible evidence may be excluded when the danger of unfair prejudice substantially outweighs its probative value.  *See, e.g.*, *Schering*, 189 F.3d at 228.

Hunt primarily objects to the expert reports and testimony of Barone and Simonson because of the "universe" selected by each expert in their respective survey.  A survey's universe is "that segment of the population whose perceptions and state of mind are relevant to the issues in the case."  *Citizens Fin. Grp.*, 383 F.3d at 118-19 (quoting 6 *McCarthy on Trademarks* § 32:159).  Surveys "of the wrong 'universe' will be of little probative value in litigation," and the party offering the survey bears the burden to show that the universe of the survey is proper.  *Id.*  Furthermore, a survey that provides information about a wholly irrelevant universe of respondents is irrelevant and should not be admitted into evidence.  *See id.* at 119-20; *see also J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 368-69 (D.N.J. 2002).  But "[t]he selection of an inappropriate universe generally affects the weight of the resulting survey data, not its admissibility." 6 *McCarthy on Trademarks* § 32:162.

In a typical trademark case, the new, junior user of a mark attempts to use the "reputation and good will of the senior user [to its advantage] by adopting a similar or identical mark." *Fisons Horticulture Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 474 (3d Cir. 1994).  Hunt does not allege this type of confusion, commonly known as direct confusion, in this case.  Instead, Hunt's theory of confusion is that Philips—a much larger company than Hunt, with significantly more resources to spend on advertising—has likely caused confusion for consumers as to the source of goods bearing Hunt's "Simplicity" mark, based on Philips's use of "sense and simplicity" as a tagline.  Hunt's theory alleges an example of reverse confusion, which occurs "when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services."  *Id.*  Therefore,

10

"the universe in a reverse confusion case should be limited to the senior user's customer base"—here, Hunt's actual customer base.  *Citizens Fin. Grp.*, 383 F.3d at 119.

### B.   MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF MICHAEL BARONE

Hunt first moves to exclude the expert report and testimony of Michael Barone [Docket Entry 183].  Barone's expert report and testimony focus on the survey he designed and implemented to assess the likelihood of confusion among individual consumers for light bulb products sourced by Hunt and sold at a website managed by Hunt, www.simplicitylightingsolutions.com.  (Barone 6/3/15 Report ¶ 6.)  Barone surveyed "consumers who had purchased light bulbs via the Internet in the last 6 months or who planned to do so in the following 6 months."  (Barone 6/3/15 Report ¶ 9.)[3]  These consumers were divided into two equally-sized groups for the purposes of the survey, "test" and "control." (Barone 6/3/15 Report ¶ 10.)  The test group were instructed to examine the homepage of www.simplicitylightingsolutions.com, which displayed Hunt's "Simplicity" trademark several times, "as if you were looking to purchase light bulbs via the Internet and had encountered this website."  (Barone 6/3/15 Report ¶ 12.)  The control group viewed the same homepage, except that all references to "Simplicity" had been removed.  (Barone 6/3/15 Report ¶ 17.)  Consumers in both groups answered questions designed to probe reverse confusion, based on the survey approved in *Union Carbide Corp. v. Ever-Ready Inc*, 531 F.2d 366, 387-88 (7th Cir. 1976). (Barone 6/3/15 Report ¶¶ 11-18.)  Barone found a less than one percent likelihood of confusion.

---

[3] Qualifying participants had to successfully answer three screening questions to participate in the survey, including a quality control check and a question designed to exclude individuals from the survey who may have had "unusual knowledge of matters relevant in this case."  (Barone 6/3/15 Report ¶¶ 8-9.)  The third screening question asked participants "Have you purchased light bulbs over the Internet in the last 6 months or do you plan to purchase light bulbs via the Internet in the next 6 months?"  (Barone 6/3/15 Report ¶ 9.)

(Barone Report 6/3/15 ¶ 21, Table 1.)  Based on his examination of the survey's results, Barone opines that:

> [P]ersons who encounter Hunt's use of 'Simplicity' at its 'www.simplicitylightingsolutions.com' website do not experience confusion between Hunt and Philips due to Philips having used the tagline 'Sense and Simplicity.'  Specifically, these results show that such consumers are extremely unlikely to experience confusion as to ownership, source, or affiliation between Hunt and Philips.

(Barone 6/3/15 Report ¶ 24.)

Hunt objects to the Barone survey for three main reasons.  First, Hunt argues that Barone's survey is under-inclusive because it only surveys the purchase of light bulbs, not other Hunt products.  Barone's survey is also allegedly under-inclusive because it only surveys individual consumers, not business, governmental, and institutional entities.  Furthermore, the Barone survey is, according to Hunt, under-inclusive because it only surveys "purchasers" and not those who may influence a purchase, such as specifiers.

Hunt's objections as to the under-inclusiveness of the Barone survey's universe all address purported technical flaws in the Barone survey.  Even if a survey's universe is imperfect, this defect is not necessarily fatal to a survey's admissibility.  6 *McCarthy on Trademarks* § 32:162 ("Even if a survey does not target what the court considers to be the optimal universe, the results may be so compelling that it still supports the factual finding for which is was intended.").  In fact, the use of an inappropriate universe generally affects the weight given to a survey, not its admissibility.  *See id.*  Barone's survey addresses a relevant population to the likelihood of confusion inquiry in this case: consumers who purchase light bulbs through an online interface managed by Hunt.  In contrast, the Third Circuit upheld a district court's exclusion of a consumer survey where the interviewer polled consumers not located in the geographic area

relevant to the facts of the case. *Citizens Fin. Grp.*, 383 F.3d at 118-21.  In addition, a court in this district excluded a consumer survey in which the goods at issue were only sold through and advertised to food service distributors, but the survey only polled individual consumers.  *J & J Snack Foods*, 220 F. Supp. 2d at 371-72; *see also Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 322-23 (S.D.N.Y. 2000) (rejecting a survey that surveyed purchasers of fragrances, instead of jeans or casual clothing, where jeans and casual clothing were the relevant products in the litigation).  Barone's survey does not exclude the entire relevant population for a reverse confusion inquiry; it examines a relevant population, those consumers seeking to purchase lightbulbs through Hunt's online interface.  The Court will consider arguments as to the extent to which that Barone's survey does not address the whole relevant universe of Hunt's consumers at trial, and adjust the weight given to the survey accordingly.  For these reasons, the Court will not exclude the Barone survey for being fatally under-inclusive as to its universe.

Hunt's criticism that the Barone survey is over-inclusive for surveying parties who purchased light bulbs in the past six months is also not fatal to the survey's admissibility as it addresses the technical merits of the survey.  (Barone 6/3/15 Report ¶ 9.)  Surveys, by design, can only approximate actual purchasing conditions to show the state of mind of a prospective purchaser.  6 *McCarthy on Trademarks* § 32:163.  Some courts have excluded surveys where the respondents solely consisted of parties who had already purchased the good at issue.  *See, e.g., Paco Sport*, 86 F. Supp. 2d at 323 (citing *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984)).  This is not the case with the Barone survey, where the universe includes both those who have purchased light bulbs and those who intend to purchase light bulbs.  Furthermore, the Barone survey replicated how consumers encounter the light bulbs online through Hunt's website.  The Court also notes that "[l]ikely confusion of purchasers does not

13

define the only type of confusion that may be relevant.  Confusion of non-purchasers may be just as important in some cases."  6 *McCarthy on Trademarks* § 32:163.  No survey is perfect, and to the extent that this survey does not perfectly replicate market conditions, the Court may give it less evidentiary weight at trial.

For the reasons stated above, Hunt's motion to exclude the expert report and testimony of Barone is denied.

### C.  MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF ALEX SIMONSON

Hunt further asks the Court to exclude the expert report and testimony of Alex Simonson [Docket Entry 186].  Simonson conducted a national telephone study of electrical engineers and electrical contractors to assess the likelihood of reverse confusion.  (Simonson May 2015 Report at 1.)  Specifically, Simonson surveyed "electrical engineers and electrical contractors who specify or choose architectural dimming systems and controls and/or architectural wallbox dimmers and who have been doing so for one or more years."  (Simonson May 2015 Report at 4.)  Simonson asked participants to view the Hunt Dimming website (www.huntdimming.com) "as if [the participant was] now considering specifying or choosing this company's products."  (Simonson May 2015 Report at 7.)  The survey directed participants to a number of places on the Hunt Dimming website displaying the "Simplicity" mark.  (*Id.*)  Participants then answered questions designed to probe reverse confusion, based on the survey approved in *Union Carbide Corp. v. Ever-Ready Inc*, 531 F.2d 366, 387-88 (7th Cir. 1976).  (Simonson May 2015 Report at 8.)  In his report, Simonson states that:

> The results of this study indicate virtually no detectable level of reverse confusion with respect to the relevant universe studied . . . Electrical engineers and contractors seeing, hearing, and reading about Hunt's Simplicity are not confusing the line or brand with Philips or with Philips's Sense and Simplicity.  There is no evidence

14

that the engineers or contractors believe that Philips is the source of Hunt's goods
or that Philips is affiliated with Hunt or that Philips provided authorization to Hunt.

(Simonson May 2015 Report at 1.)  Simonson based his conclusion on finding that only 3 of 336

participants in the survey mentioned Philips or a division of Philips (Lightolier) in their answers

to the survey questions, and none of these positive responses indicated that Philips's "sense and

simplicity" tagline prompted the participant's answer.  (Simonson May 2015 Report at 2.)

Hunt asserts three main arguments as to why the Simonson survey is under-inclusive.

First, Hunt argues that the Simonson survey is under-inclusive because it only surveyed

purchasers of architectural dimming systems and controls, and/or architectural wallbox dimmers.

Furthermore, the Simonson survey is allegedly under-inclusive for only surveying electrical

engineers and electrical contractors, versus non-professional consumers or other lighting

professionals.  Hunt further argues that the Simonson survey is under-inclusive for only

surveying those who "specify or choose" lighting products.

As noted in the Court's analysis of the Barone survey, any flaws as to the under-

inclusivity of the Simonson survey's universe are not necessarily fatal to its admissibility.   6

*McCarthy on Trademarks* § 32:162.  Simonson's survey assessed the likelihood of confusion

amongst electrical engineers and electrical contractors, which are a significant part of the

universe of consumers who would select or purchase Hunt products.  Furthermore, the results of

this survey are compelling on the issue of likelihood of confusion, since virtually no likelihood

of confusion is shown.  (Simonson May 2015 Report at 4.)  Given that use of an inappropriate

universe generally affects the weight given to a survey, not its admissibility, the Court will not

exclude the Simonson survey for being fatally under-inclusive as to its universe.

In addition, Hunt asserts that the Court should exclude the Simonson survey because it does not use proper control methodologies.  Philips asserts that controls were not needed for this survey, given that the survey did not have actionable levels of confusion and thus concerns about "noise from preexisting beliefs, yea-saying, and guessing (both random and biased)" are minimal.  (Opp. Br. at 18 (quoting 6 *McCarthy on Trademarks* § 32:187 (citation omitted))). Many courts have recognized that surveys lacking control questions or groups may be unreliable, depending on how the survey is designed.  *See, e.g.*, *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010).  Here, Simonson restricted the survey to professionals with at least some experience in the electrical field, therein screening the respondents of the survey for an appropriate level of knowledge about the field.  *See, e.g.*, *Black & Decker Corp. v. Positec USA Inc.*, No. 11-cv-5426, 2015 WL 5612340, at *20 (N.D. Ill. Sept. 22, 2015) (citing *Nat'l Football League Props., Inc. v. ProStyle, Inc.*, 57 F. Supp. 2d 665, 668 (E.D. Wis. 1999)).  In addition, Simonson included all respondents who mentioned Philips or a Philips-owned subsidiary in his results.  Simonson's results indicate that very few, if any, electrical professionals surveyed have mistaken beliefs about the relationship between Hunt and Philips.  The only function of a control in this survey would have been to further reduce the number of respondents whose mention of Philips would be considered in the likelihood of confusion analysis, and here, that exclusion would have been pointless.  As a further issue, Hunt has not explained to the Court what controls it believes Simonson should have used in this survey.

If the lack of a control is problematic in this survey, and the Court is not convinced that it is, this is a technical deficiency which goes to the weight that should be given to the survey, not its admissibility.  Hunt's criticisms may be appropriate issues to explore at trial, but the lack of control in Simonson's survey does not justify excluding the survey at this point in time.  *See,*

*e.g., Ironclad, L.P. v. Poly-Am., Inc.*, No. Civ.A. 3:98-CV-2600, 2000 WL 1400762, at *8 (N.D. Tex. July 28, 2000) ("[A] Court need not exclude the survey due to the lack of control, as generally, technical deficiencies go to the weight rather than admissibility.").

For the above reasons, the Court will deny Hunt's motion to exclude Simonson's report and testimony.

### III.   MOTIONS FOR SUMMARY JUDGMENT

Both parties have filed motions for summary judgment.  Hunt seeks summary judgment on Philips's request for *de novo* review of portions of the TTAB's April 27, 2011 decision that are adverse to Philips [Docket Entry 179].  Philips moves for summary judgment on Hunt's trademark infringement liability and damages counterclaims [Docket Entry 189].  For the reasons described below, Hunt's motion will be denied, and Philips's motion will be granted in part and denied in part.

#### a.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

17

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring the nonmoving party to "set out specific facts showing a genuine issue for trial"). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Summary judgment may be appropriate in reverse confusion trademark cases. *See, e.g.*, *Fancaster*, 832 F. Supp. 2d at 431 (granting summary judgment for defendant Comcast, finding that defendant's mark "Fancast" did not create a likelihood of reverse confusion with plaintiff's mark "Fancaster"); *see also Kinbook, LLC v. Microsoft Corp.*, 866 F. Supp. 2d 453, 472 (E.D. Pa. 2012), *aff'd*, 490 F. Appx. 491, 492 (3d Cir. 2013) (granting summary judgment for defendant where plaintiff failed to demonstrate a likelihood of reverse confusion between plaintiff's "Kinbox" trademark and defendant's "Kinect" and "KIN" products). That being said, "[f]ailure to strictly observe the principles governing summary judgment becomes particularly significant in a trademark or tradename action, where summary judgments are the exception." *Country Floors, Inc. v. P'ship Composed of Gepner and Ford*, 930 F.2d 1056, 1062-63 (3d Cir. 1991) (citation omitted). Therefore, courts should not be too eager to grant summary judgment in a trademark action.

### b. HUNT'S MOTION FOR SUMMARY JUDGMENT

Hunt moves for summary judgment on Philips's request for *de novo* review of sections of the TTAB's April 27, 2011 decision on Philips's Madrid Protocol application for its tagline "sense and simplicity" [Docket Entry 179]. Hunt alleges that Philips abandoned its tagline in 2012 or sometime in 2013, when it began the "innovation + you" campaign [PSMF at ¶¶ 3, 72; HRSMF at ¶¶ 3, 72]. As a result of Philips's abandonment, Hunt asserts that Philips's request for *de novo* review of the TTAB's decision is now moot. For the reasons described below, the Court will deny Hunt's motion.

The Lanham Act provides several ways to register a trademark in the United States.  15 U.S.C. § 1051 *et seq* (2012).  Section 1(a) of the Lanham Act governs applications for marks already in use in the United States, while Section 1(b) applications are based on the applicant's intent to use the mark in commerce.  *Id.*  For applications under both of these provisions, the applicant must actually use the trademark in commerce before the PTO will issue a registration. *Id.*  Section 66(a) of the Lanham Act also permits holders of international trademark registrations to request that the PTO extend their trademark protection to the United States, under the Madrid Protocol treaty's extension of protection rules.  15 U.S.C. § 1141 (2012).  The Madrid Protocol treaty facilitates the international registration of trademarks between member nations, and the International Bureau of the World Intellectual Property Organization manages its implementation. 3 *McCarthy on Trademarks* § 19:31.20.  The United States and European Union are members of the Madrid Protocol, as are many member nations of the European Union.  *Id.*

The Lanham Act outlines the following requirements for Madrid Protocol applications to the PTO:

> A request for extension of protection of an international registration to the United States that the International Bureau transmits to the United States Patent and Trademark Office shall be deemed to be properly filed in the United States if such request, when received by the International Bureau, has attached to it a declaration of bona fide intention to use the mark in commerce that is verified by the applicant for, or holder of, the international registration.

15 U.S.C. § 1141f.  A declaration of bona fide intention to use the mark in commerce must include a statement that "the applicant . . . has a bona fide intention to use the mark in commerce."  15 U.S.C. § 1141(5).  Furthermore, "[e]xtension of protection shall not be refused on the ground that the mark has not been used in commerce."  15 U.S.C. § 1141h.

A trademark registration may be cancelled "[a]t any time if the registered mark . . . has been abandoned" by the trademark holder.  15 U.S.C. § 1064(3) (2012).  Section 45 of the Lanham Act states:

> A mark shall be deemed to be "abandoned" if . . . its use has been discontinued with intent not to resume such use.  Intent not to resume may be inferred from circumstances.  Nonuse for 3 consecutive years shall be prima facie evidence of abandonment.  "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127.  "[T]o establish the defense of abandonment [under the Lanham Act] it is necessary to show not only acts indicating a practical abandonment, but an actual intent to abandon." *Marshak v. Treadwell*, 240 F.3d 184, 198 (3d Cir. 2001) (quoting *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 31 (1900)).  "[A]bandonment, being in the nature of a forfeiture, must be strictly proved." *United States Jaycees v. Phila. Jaycees*, 639 F.2d 134, 139 (3d Cir. 1981); *see also Doeblers' Penn. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 822 (3d Cir. 2006) ("A party arguing for abandonment has a high burden of proof").  Therefore, to adequately plead a claim for abandonment, a party must show either (1) at least three consecutive years of nonuse of a trademark, or (2) a period of nonuse of less than three years combined with proof of intent to not resume use.  15 U.S.C. § 1127; *see Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1579 (Fed. Cir. 1990).

As noted above, Section 66(a) applicants under the Madrid Protocol are not required to use a mark in United States commerce at any time prior to registration.[4]  *See* 15 U.S.C. § 1141(h)(a)(3); *cf.* 15 U.S.C. 1141f(a) (requiring a declaration of "*bona fide* intention to use the

---

[4] Once the registration issues, a holder of a United States trademark issued through Section 66(a) must use the registered mark in commerce to avoid abandoning its registration. *Saddlesprings, Inc. v. Mad Croc Brands, Inc.*, 104 U.S.P.Q.2d 1948, 1951 (TTAB 2012).

mark in commerce").  The TTAB recently examined the issue of registration under Section 66(a) and held:

> Because use is not required for an application filed under Trademark Act Section 66(a), we hold that in order to sufficiently plead a claim for cancellation of a Section 66(a) registration on grounds of abandonment for nonuse, the plaintiff must allege, as of the date the claim is filed, either:
>
>> (a) three or more consecutive years of nonuse commencing no earlier than the date on which the registration was issued; or,
>>
>> (b) if the period of non-use commencing no earlier than the date of registration and extending to the filing date of the claim is less than three years, facts supporting nonuse after the date of registration, coupled with an intent not to resume use.

*Dragon Bleu (SARL) v. Venm, LLC*, 112 U.S.P.Q.2d 1925, 1931 (TTAB 2014).   Therefore, courts should "not consider any time prior to the issuance of a Section 66(a) registration as constituting a period of nonuse for purposes of abandonment."  *Id.*  Furthermore, "[t]here can be a period of time during which a <u>holder of a registration</u> based on § 66(a) has not actually used the mark in commerce but still asserts a bona fide intention to do so. It is in this liminal state that a petition to cancel a registration on the ground of a lack of bona fide intent to use the mark can be heard."  *Sandro Andy, S.A. v. Light Inc.*, No. 12-Civ-2392, 2012 WL 6709268, at *3 (S.D.N.Y. Dec. 27, 2012) (emphasis added).

Hunt has not offered sufficient evidence such that a reasonable jury could find that Philips abandoned its Section 66(a) application for an extension of its international registration for "sense and simplicity."  Hunt does not dispute that Philips satisfied all requirements under Section 66(a) for filing an application for extension of its international registration, including the filing of a declaration of bona fide intention to use the mark in commerce at the time of application.  The PTO has not issued Philips a trademark for "sense and simplicity" under the

Madrid Protocol, however, because the TTAB sustained Hunt's opposition of Philips's trademark application as to certain lighting goods in 2011. *Hunt Control Sys. Inc. v. Koninkijke Philips. Elec. N.V.*, 98 U.S.P.Q. 1558 (TTAB 2011). Philips has not formally withdrawn its application, and in fact this case is currently before this Court because Philips seeks review of the TTAB's decision. Given that Section 66(a) does not require a trademark applicant to use the trademark in commerce prior to a registration's issuance, the Court will not consider events occurring before a trademark registration issues as part of a period of nonuse. *Dragon Bleu*, 112 U.S.P.Q.2d at 1931.

Based on this reasoning, Hunt cannot satisfy the requirements to show that Philips has abandoned its application. Since Philips's registration has not yet issued, Hunt cannot demonstrate any period of nonuse, under *Dragon Bleu*'s requirements. Therefore, Hunt cannot show either that Philips has not used "sense and simplicity" for three years following the date of registration issuance (since there is no documented period of nonuse), or that Philips has not used "sense and simplicity" for a shorter period of time, coupled with an intent to not use the "sense and simplicity" tagline in the future.

Hunt has not offered sufficient evidence such that a reasonable jury could find that Philips has abandoned its application for the "sense and simplicity" trademark. For these reasons, Hunt's motion for summary judgment is denied.

### c.   PHILIPS'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY AND DAMAGES

Philips moves for summary judgment on Hunt's trademark infringement liability and damages counterclaims [Docket Entry 189]. The Court will deny Philips's motion on liability, and will grant Philips's motion as to the availability of all requested forms of monetary damages.

i. **T**RADEMARK **I**NFRINGEMENT: **L**IKELIHOOD OF **C**ONFUSION **B**ETWEEN "**SENSE AND SIMPLICITY**" AND "**SIMPLICITY**"

"The Lanham Act defines trademark infringement as use of a mark so similar to that of a prior user as to be 'likely to cause confusion, or to cause mistake, or to deceive.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 711 (3d Cir. 2004) (quoting 15 U.S.C. § 1114(1)). Thus "[t]he law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983). "A claim of trademark infringement is established when the plaintiff proves that: (1) its mark is valid and legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the origin of those goods or services." *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000) (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990)). The parties do not dispute that Hunt owns the valid and legally protectable mark "Simplicity," and thus the Court must consider the likelihood of confusion between the Hunt and Philips marks.

"A likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 211 (3d Cir. 2000) (quoting *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992) (quotation marks omitted)). The relevant inquiry for the court is whether confusion is likely, not whether confusion is merely a possibility. *Id.* at 198.

As discussed above, the Third Circuit has recognized two types of likelihood of confusion claims: direct confusion claims and reverse confusion claims. *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005). In a direct confusion claim, a trademark owner alleges facts where "a junior user of a mark attempts to free-ride on the reputation and goodwill of the senior user by adopting a similar or identical mark." *Id.* at 470 (citing *A & H Sportswear*, 237 F.3d at 228). Therefore, "the consuming public may assume that the established, senior user is the source of the junior user's goods." *Id.* (quoting *Checkpoint Systems, Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 301 (3d Cir. 2001)). Conversely, reverse confusion "occur[s] when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services. Thus, the 'junior' user is junior in time but senior in market dominance or size." *Id.* at 471. Reverse confusion "depends on the overall commercial strength of the junior user's mark." *Fancaster*, 832 F. Supp. 2d at 407 (citing *Commerce Nat'l Ins. Servs.*, 214 F.3d at 444; *A & H Sportswear*, 237 F.3d at 230).

To determine whether there is a likelihood of confusion between two marks, the Third Circuit has adopted a non-exhaustive ten factor test known as the "*Lapp* factors." *Lapp*, 721 F.2d at 463. The *Lapp* test is used for trademarks on both competing and non-competing goods,[5] and in direct and reverse confusion cases. *A & H Sportswear*, 237 F.3d at 212-15; *Freedom Card*, 432 F.3d at 472. Logically, though, "economic reality and common sense require that

---

[5] The Third Circuit has indicated that district courts are not required to use the *Lapp* factors in situations where products are directly competing and the marks are very similar. In this scenario, the district court may consider only the similarity of the marks themselves. *See, e.g.*, *Opticians Ass'n*, 920 F.2d at 195. Furthermore, when goods directly compete, the Court may not need to apply every *Lapp* factor, since the similarity of the marks will be of high importance. *A & H Sportswear*, 237 F.3d at 215.

some of the *Lapp* factors be analyzed differently when reverse [confusion] is at issue." *Freedom*

*Card*, 432 F.3d at 472.

The *Lapp* factors, as applied in a reverse confusion case, are:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;
(2) the strength of the two marks, weighing both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior user's favor;
(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
(4) the length of time the defendant has used the mark without evidence of actual confusion arising;
(5) the intent of the defendant in adopting the mark;
(6) the evidence of actual confusion;
(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
(8) the extent to which the targets of the parties' sales efforts are the same;
(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;
(10) other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market.

*A & H Sportswear*, 237 F.3d at 234.  The *Lapp* factors "are tools to guide a qualitative decision,"

and thus are "not to be mechanically tallied" by the Court or given pre-determined weights in the

Court's analysis.  *Id.* at 215-16, 234.  No one factor is dispositive, and depending on the facts of

a particular case, one or more of the factors may not be probative on the issue of likelihood of

confusion.  *Id.*  The Court must weigh and balance the *Lapp* factors at the summary judgment

stage to determine if a genuine issue of material fact exists as to the likelihood of confusion in a

particular case.  *Checkpoint Sys., Inc. v. Check Point Software Techs.*, 104 F. Supp. 2d 427, 457

(D.N.J. 2000).

The Third Circuit explained that there are several factors that should be analyzed in the

same manner for direct confusion and reverse confusion claims:

26

> First, the attentiveness of consumers does not change ([*Lapp*] factor (3)); in both direct and reverse confusion, the question is whether this is the kind of product that consumers will care enough about to notice the differences, or purchase hastily with only a limited impression. Second, and similarly, the degree to which the channels of trade and advertisement overlap ([*Lapp*] factor (7)) should be analyzed in the same fashion. Finally, *Lapp* factors (8) and (9), considering the similarity of the targets of the parties' sales efforts and the similarity of products, are also analyzed no differently in the reverse confusion context.

*A & H Sportswear*, 237 F.3d at 229 (citations omitted).  *Lapp* factors (2), (4), (5), (6), and (10) may need to be analyzed differently for a reverse confusion claim versus a direct confusion claim, and these differences will be explored where appropriate as the Court examines each factor.  *Id.* at 231-34.

### 1.  Similarity of the Marks (*Lapp* Factor (1))

The "degree of similarity of the marks may be the most important of the ten factors in *Lapp*."  *Fisons*, 30 F.3d at 476.  This factor is not necessarily dispositive of the likelihood of confusion analysis, however.  *Checkpoint*, 104 F. Supp. 2d at 457. "[M]arks need not be identical, only confusingly similar."  *Id.* at 477.  The marks in this case "are confusingly similar if ordinary consumers would likely conclude that ['Simplicity'] and ['sense and simplicity'] share a common source, affiliation, connection or sponsorship."  *Fisons*, 30 F.3d at 476.  The Court's assessment of the similarity of the marks should include a comparison of the "appearance, sound and meaning of the marks."  *Kos Pharms.*, 369 F.3d at 713.  The Third Circuit's "test for such similarity is whether the labels create the same overall impression when viewed separately."  *A & H Sportswear*, 237 F.3d at 216 (quotation omitted).  In particular, the court should examine how the marks are presented to consumers.  *A & H Sportswear*, 167 F. Supp. 2d at 782.  Should the overall impression from the marks be "essentially the same, it is very probable that the marks are confusingly similar."  *Opticians Ass'n*, 920 F.2d at 195.

First, the Court will examine the similarities and differences between "Simplicity" and "sense and simplicity" in terms of sight, sound, and meaning.  Given that Philips's tagline "sense and simplicity" incorporates Hunt's registered mark "Simplicity" in its entirety, it is clear that there is at least some degree of similarity in sight and sound between the marks.  Hunt's mark is typically displayed in ordinary black typeface, with a capitalized first letter, but may also be displayed in blue or white typeface.  (PSMF at ¶ 53; HRSMF at ¶ 53.)  In contrast, Philips's tagline, "sense and simplicity," is typically displayed in lowercase sans serif typeface (Gil Sans MT font), in a distinctive grey and blue color combination.  (PSMF at ¶ 79.)  Based on this evidence, the visual impressions of the marks are at least somewhat distinct.  *See Fancaster*, 832 F. Supp. 2d at 412.

Furthermore, even though both marks include the word "simplicity," Philips's mark includes extra syllables, the use of alliteration, and the word "sense" at the beginning of the mark.  This observation leads the Court to consider which part of Philips's mark, if any, is dominant, and here, the Court finds that Hunt has shown that a genuine issue of material fact exists.  When the dominant parts of the marks at issue are the same, and when the overall impression created by the marks is essentially the same, "it is very probable that the marks are confusingly similar."  *Opticians Ass'n*, 920 F.2d at 195.  The parties dispute importance of the word "sense" to the overall commercial impression of Philips's tagline.  Philips argues that "simplicity" is a common word, and that Philips's tagline is intended to evoke a comparison to the literary and film title "Sense and Sensibility."  (Moving Br. at 18; PSMF at ¶ 91; HRSMF at ¶ 91.)  But "sense" is a common word as well, particularly how Philips uses it in its tagline—to indicate that Philips's products "make sense" for consumers.  *See Hunt Control Sys. Inc. v. Koninkijke Philips. Elec. N.V.*, 98 U.S.P.Q. 1558 (TTAB 2011).  Philips also offers evidence that

28

consumers remembered Philips's tagline as "sense and [something else]," when they were able to recall the tagline at all.  (PSMF at ¶ 90.)  If, in fact, the word "sense" was a distinctive term, the fact that it appears first in the tagline may serve to distinguish Philips's mark from Hunt.  There is sufficient evidence on this record, though, for a reasonable trier of fact to conclude that the dominant part of "sense and simplicity" is, in fact, the word "simplicity," given that a major focus of Philips's advertising is to show how simple its goods are to use.

This Court "has consistently refused to allow a plaintiff to focus on an abbreviated mark when analyzing confusing similarity."  *Genovese Drug Stores, Inc. v. TGC Stores, Inc.*, 939 F. Supp. 340, 346 (D.N.J. 1996).  That being said, Hunt offers evidence that Philips used the term "simplicity" as the only tagline on a variety of occasions as a part of its marketing operations. (HSSF at ¶ 171; PRHSSF at ¶ 171.)  Philips disputes some of those alleged uses, and asserts that its other uses of "simplicity" were "isolated" or part of a descriptive fair use of the term to describe Philips products.  (PSMF at ¶¶ 94-114.)  Furthermore, Philips asserts that many other companies use the term "Simplicity" in their advertising, including several lighting companies who have incorporated "Simplicity" into their trademarks or taglines. (*Id.*)   Due to record evidence of Philips's use of Hunt's exact trademark in its advertising, Hunt has raised another genuine issue of material fact for a trier of fact to consider.

As both parties have used housemarks alongside their trademarks, the Court must also examine the effects of these housemarks on a consumer's impressions of similarity between the marks.  "Conflicting marks must be compared in their entirety, including any housemark which either party appends to its mark."  *A & H Sportswear*, 167 F. Supp. 2d 770, 780 (citing 4 *McCarthy on Trademarks* §23:43). A party's use of a housemark in connection with its mark may affect the general commercial impression of the mark.  *See A & H Sportswear*, 237 F.3d at

229-30.  In a direct confusion case, the presence of a well-known housemark alongside a trademark may diminish the likelihood of confusion.  *Id.* at 218.  Housemarks are treated differently in the reverse confusion context, however.  Although the Third Circuit noted that "not only is there the possibility that consumers will fail to remember the mark when encountering [the senior user's product], but there is also the possibility that the mark will *aggravate*, rather than mitigate, reverse confusion by reinforcing the association" of the mark, or part of the mark, with the junior user, it refused to adopt a *per se* rule that housemarks are aggravating factors in reverse confusion cases.  *Id.* at 230.

Philips asserts that both parties made "systematic and prominent use" of their housemarks in conjunction with their trademarks. (Moving Br. at 17.)  Philips in particular offers evidence to show that it always used the "Philips" housemark with its tagline, and argues that since the Philips housemark dominated its tagline, that no confusion could have resulted.  (PSMF ¶¶ 78, 80.)  Philips cites to *Fancaster*, among other cases, for the proposition that reverse confusion may not exist where a mark is used merely as a tagline alongside a dominant house mark.  *See Fancaster*, 832 F. Supp. 2d at 412.  Whether Philips's housemark actually dominated its tagline should be considered by a trier of fact, given that there is no record evidence establishing that this claim is undisputed.  Furthermore, the presence of the Philips housemark in advertising is not necessarily the remedy for confusion that Philips describes it as, given that Hunt alleges reverse confusion in this case.  In fact, the Philips housemark may have aggravated reverse confusion by reinforcing a link between Philips and the word "simplicity."  *See A & H Sportswear*, 237 F.3d at 230.  For these reasons, Hunt has raised a genuine issue of material fact as to how the housemarks affect how a consumer would perceive the similarity of the marks.

In April 2011, the TTAB sustained Hunt's opposition of Philips's application to register

"sense and simplicity" for various lighting goods. *Hunt Control Sys. Inc. v. Koninkijke Philips. Elec. N.V.*, 98 U.S.P.Q. 1558 (TTAB 2011). This decision is not binding on this Court (and in fact the appeal of the TTAB's decision on Philips's application is what brought this matter before this Court in the first place). *A & H Sportswear*, 237 F.3d at 221. Furthermore, "although an initial PTO determination by an examining attorney may be considered, it need not be given weight when the PTO attorney did not review all the evidence available to the District Court." *Id.* The parties have augmented the record available to the TTAB with numerous submissions before this Court. Therefore, the Court will rely on its own analysis of the marks to make its likelihood of confusion analysis for the purposes of summary judgment.

Hunt has provided sufficient evidence such that a reasonable trier of fact could find that the overall commercial impression of the marks are confusingly similar. Hunt points to Philips's independent uses of the word simplicity in its marketing, and although Philips disputes the importance of these uses, they are still on the record before this Court. Furthermore, should "simplicity" be the dominant portion of Philips's tagline, consumers are more likely to remember it, given that the marks will not be viewed side by side. Furthermore, the presence of the Philips housemark with the "sense and simplicity" tagline could actually aggravate reverse confusion, by promoting the perception that "simplicity" is associated with Philips. For these reasons, the Court finds that a genuine issue of material fact exists on the similarity of the marks.

### 2.  Strength of the Marks (*Lapp* Factor (2))

The second *Lapp* factor directs the Court to evaluate a mark's strength by assessing "(1) the [plaintiff's] mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) its commercial strength (factual evidence of marketplace recognition)." *Freedom Card*, 432 F.3d at 472. The Lanham Act provides greater protection to stronger marks, given that

31

stronger marks will likely have greater consumer recognition. *A & H Sportswear*, 237 F.3d at 222 (citing *Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 203 (3d Cir. 1995), *cert. denied*, 516 U.S. 808 (1995)). "'Strong' marks are given "strong" protection—protection over a wide range of related products and services and variations on visual and aural format. . . . Conversely, relatively weak marks are given a relatively narrow range of protection both as to products and format variations." 2 *McCarthy on Trademarks* § 11:73. Furthermore, the presence of a commercially strong junior mark, along with a conceptually strong senior mark, favor the senior user on this factor. *A & H Sportswear*, 237 F.3d at 234. The Court will examine each facet of a mark's strength in turn.

### a. Distinctiveness/Conceptual Strength

Courts often use a four-part spectrum to classify trademark distinctiveness: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic. *A & H Sportswear*, 237 F.3d at 221 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). Arbitrary or fanciful marks "use terms that neither describe nor suggest anything about the product; they bear no logical or suggestive relation to the actual characteristics of the goods." *Id.* (quotation and citation omitted). A consumer must use "imagination, thought, or perception" to determine what a product bearing a suggestive mark may be. *Id.* at 221-22 (quoting *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986)). A descriptive mark gives the consumer an idea of the product's ingredients, qualities, or features. *Id.* at 222 (citation omitted). Generic marks are marks that operate "as the common descriptive name of a product class." *Id.* (citation omitted). To qualify for protection under the Lanham Act, a mark must be arbitrary, fanciful, suggestive, or descriptive with secondary meaning—generic marks receive no protection, and in fact may not be registered as trademarks. *Id.* (citation omitted).

"Although the conceptual strength of a mark is often associated with the particular category of 'distinctiveness' into which a mark falls (i.e., arbitrary, suggestive, or descriptive), that is not the only measure of conceptual strength." *Id.* Arbitrary or suggestive marks may in fact be "weak" marks, especially when used on a range of different products or by a large number of competitors. *Id.* Thus, the distinctiveness classification spectrum described above may be useful in determining a mark's conceptual strength in some situations, but is certainly not dispositive. *See id.* A mark's conceptual strength should be analyzed in the same manner for direct and reverse confusion cases, with conceptually strong marks weighing in favor of the trademark holder. *Id.* at 232.

Hunt has offered evidence such that a reasonable trier of fact could find that the "Simplicity" mark is suggestive, at best. A consumer must use "imagination, thought, or perception" to determine what a product bearing a suggestive mark may be. *Id.* at 221-22 (quoting *A.J. Canfield*, 808 F.2d at 297). "Simplicity" is not literally descriptive of Hunt's products, but it does describe a quality Hunt seeks to associate with its products. In addition, Hunt's registration of "Simplicity" with the PTO indicates that the mark is not descriptive without secondary meaning or generic, given that registration is reserved for distinctive marks. *See A & H Sportswear*, 167 F. Supp. 2d at 790. Furthermore, registration serves as *prima facie* evidence of the validity of a mark, meaning that Hunt "is entitled to a strong prima facie presumption that its registered mark is either not merely descriptive or if descriptive, that secondary meaning is presumed, which amounts to the same thing." 15 U.S.C. § 1115(a); 2 *McCarthy on Trademarks* § 11:43. On the balance, Hunt's mark is likely suggestive. But this determination does not end the Court's examination of the mark, given that a mark's weakness may be measured in other ways.

Philips asserts that Hunt's mark "Simplicity" is conceptually weak, because Hunt promotes its "Simplicity" products in a descriptive fashion: Hunt's products offer "simplicity" and are simple to understand.  (PSMF at ¶ 26.)  Furthermore, Philips highlights significant third-party usage of the mark "Simplicity" by other companies, both in and beyond the lighting industry.  (PSMF at ¶¶ 94-114.)  In particular, Philips points to evidence showing that lighting companies EiKo, Cooper, Legrand, and Traxon distributed over 300,000 items containing the mark "Simplicity" through print or the Internet.  (PSMF at ¶¶ 95-96, 98-99, 103-04, 106-07.)  Furthermore, there is no documentation of confusion from any of these third-party uses of "simplicity."  (*Id.*)  "[A]s a general rule, widespread use of even a distinctive mark may weaken the mark." *Citizens Fin. Grp.*, 383 F.3d at 123 (citing *Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93-94 (4th Cir. 1997).

Hunt has offered sufficient evidence such that a reasonable trier of fact could use to conclude that its mark is distinctive.  Philips offers compelling evidence to show that the "Simplicity" mark has been weakened by extensive third-party use, but, as noted above, even weak marks may be entitled to some protection under the trademark laws.

### b.  Commercial Strength

In a reverse confusion case, "the lack of commercial strength of the smaller senior user's mark is to be given less weight in the [*Lapp*] analysis because it is the strength of the larger, junior user's mark which results in reverse confusion." *A & H Sportswear*, 237 F.3d at 231 (citing *Commerce Nat'l Ins. Servs.*, 214 F.3d at 444).  Thus, "a court should analyze the 'commercial strength' factor in terms of (1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark." *Id.* (citing

34

*Fisons*, 30 F.3d at 474, 479).

The parties do not dispute that there is a significant disparity in the relative economic power of the parties:  Philips is a multinational corporation employing approximately 47,000 people in its lighting business, and Hunt is a small business.  (Elsten 6/22/15 Expert Report at 3-6.)  Philips argues that its larger size is not dispositive on this factor, as in this case, larger size may not necessarily overcome the conceptual weakness of Hunt's "Simplicity" mark.  Philips offers evidence that Hunt has declared itself a leader in the lighting industry and has been participating in the lighting market for a long period of time through an established set of distributors and dealers, thus ensuring Hunt's industry-wide reputation.  (PSMF at ¶¶ 20-22.)  Furthermore, Hunt's CEO Glaser is the current president of the Lighting Controls Association, and has held that position in the past.  (PSMF at ¶ 24.)

The Court will next examine the advertising campaigns of the parties.  Philips began its "Simplicity Brand Campaign" in 2004, and spent millions on advertising the "sense and simplicity" tagline in the United States between 2004 and 2007.  (PSMF ¶¶ 88-89.)  From 2004 to 2007, Philips spent $25.9 million on advertising related to the tagline at issue.  (Elsten 6/22/15 Report at 30.)  Philips has stated that it has spent over $100 million on advertising related to the "sense and simplicity" tagline to 2009.  (Testimonial Decl. of Terry Fassburg; Elsten 6/22/15 Report at 30.)  In comparison, between 2003 and 2013, Hunt spent about $1.68 million on advertising. (Elsten 6/22/15 Report at Ex. 9.2.)

Although Philips clearly spent more money on advertising than Hunt, it asserts that its campaign did not successfully saturate the market.  In market research conducted by Philips in 2005 and 2006, only about three percent of respondents who had seen Philips' advertising spontaneously associated "simplicity" with Philips.  (PSMF ¶ 90.)  Furthermore, in November

2006, only about 1 percent of respondents claiming to be familiar with Philips could, without aid, correctly recall the full Philips tagline "sense and simplicity," and only two percent of respondents gave a partially correct tagline.  (*Id.*)

Hunt asserts other findings from Philips's marketing survey in support of its position that Philips did, in fact, saturate the market with its advertising.  For example, when aided, 37% of respondents "very familiar" with Philips associated the brand statement "This brand stands for simplicity" with Philips.  (*Id.*)  Furthermore, 32% of core target customers remembered the Philips brand promise "sense and simplicity," when aided.  (*Id.*)

Whether Philips succeeded in saturating the market is a clear factual issue, and Hunt has put sufficient evidence on the record such that a trier of fact could find in favor of Hunt.

### c.   Conclusion

This *Lapp* factor favors the senior user in the situation where a commercially strong junior user adopts a conceptually strong mark.  Philips may have significantly more commercial strength than Hunt, although Philips's level of market saturation with its tagline is disputed by the parties. The evidence offered by Hunt indicates that its mark is suggestive at best, and that it is not a particularly strong mark, given the significant third-party usage—even in the lighting industry.  That being said, Hunt has offered evidence sufficient such that a reasonable trier of fact could find in favor of Hunt on this factor.

### 3.   Price of Goods, Sophistication of Purchasers, and Attention Expected of Reasonable Customers (*Lapp* Factor (3))

On this factor, a trier of fact must determine whether consumers will care enough about the products at issue to distinguish between them, or if the products are purchased when consumers have a limited impression of them.  *Fisons*, 30 F.3d at 476 n.12. "As common sense

dictates, the law provides that confusion is unlikely if the products or services at issue are complex and expensive, the purchasers highly sophisticated, and the purchase process one that is lengthy and requires close attention and analysis by the purchasers." *Checkpoint*, 104 F. Supp. 2d at 460 (citations omitted).

Philips offers evidence to show that the purchasers of the competing products are sophisticated and give careful attention to the purchase of lighting products. Philips notes the process of selecting lighting controls may be lengthy and complex. (PSMF at ¶ 40.) In addition, Philips asserts that electrical contractors are sophisticated purchasers, given that contractors must have strong knowledge about electrical products and suppliers to effectively bid for projects. (PSMF ¶¶ 39-40; *see GB Elec. Inc. v. Thomas & Betts Corp.*, No. 95C0426, 1995 WL 795660, at *6 (E.D. Wis. July 28, 1995)). Glaser has discussed the complexities of even basic dimming systems in an article entitled "*Dimming Protocols Explained.*" (PSMF ¶¶ 44, 49.) Part of the complexity of dimming systems is that wallbox dimmers must be matched to appropriate components, for the systems to operate properly and to avoid damage to the dimmer. (PSMF ¶ 48.) Philips also notes that Hunt wallbox dimmers are not sold at retail, start at a $100 price point, and may not be returned. (PSMF at ¶¶ 33-34, 46.) Finally, Philips cites to testimony from a former Hunt employee indicating that Hunt's policy was to steer individual consumers away from Hunt products, since Hunt mostly sold commercial dimmers. (PSMF at ¶ 47.)

Hunt asserts that its wallbox dimmers priced at $100 are "relatively inexpensive wallbox dimmers," and thus that Philips's factual premise that Hunt's products are very expensive is flawed. (Opp. Br. at 18.) In support of its argument, Hunt offers the expert report of James V. Cody, who has significant experience in the lighting industry [Docket Entry 199-19]. Cody explains how the sophistication of the consumers in the lighting industry actually favors Hunt,

given that experienced consumers in lighting oftentimes know that invisible vertical relationships exist between larger and smaller suppliers.  (HSSF at ¶ 166.)  Hunt supports Cody's conclusions by pointing out that Philips has engaged in this sort of vertical relationship with several smaller businesses, such as Genlyte, where Philips phased in its trademarks slowly, over a period of years.  (PSMF ¶¶ 16-19.)

Hunt does not cite to the record to support its assertion that its $100 wallbox dimmers are "relatively inexpensive," and the other evidence on the record leads the Court to the conclusion that purchasers of these products are sophisticated.  The effects of the sophistication of consumers, however, are disputed.  Hunt raises a genuine issue of material fact as to what the effects of vertical relationships between lighting manufacturers would be on the likelihood of confusion in this case.

### 4.  Actual Confusion and Length of Time without Actual Confusion (*Lapp* Factors (4), (6))

*Lapp* factors (4) and (6) require the Court to determine the length of time, if any, the mark has been used without actual confusion, and whether the party claiming trademark infringement can provide evidence that consumers are actually confused by the marks at issue.  These factors are necessarily interrelated, and the Court will examine them together.

Any evidence of actual confusion between the parties is significant to this analysis and is highly probative of likelihood of confusion, but such evidence is neither necessary nor determinative to find likelihood of confusion, given the potential difficulties of collecting evidence of actual confusion.  *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 187 (3d Cir. 2010); *Checkpoint*, 104 F. Supp. 2d at 460-61; *Versa*, 50 F.3d at 205; *see also Fisons*, 30 F.3d at 476.  The "most relevant evidence of actual confusion is the testimony of a reasonably

prudent purchaser who was in fact confused by defendant's trademark." *Checkpoint*, 104 F.
Supp. 2d at 464 (internal quotations omitted).  Courts should view actual confusion evidence
collected by a party's employees with skepticism, because of the tendency for such evidence to
be self-serving or biased, and because of the inability to cross-examine the allegedly confused
consumers. *Citizens Fin. Grp.*, 383 F.3d at 122 (citing *Checkpoint*, 269 F.3d at 298; *A & H
Sportswear*, 237 F.3d at 227).

Philips asserts that no actual confusion has occurred over the past nine years, either from
2004 to 2007 when Hunt used "Simplicity" for its dimming panels, or after 2007 when Hunt
began using "Simplicity" on its wallbox dimmers as well.  (PSMF ¶¶ 114, 117, 127.)  Philips
points to a lack of evidence that any person who purchased a Hunt product believed (1) that
Philips either owned or now owns Hunt, (2) that the companies are related in any way, or (3) that
Hunt needed to license or otherwise obtain permission from Philips to use the term "Simplicity."
(PSMF ¶ 129.)

Furthermore, Philips also asserts that Hunt's failure to conduct a likelihood of confusion
survey, when it had the financial means to do so, may lead to the inference that the results of
such a survey would be unfavorable to Hunt, as the trademark holder.  (Moving Br. at 15.)
Philips argues that Hunt had the means to run a survey, since it retained three experts in this
litigation and conducted eight depositions.  (PSMF ¶¶ 130, 148.)

Hunt counters by offering a "business survey" conducted and designed by Glaser, that
purportedly demonstrates a qualitative likelihood of confusion [Docket Entries 199 Exs. G-H].
This survey consists of a questionnaire of 30 head of household consumers over the age of 18.
The survey asked consumers to compare pictures of products labeled with the respective marks
at issue in this action, side by side, and to determine the origin of the marks.  (Docket Entry 199

Ex. G.)  There are numerous problems with this survey that affect its admissibility and relevance

to this litigation.  From the evidence Hunt has presented with respect to this survey, the Court

cannot determine if Hunt even polled its actual or potential customers.  Furthermore, Glaser does

not claim to be an expert in designing consumer trademark surveys, or indeed to have any

experience in the design of surveys.  There is no indication that this survey accounted for

marketplace conditions, or that it surveyed consumers looking to buy relevant lighting products.

For these reasons, Glaser's "business survey" is inadmissible, and Hunt has offered no other

evidence to negate the adverse inference from Hunt's failure to present survey results on the

likelihood of confusion.

Hunt also attacks the surveys offered by Philips; many of these objections are addressed

in the sections above.  Hunt offers the expert report of Dr. Michael Rappeport, which critiques

the reports of Barone and Simonson [Docket Entry 199 Ex. DDD].  In its analysis section, the

Rappeport report does not cite to authorities that are typically relied upon by survey experts.

Furthermore, Rappeport's criticism of the Barone and Simonson reports would have been aided,

perhaps significantly, by a demonstration that Rappeport's suggested methodology would have

given different results on the issue of likelihood of reverse confusion.  *See, e.g.*, *Whirlpool*

*Props., Inc. v. LG Elecs. U.S.A., Inc.*, No. 1:03-cv-414, 2006 WL 62846, at *3 (W.D. Mich. Jan.

10, 2006).  As discussed in detail in this Court's review of Hunt's *Daubert* motions, the weight

that should be given to the Barone and Simonson surveys will be addressed at trial.  The

statements in the Rappeport report do not change the Court's conclusions on the admissibility of

the Barone and Simonson reports.

Most importantly, Hunt disputes Philips's assertions that no actual confusion has

occurred, and offers evidence of consumers experiencing actual confusion.  Hunt focuses on two

alleged instances of actual confusion: (1) conversations held between Glaser and individuals visiting Hunt's booth at Lightfair in 2007; and (2) an online post at a FixYa.com forum devoted to Philips dimmers, where a Hunt dimmer consumer asked for help.

Hunt asserts that Glaser encountered an unidentified regional sales manager from Leviton, a competing lighting company, at his marketing booth at the 2007 Lightfair marketing event held in New York City. (HRSMF at ¶¶ 123-26.) During this encounter, the Leviton representative teased Glaser about Philips's tagline, noting the similarity between "sense and simplicity" and Hunt's trademark. (HRSMF at ¶ 123.) Glaser acknowledges that, if the Leviton representative actually had any misconceptions about the relationship between Hunt and Philips at that time, Glaser was able to dispel confusion. (HRSMF at ¶¶ 118-26.) Hunt offers no corroboration of this event, and cannot even offer the name of the Leviton representative as evidence.

Hunt also points to documented evidence of at least one Hunt dimmer customer who requested help for a product on a FixYa.com forum devoted to Philips dimmers. (HRSMF at ¶ 127.) Philips notes that the FixYa.com post that Hunt points to as evidencing confusion does not mention "sense and simplicity" or "Simplicity." (PSMF at ¶ 127.)

Hunt has presented evidence of instances of actual confusion on the record, however weak or uncorroborated. Despite Philips's objections that Hunt failed to conduct an admissible likelihood of confusion survey, the weight that should be given to the actual confusion evidence offered by Hunt should be determined by a trier of fact. The Court notes, though, that it is not overwhelmed by the strength of the evidence on actual confusion brought by Hunt in this case, given the uncorroborated nature of the Lightfair evidence, as well as the scant facts presented surrounding the FixYa.com forum post.

41

### 5. Intent of Philips in Adopting "sense and simplicity" as a Tagline (*Lapp* Factor (5))

For forward confusion cases, the *Lapp* analysis includes an assessment of "whether the defendant adopted a mark with the intent of promoting confusion and appropriating the prior user's good will." *Fisons*, 30 F.3d at 479. "When reverse, rather than direct, confusion is alleged, 'intent to confuse' is unlikely to be present. However, though perhaps unusual, should an intent to confuse exist, it would be relevant to the likelihood of confusion analysis in the same manner as it would for a direct confusion claim." *A & H Sportswear*, 237 F.3d at 232 (internal citation omitted). In a reverse confusion case, the trier of fact typically assesses whether the junior user "deliberate[ly] inten[ded] to push the senior user out of the market." *Freedom Card*, 432 F.3d at 479. "[M]ere carelessness, as opposed to deliberate intent to confuse . . . does not shed any light" on whether confusion is likely in a reverse confusion case. *A & H Sportswear*, 237 F.3d at 232-33. Furthermore, "mere knowledge of the existence of a competitor's mark is insufficient to prove bad faith." *Fancaster*, 832 F. Supp. 2d at 418 (quotation and citation omitted). The Court need not find that Philips has intentionally infringed Hunt's mark to find overall likelihood of confusion, however. *Checkpoint*, 104 F. Supp. 2d at 465 (citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986)).

Philips argues that there is no evidence on the record that Philips attempted to drive Hunt out of the lighting market. Furthermore, Philips asserts that Hunt has not presented evidence to show that anyone at Philips who was involved in the selection or approval for the "sense and simplicity" tagline knew about Hunt or its use of "Simplicity" as a trademark. In fact, Philips has cooperated with Hunt to ensure that Hunt's dimmers are compatible with Philips LED driver and ballast products. (PSMF at ¶¶ 69-70.) Philips Advance also lists Hunt Dimming dimmers in

its compatibility guide, which lighting professionals use to select dimming controls that are compatible with Philips Advance ballasts and dimmers.  (PSMF at ¶ 70.)  Philips also gave Hunt permission to refer to Philips's registered trademarks when promoting products compatible with Philips Advance products. (PSMF at ¶ 70.)

Hunt conversely argues that Philips acted in bad faith in its adoption of the "sense and simplicity" tagline, for a variety of reasons.  Hunt asserts that Philips incontrovertibly knew of Hunt's role in the lighting industry prior to 2004, when Philips adopted the "sense and simplicity" tagline.  (HRSMF at ¶ 73.)  Also, Glaser asked Philips to stop using the term simplicity before Hunt filed its TTAB opposition, yet Philips continued to use the "sense and simplicity" tagline for several years.[6]  (HSSF ¶ 170.)  Furthermore, Hunt offers evidence to show that, despite the fact that the TTAB sustained Hunt's objections to the extension of registration for Philips's "sense and simplicity" tagline as to certain products, Philips continued to use the tagline on lighting goods, including goods identical in use to Hunt's goods, for years.  (HSSF ¶¶ 3, 164.)

The parties clearly dispute whether Philips intended to push Hunt out of the lighting goods market through its use of "sense and simplicity."  Philips's evidence of actual collaboration with Hunt to ensure compatibility of goods is compelling on this issue.  In addition, Hunt offers no evidence that the Philips personnel who developed, selected, and cleared the "sense and simplicity" tagline knew about Hunt or Hunt's "Simplicity" trademark, nor that Philips chose the tagline with Hunt in mind.  Although Hunt allegedly used its "simplicity" trademark as early as 1991, it did not attempt to register the trademark until 2004.  (PSMF ¶¶ 50-

---

[6] The parties dispute whether this evidence, along with other evidence from conversations between Glaser and Philips prior to the filing of this lawsuit, are admissible.

52.)  Even if Philips had known about Hunt's trademark, however, this fact on its own would be insufficient to establish that Philips acted in bad faith.  *See Fancaster*, 832 F. Supp. 2d at 418. Furthermore, Philips's continued use of "sense and simplicity" after Hunt's demand, and even after the TTAB's decision may not necessarily be indicative of bad faith, given that "[i]nfringement is not willful if the defendant might have reasonably thought that its proposed usage was not barred by the statute."  *SecuraComm Consulting, Inc. v. Securacom Inc.*, 166 F.3d 182, 188 (3d Cir. 1999) (quotation omitted); *see also id*. at 189 ("A defendant's refusal to cease using a mark upon demand is not necessarily indicative of bad faith." (citation omitted)).  Given the widespread third-party usage of "simplicity" in trademarks on lighting goods, Philips has shown that it did not act in bad faith in adopting its tagline.  Philips's actions in general do not rise to the level of "purposeful manipulation of the junior mark to resemble the senior" mark.  *A & H Sportswear*, 237 F.3d at 225-26.  On this factor, Hunt has not presented sufficient evidence such that a reasonable trier of fact could find that Philips has acted in bad faith.

> **6.  Marketing Channels, Sales Efforts and Targeting of Consumers, Relationship of Services in the Minds of Consumers, and Other Relevant Factors (*Lapp* Factors (7)-(10))**

Finally, the Court will consider *Lapp* factors (7), (8), (9), and (10) together, as the factual disputes are related in this case since at least some of the goods produced by Philips and Hunt compete.  The seventh *Lapp* factor considers whether Philips and Hunt sell their products through overlapping or the same channels of trade.  The eighth *Lapp* factor considers whether the parties target the same consumers with their sales efforts, given that "when parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion."  *Checkpoint*, 269 F.3d at 289.  For the ninth *Lapp* factor, the Court must determine whether the products

offered under the "Simplicity" and "sense and simplicity" marks are "similar enough that a consumer could assume they were offered by the same source." *Kos Pharms.*, 369 F.3d at 723 (quotation and citation omitted).  Finally, *Lapp* factor (10) "is necessarily transformed in the reverse confusion context to an examination of other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market."  *A & H Sportswear*, 237 F.3d at 234. These categories are important to the likelihood of confusion analysis in this case, because likelihood of confusion must be determined with respect to the actual marketplace conditions, based on the respective marks and how they are used on the relevant goods and services that consumers encounter.  *See, e.g.*, *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1569 (Fed. Cir. 1983). The Third Circuit noted that *Lapp* factors seven, nine and ten are not apposite for determining whether a likelihood of confusion exists in actions between direct competitors because "[b]y definition, the goods are competing, their function is the same, and the senior and junior user are already in each other's markets."  *A & H Sportswear*, 237 F.3d at 212.

Hunt acknowledges that it directly competes with Philips in the lighting market, although Philips sells far more types of lighting goods than Hunt does.  Philips and its subsidiaries sell lamps, ballasts, and LED drivers and modules, among other products.   (PSMF at ¶¶ 2, 4, 11-12.) Philips does sell dimming controls, but these sales account for less than 1 percent of Philips's U.S. lighting sales and go through professional channels.  (PSMF, at ¶¶ 14-15, 45.)  Hunt manufactures architectural dimming systems and other types of lighting controls, among other products.  (HRSMF at ¶¶ 20-22, 30.)  Hunt sells products through electrical distributors and sales representatives primarily to commercial users.  (HRSMF at ¶¶ 36-37, 45-47.)  As to *Lapp* factor

45

(8), Hunt asserts that the marketing targets of the parties are virtually identical, and that the parties target many of the same consumers [Docket Entry 199-19]. Philips does not dispute this evidence. Based on these facts, Philips asserts that *Lapp* factors (7), (9), and (10) are neutral and not consequential to the likelihood of confusion analysis in this case, given that these factors are generally not apposite for direct competitors. (Moving Br. at 26.) This Court will follow the reasoning of the Third Circuit in concluding that these factors are apposite to the extent that the parties are direct competitors.

In its discussion of *Lapp* factor (10), Hunt raises three additional facts for the Court to consider: that the TTAB sustained Hunt's opposition in April 2011; that Philips did not stop using its tagline until after Hunt countersued; and that all TTAB evidence is admissible and part of this proceeding, pursuant to 15 U.S.C. § 1071(b). The Court has already addressed the issues raised by these facts in this Opinion. The Court has examined the TTAB ruling, but is not bound by it, and has examined all relevant evidence offered by the parties. Furthermore, the issue of when Philips stopped using its tagline speaks to whether Philips acted in bad faith, and the Court has already considered this argument in the discussion for *Lapp* factor (5).

These factors are not outcome determinative, to the extent that the parties compete in the lighting market. To the extent the parties do not compete, Hunt has put evidence on the record sufficient for a reasonable trier of fact to find in favor of Hunt on these factors.

### 7. Conclusion

As reviewed above, Hunt has demonstrated that numerous genuine issues of material fact exist for a trier of fact to examine: the similarity of the marks (*Lapp* factor (1)); the strength of the marks (*Lapp* factor (2)); how the sophistication of the consumers affects consumer care in selecting products (*Lapp* factor (3)); whether actual confusion has, in fact, occurred (*Lapp*

factors (4) and (6)); and issues related to the overlap in the parties' businesses (*Lapp* factors (7)-(10)).  Given that Hunt has only failed to demonstrate that a reasonable trier of fact could find that Philips acted in bad faith in its adoption and use of its tagline (*Lapp* factor (5)), it would be inappropriate to grant Philips's summary judgment motion.  Therefore, the Court will deny Philips's motion for summary judgment on the issue of trademark liability.

### ii. AVAILABILITY OF MONETARY RELIEF AS A REMEDY

The Lanham Act provides for two trademark infringement remedies: injunctive relief and monetary damages.  15 U.S.C. §§ 1116(a), 1117(a).  A trademark owner who demonstrates likelihood of confusion is entitled to injunctive relief.  *Lapp*, 721 F.2d at 462 (citing 15 U.S.C. § 1114(1)).  Most commonly, courts apply injunctive relief pursuant to section 34 of the Lanham Act, which states that "courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office."  15 U.S.C. § 1116(a); *see also A & H Sportswear*, 166 F.3d at 207-08.  The parties do not dispute that, if liability is found on the likelihood of confusion issue, injunctive relief may be appropriate.  (*See* Moving Br. at 30; Opp. Br. at 26-27; Reply at 10.)

The Lanham Act also provides that in certain cases, monetary damages may be appropriate:

> When a violation of any right of the registrant of a mark . . . shall have been established . . . the plaintiff shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such

> amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just. . . . Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a).  Courts only award monetary damages in trademark cases "in light of equitable considerations," and litigants must not be permitted to make excessive demands for profits. *A & H Sportswear*, 167 F. Supp. 2d at 801.  When an injunction on future use of an infringing trademark satisfies the equities of a case, courts should deny the award of profits.  *Id.*

### 1.  HUNT'S LOST SALES AND LOST PROFITS

Hunt asserts that it is entitled to compensation for its lost sales and profits, as a result of Philips's infringement of the "Simplicity" trademark.  As noted above, a trademark owner may be entitled to the damages it sustained from infringing activities.  15 U.S.C. § 1117(a).  But a party that fails to provide "at least some evidence of harm arising from defendant's violation" may not receive an award of profits or damages.  *Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 274 (3d Cir. 1975).

On this issue, Philips offers the declaration and expert report of Laura Stamm [Docket Entry 190-3].  Stamm found no causal link between the decline in overall sales Hunt experienced after 2007 and Hunt's alleged lost sales based on Philips's use of "sense and simplicity." (Stamm 6/22/15 Report, at ¶ 9).

As Hunt's damages expert Cate Elsten did not review lost sales or profits in her report [Docket Entry 199-48], Hunt's only evidentiary support for its lost sales and lost gross margin claims is the testimony and declaration of Glaser [Docket Entry 199-22].   Hunt does not offer Glaser as an expert witness, but instead argues that Glaser should be permitted to give lay

testimony on the issue of lost sales under Federal Rule of Evidence 701, because Glaser "knows

his privately-held business the best."  (Opp. Br. at 28-29).   Philips objects to Glaser's

declaration and testimony, because Glaser did not identify any specific examples where Hunt

allegedly lost sales or customers to Philips.  Furthermore, Philips challenges Glaser's testimony

as speculative, and devoid of economic analysis or evidence.[7]

> Lay testimony under Federal Rule of Evidence 701 is governed as follows:

> > If the witness is not testifying as an expert, the witness' testimony in the form
> > of opinions or inferences is limited to those opinions or inferences which are
> > (a) rationally based on the perception of the witness and (b) helpful to a clear
> > understanding of the witness' testimony or the determination of a fact in issue.

"The modern trend favors the admission of [lay] opinion testimony, provided that it is well

founded on personal knowledge and susceptible to specific cross-examination." *Teen-Ed, Inc. v.*

*Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980).  A witness offering lay opinion testimony

may rely on documents prepared by others in certain situations, so long as the witness's

testimony is based on his personal knowledge. *Lightning Lube Inc. v. Witco Corp.*, 4 F.3d 1153,

1175 (3d Cir. 1993).

> Where a lay opinion is based on at least some valid assumptions, it may be helpful to the

jury. *Id.*  But "[a]n opinion based on false assumptions is unhelpful in aiding the jury in its

search for the truth, and is likely to mislead and confuse." *Id.* (citation omitted).  For these

reasons, "Rule 701 requires that a lay opinion witness have a reasonable basis grounded either in

*experience or specialized knowledge* for arriving at the opinion that he or she expresses . . . for

lay opinion as to technical matters such as product defect or causation to be admissible, it must

---

[7] Philips also notes that Glaser initially answered "I don't know" at his Rule 30(b)(6) deposition when asked why
Hunt's sales had declined.  (Glaser 11/12/13 Dep. at 259:18-260:19.)  Later, Glaser blamed Philips for his lost sales.
(*Id.* at 309:8-313:8.)

derive from a sufficiently qualified source as to be reliable and hence helpful to the jury."

*Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201 (3d Cir. 1995) (emphasis in

original). The Third Circuit instructs trial courts to "rigorously examine the reliability of the lay

opinion by ensuring that the witness possesses sufficient special knowledge or experience which

is germane to the lay opinion offered." *Id.*

Although expert testimony under Federal Rule of Evidence 702 requires a "greater level

of scrutiny" than lay opinion evidence, the trial judge should undertake some "judicial

gatekeeping" for lay opinion testimony on technical issues. *Id.* at 1202. "Allowing a witness,

with first-hand knowledge, to offer a technical opinion which he lacks the necessary knowledge

and experience to make, runs afoul of the requirements of Rule 701," and a trial court may

exclude evidence otherwise admissible under Federal Rule of Evidence 401, should the witness's

knowledge and basis for the opinion be insufficient. *Id.* Therefore, the screening of a lay

opinion witness's qualifications should proceed as follows:

> The judicial Rule 701 screening that we speak of for cases such as this one is not
> very different from the screening that attends the ordinary expert qualification
> ruling. In determining whether a lay witness has sufficient special knowledge or
> experience to ensure that the lay opinion is rationally derived from the witness's
> observation and helpful to the jury, the trial court should focus on the substance of
> the witness's background and its germaneness to the issue at hand. Though
> particular educational training is of course not necessary, the court should require
> the proponent of the testimony to show some connection between the special
> knowledge or experience of the witness, however acquired, and the witness's
> opinion regarding the disputed factual issues in the case.

*Id.* at 1202 (citation omitted). The question of "[w]hether a witness is 'qualified' to offer opinion

testimony is committed to the discretion of the trial court." *Eichorn v. AT&T Corp.*, 484 F.3d

644, 650 (3d Cir. 2007)

Under Rule 701, the Court must undertake at least some judicial gatekeeping to assess whether Glaser's opinion on lost sales and lost profits is admissible.  Therefore, the Court will consider Glaser's background as it applies to the economic predictions he has offered to the Court, to determine if he is sufficiently qualified to offer this opinion as lay testimony.  Glaser is not required to have specific educational training, but Hunt must demonstrate some connection between special knowledge or experience Glaser possesses and Glaser's opinion on lost sales.

On this point, Hunt notes that Glaser is the president and sole owner of Caribe Corporation, a holding company which operates Hunt Control Systems, Inc., Hunt Dimming, Hunt Electronics, Simplicity Lighting Solutions, and Diversified Components.  (Glaser Decl., Docket Entry 199-22, at ¶ 2.)  Hunt offers no justification for why Glaser should be permitted to offer an economic opinion about Hunt's lost sales or profits, beyond the fact that he is familiar with his own business figures.  For example, Hunt offers no evidence that Glaser is familiar with the calculation of lost sales or profits, or other kinds of economic predictions.  Furthermore, when asked questions about the source of his knowledge about the economic conditions of the lighting industry, Glaser could only speculate that he had, at some point in time, reviewed documents reflecting the financial performance of a few companies in the lighting industry. (Glaser 11/12/13 Dep. 15:8-16:21, 18:22-21:1, 22:20-25:25:15.)   Glaser failed to review publications from consulting groups that focus on the economics of the lighting industry, for example.  (*Id.*)  Based on these facts, Hunt has not met its burden to show a sufficient connection between Glaser's knowledge or experience and Glaser's proposed testimony.

Furthermore, for Glaser's opinion on lost sales and profits to be admissible, his opinion must be both rationally based on his perceptions, and helpful to the determination of a fact in issue. Fed. R. Evid. 701.  Glaser's opinion satisfies neither requirement.  First, Glaser provides

51

no information about any assumptions he may have used in forming his opinion, besides a general statement that the downward progression of Hunt's sales in the 2007 to 2010 timeframe "was beyond what I believe the overall lighting industry experienced."  (Glaser Decl. at ¶ 7.) Glaser does not indicate any foundation for this statement, besides speculation.  When questioned specifically about the foundation of his knowledge in his deposition, Glaser could not point to specific documents or sources supporting his testimony that the lighting sector was not adversely affected by the economic conditions in the United States between 2007 and 2010. (Glaser 11/12/13 Dep. at 15:14-16:10.)

Second, Glaser's opinion itself amounts to generalized speculation, and therefore does not raise a triable issue of fact on the issue of lost sales and lost profits.  So far as the Court can tell from its examination of Glaser's declaration and accompanying graph, Glaser assumed that without Philips's use of "sense and simplicity," Hunt would have continued to have the same rate of growth in sales that it had experienced from 2003 until 2006 until the recession hit.  Glaser then opines that Hunt would have experienced a period of no growth in sales during the recession, and then would have continued to have the same rate of growth it had experienced before the recession, from the end of the recession until 2013.  (Glaser Decl. at ¶ 5.)  The Court cannot find any justification in Glaser's declaration or testimony to support these findings.  Due to its wholly speculative nature, the Court finds that Glaser's testimony would not be helpful to a trier of fact.

The Sixth Circuit has recognized that "seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness' and the witness turns into little more than an 'oath helper.'"  *Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir. 1986).  At this stage, Hunt "must present more than

just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue" to justify the denial of summary judgment on this issue. *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex*, 477 U.S. at 325).  Hunt has not satisfied this burden, and therefore the Court will strike Glaser's declaration and opinion.

Given that Hunt has offered no other evidence on the issue of lost sales and lost profits, the Court is satisfied that Philips has met its burden to demonstrate that no genuine issue of material fact exists on this issue.  Therefore, the Court will enter judgment in favor of Philips on the availability of a lost sales or lost profits remedy.

## 2.  DISGORGEMENT/ACCOUNTING OF PHILIPS'S PROFITS

"[A]n accounting for profits [or a disgorgement] is a form of equitable relief, and it does not follow as a matter of course upon the mere showing of an infringement.  It will be denied where an injunction satisfies the equities of a case, as for example, where there is a clear showing that no profit was made." *A & H Sportswear*, 166 F.3d at 208 (citation and footnote omitted)).  Disgorgement of profits as a remedy is only available "if the defendant is unjustly enriched, if the plaintiff sustained damages, or if an accounting is necessary to deter infringement. These rationales are stated disjunctively; any one will do."  *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 178 (3d Cir. 2005); *see also Marshak*, 595 F.3d at 495.

The First Circuit has held that the accounting of profits is inconsistent with a claim of reverse confusion, given that "[r]everse confusion does not lend itself to any automatic assumption that there is an equivalence between defendant's profits and plaintiff's diverted sales." *Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 80-81 (1st Cir. 2008) (citing *Johnny Blastoff, Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 436-37 (7th Cir. 1999); *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1374 (10th Cir. 1977);

Restatement (Third) of Unfair Competition § 37 cmt. b (1995) ("in most [reverse confusion] cases there is no reason to expect that every sale made by the defendant has been diverted from the plaintiff, or that the profit margins of the parties are necessarily the same.")).

The Third Circuit has not ruled directly on whether a disgorgement remedy is available to a trademark holder raising a reverse confusion claim. The parties to this action considered this issue using the disgorgement framework presented in the direct confusion case *Banjo Buddies*, where the Third Circuit outlined six non-exhaustive factors used to determine whether an alleged infringer's profits should be awarded to a trademark holder, upon a finding of trademark infringement:

> These factors include, but are not limited to (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

*Banjo Buddies,* 399 F.3d at 175 (quoting *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 349 (5th Cir. 2002) (quotation and internal citations omitted)). The Court will examine each of these factors in turn, with the caveat that the reverse confusion claims in this case may necessitate different analysis for some of the factors.

### a.  Philips's Intent to Confuse or Deceive

"Knowing or willful infringement consists of more than the accidental encroachment of another's rights. It involves an intent to infringe or a deliberate disregard of a mark holder's rights." *Securacomm*, 166 F.3d at 187. In a reverse confusion case, the Seventh Circuit found that the intent to trade on a trademark holder's good will or reputation must be "necessarily absent in a reverse confusion case." *Sands, Taylor & Wood Co.*, 978 F.2d at 961.

The relevant facts for this inquiry are the same facts reviewed for *Lapp* factor (5) above.

As discussed in more detail above, the Court finds that Philips lacked the requisite intent to cause confusion or deceive customers in adopting its "sense and simplicity" tagline. Philips's knowledge about Hunt's trademark is not sufficient to establish bad faith, nor is Philips's continued use of its tagline. *Fancaster*, 832 F. Supp. 2d at 418; *SecuraComm*, 166 F.3d at 189.

This factor favors Philips. The Court notes, however, that willfulness is not a prerequisite finding for recovery under a theory of disgorgement. *Banjo Buddies,* 399 F.3d at 175. Thus, the Court must consider this factor together with the other factors described in *Banjo Buddies*. *Sabinsa Corp. v. Creative Compounds, LLC*, No. 04-4239, 2011 WL 3236096, at *3 (D.N.J. July 27, 2011).

### b. Diversion of Sales

As noted above, the First Circuit has reasoned that "[r]everse confusion does not lend itself to any automatic assumption that there is an equivalence between defendant's profits and plaintiff's diverted sales." *Visible Sys.*, 551 F.3d at 80-81 (citations omitted). This finding is logical, given the theory of confusion underlying a reverse confusion claim. In a reverse confusion case, the junior user/alleged infringer is not seeking to benefit from the senior user's goodwill. Instead, the harm of reverse confusion is that a consumer may assume that the senior user's products are the junior user's, or alternatively that the junior and senior users are now connected. *Johnny Blastoff,* 188 F.3d at 436. This assumption does not lead to the conclusion that an alleged infringer has necessarily diverted the sales of the senior user. An infringer in a reverse confusion case causes other types of indirect harm to the senior user, predominantly related to the devaluation of the trademark through damage to its product identity, corporate identity, control over its goodwill and reputation, and its ability to enter new markets. *Id.* at 436-37 (citations omitted). For these reasons, the Court will not apply any sort of presumption that

defendant's profits are equivalent to plaintiff's diverted sales.

There is no admissible evidence before the Court that Hunt lost sales or profits based on Philips's use of the "sense or simplicity" tagline. Other courts have denied disgorgement in reverse confusion cases where there was no indication that the trademark holder's mark contributed to the defendant's profits. *See, e.g., CPC Props., Inc. v. Dominic, Inc.,* No. 12-4405, 2013 WL 5567584, at * 2 (E.D. Pa. Oct. 9, 2013); *A & H Sportswear*, No. CIV.A. 94-CV-7408, 2002 WL 27735, at *5 (E.D. Pa. Jan. 9, 2002). For these reasons, this factor favors Philips.

### c.   Adequacy of Other Remedies for Hunt

The parties dispute whether an injunction would sufficiently remedy any harm Philips may have done to Hunt. Hunt asserts that an injunction is not adequate because Philips has been unjustly enriched through its alleged trademark infringement, while Philips argues that an injunction would be an appropriate remedy since harm to Hunt has not been proven.

Absent proof of "actual harm" such as lost sales or other financial damage, an injunction is an adequate remedy for trademark infringement. *A & H Sportswear*, 166 F.3d at 209 (citing Restatement (Third) of Unfair Competition § 36, cmt. c). For the purpose of examining whether an injunction would be an adequate remedy in this case, the Court will assume it has found a likelihood of confusion, and thus that Hunt has demonstrated a likelihood of success on the merits. Philips voluntarily stopped using the "sense and sensibility" tagline in November 2013, so presumably Philips would not be harmed should an injunction issue. Also, presumably an injunction would protect Hunt from harm in the future, should Philips wish to resume use of the "sense and simplicity" tagline. There is no evidence that Philips has committed fraud, or engaged in palming off of goods, as will be discussed below. Furthermore, the Third Circuit has noted that the public interest question in trademark infringement cases is "the interest in

prevention of confusion, particularly as it affects the public interest in truth and accuracy." *Kos Pharms.,* 369 F.3d at 730.  Imposing an injunction would protect consumers from any further confusion caused by Philips's use of its tagline in the future.  A permanent injunction would therefore be both proper and an adequate remedy in this case.  *See, e.g., Champion Spark Plugs, Co. v. Sanders,* 331 U.S. 225 (1947) (declining to award an accounting of profits, finding that an injunction would satisfy the equities of the case, where the court found no showing of fraud or palming off).  This factor favors Philips.

### d.  Hunt's Unreasonable Delay in Asserting Its Rights

Philips asserts that Hunt delayed unreasonably in asserting its trademark rights, by waiting over six years after Philips adopted the "sense and simplicity" tagline to assert its infringement and damages claims.  To support this argument, Philips offers evidence that Glaser is a Philips shareholder and that Hunt knew about Philips's plans to market its products using "sense and simplicity" as early as 2005.  (PSMF at ¶¶ 38, 71.)  In addition, Glaser attempted to monetize his mark in 2007 by selling his rights to Philips competitors GE, Osram/Sylvania, non-practicing entity Intellectual Ventures, and other potential intellectual property asset acquirers. (PSMF at ¶ 115.)  Hunt does not dispute these facts.

Hunt argues that it did not delay unreasonably in bringing its infringement and damages claims, given the small size of its company and its limited resources for litigation.  Instead, it waited to see how the TTAB would rule on its opposition, and until Philips sued.  This reasoning does not satisfactorily explain Hunt's delay, particularly since Hunt is asking for disgorgement of profits that accumulated during the six-year period between when Hunt learned of Philips's plans

to use "sense and simplicity" and when it filed its counterclaim for damages.  The Court finds

that Hunt unreasonably delayed its pursuit of these claims, and thus this factor favors Philips.

### e.   Public Interest in Making Misconduct Unprofitable

A public interest exists in deterring misconduct, particularly where the infringer has

diverted sales and/or engaged in other culpable conduct.  *See Banjo Buddies*, 399 F.3d at 175-76.

It does not follow that the public interest is served by a disgorgement of profits in all cases where

the trademark holder has proven liability for infringement, without examination of the infringer's

conduct; in effect, automatic disgorgement would serve as a punishment, not a compensation to

the trademark holder.  *See* 15 U.S.C. 1117(a); *see also Sabinsa*, No. 04-4239, 2011 WL

3236096, at *6 (D.N.J. July 27, 2011).  Logically, it follows that the facts of each case must

guide the analysis of this factor, because the public interest is stronger when an infringer has

palmed off or otherwise demonstrated intent to infringe.  *See Sabinsa,* No. 04-4239, 2011 WL

3236096, at *6 (D.N.J. July 27, 2011).  Here, Philips has not demonstrate intent to confuse or

deceive, nor has it palmed off, as will be discussed below.  The public interest here may be

served adequately with injunctive relief, rather than a punitive order for accounting.  For these

reasons, this factor weighs in favor of Philips.

### f.   Whether Philips was Engaged in "Palming Off" Its Goods

"Passing off (or palming off, as it is sometimes called) occurs when a producer

misrepresents his own goods or services as someone else's." *Dastar Corp. v. Twentieth Century*

*Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003) (citations omitted).  Typically there will be close

similarities between products, packaging, or marketing in a case of palming off.  *Banjo Buddies*,

399 F.3d at 175-76.  The Court is not convinced that this factor applies to the analysis of a

reverse confusion claim for disgorgement, given that Hunt's theory of confusion requires that Philips has overwhelmed Hunt's trademark through extensive marketing of Philips products. Hunt does not allege that Philips had the intent of making consumers believe that Philips's products were actually from Hunt; Hunt alleges that its customers were confused because of Philips's alleged infringement of Hunt's trademark.  For Philips to have palmed off its products, Philips would have had to misrepresent that its products were coming from Hunt, despite the display of the prominent Philips housemark on products.  Hunt offers no evidence that a reasonable trier of fact could use to support the finding that Philips palmed off, and furthermore, this theory is counter to Hunt's reverse confusion allegations.  This factor also favors Philips.

### g.  Conclusion

An accounting of profits does not automatically follow a finding of infringement. Damages should be compensation to the trademark holder for infringement, and should not be awarded merely to serve as punishment of the infringing party. *See* 15 U.S.C. § 1117(a).  The *Banjo Buddies* factors should be weighed together in determining whether disgorgement is an appropriate remedy.  Here, all six factors weigh in favor of Philips.  Hunt did not offer evidence sufficient to show that Philips's actions with respect to the "sense and simplicity" trademark damaged Hunt, and there is no evidence before this Court to show that Philips was unjustly enriched by the use of its tagline.  In addition, given that "the harm associated with reverse confusion is that consumers will associate the senior user's product with the infringing junior user," any reverse confusion in this case may have actually increased Hunt's sales of its products through consumers' mistaken beliefs that they had purchased items from Philips, not Hunt.  *See A & H Sportswear*, No. CIV.A. 94-CV-7408, 2002 WL 27735, at *5 (E.D. Pa. Jan. 9, 2002). Based on the evidence before the Court, a reasonable trier of fact could not find that Hunt is

entitled to any share of Philips's profits.  For these reasons, the Court will enter judgment in favor of Philips on the availability of a disgorgement remedy in this case.

### 3.  REASONABLE ROYALTY

Should Philips be found liable for trademark infringement, Hunt also asks the Court to impose a reasonable royalty onto Philips.  "A royalty is a measure of damages for past infringement," often used in patent and trade secret disputes, but the use of royalties in trademark is "atypical."  *A & H Sportswear*, 166 F.3d at 208.  "Even when the courts have awarded a royalty for past trademark infringement, it was most often for continued use of a product beyond authorization, and damages were measured by the license the parties had or contemplated."  *Id.* at 209 (citing *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1519-20 (11th Cir. 1990); *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1563-65 (11th Cir. 1986); *Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 597 F.2d 71, 75-76 (5th Cir. 1979) (basing reasonable royalty rate on prior negotiations between the parties)).  *But see Sands, Taylor & Wood Co. v. Quaker Oats Co. (Sands I)*, 978 F.2d 947 (7th Cir. 1992); *Sands, Taylor & Wood v. Quaker Oats Co. (Sands II)*, 34 F.3d 1340 (7th Cir. 1994) (permitting the award of a reasonable royalty, instead of profits, where no licensing agreement had existed or been contemplated between the trademark holder and the infringing party, and suggesting the royalty should be based on the fee paid by another competitor to the trademark holder for the trademark at issue).  The Third Circuit has found that bad faith or a prior licensing agreement could justify the award of a reasonable royalty in a trademark infringement action, but declined to speculate on whether other circumstances could also justify such an award.  *A & H Sportswear*, 166 F.3d at 209.  Furthermore, imposing a compulsory license on the parties, where neither party had requested nor negotiated for such a license, is improper.  *Id.* at 208.

Hunt's evidence and arguments do not persuade the Court that a reasonable royalty should be available in this case. At the outset, the Lanham Act does not explicitly provide for the award of a reasonable royalty to compensate a trademark holder for damages in a trademark infringement action. Hunt suggests that, in *A & H Sportswear*, the Third Circuit did not bar the award of a reasonable royalty where a prior license does not exist. 166 F.3d at 208-09. But the Third Circuit also indicated that most often, a royalty award is granted "for continued use of a product beyond authorization, and damages [in these cases] were measured by the license the parties had or contemplated." *Id.* at 209. Hunt acknowledges this is not the situation before this Court. Hunt notes that the Seventh Circuit has directed that a reasonable royalty be awarded in a reverse confusion case where the parties had not discussed a licensing agreement. *Sands I*, 978 F.2d at 947; *Sands II*, 34 F.3d at 1340. That case is not binding precedent on this Court, and furthermore the royalty directed by the Seventh Circuit in that case was based off the licensing fee paid by a prior competitor for use of the trademark in the same line of business. *Id.* Hunt has not cited evidence in its briefing to show that there is a licensing agreement between the parties, that the parties negotiated a license at any point, or that Hunt has in fact licensed its trademark to anyone. For these reasons, Hunt has not shown that a reasonable royalty should be available to Hunt if should it win the infringement portion of this case, and the Court will enter judgment for Philips on this issue.

### 4.  CORRECTIVE ADVERTISING

Finally, Hunt seeks damages in the form of corrective advertising to remedy Philips's alleged infringement of its "Simplicity" mark. The purpose of corrective advertising is to repair any damage the infringer may have caused to the mark. *See, e.g.*, *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506 (7th Cir. 1992). The court in *Fancaster* stated that, for corrective advertising

to be a proper remedy for trademark infringement, the trademark holder "must show that (1) 'the confusion caused by the defendant's mark injured the plaintiff' and (2) 'that repair of the old trademark, rather than adoption of a new one, is the least expensive way to proceed.'" *Fancaster*, 832 F. Supp. 2d at 423 (quoting *Zazu*, 979 F.2d at 506).  Corrective advertising damages are not awarded where the trademark holder has not demonstrated actual damages and where the alleged infringer has not acted in bad faith.  *A & H Sportswear*, 167 F. Supp. 2d at 801-02; *A & H Sportswear*, No. CIV.A. 94-CV-7408, 2002 WL 27735, at *64 (E.D. Pa. Jan. 9, 2002); *see also Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04-7203, 2006 WL 1359955, at *2 (S.D.N.Y. May 18, 2006) (finding that an award of corrective advertising is precluded where trademark holder fails to show lost profits, lost sales, or damage to reputation).

Based on the evidence presented to the Court, Hunt is precluded from receiving a corrective advertising award.  Hunt has not provided admissible evidence as to the damage Philips's mark caused to Hunt, since Hunt has not supported its claims to lost profits, lost sales, or any damage to Hunt's reputation based on Philips's use of the "sense and simplicity" tagline. Furthermore, Philips did not act in bad faith in its adoption or continued use of the tagline.  In particular, the TTAB did not rule on Philips's request for extension of its international registration until 2011, and Philips timely appealed that ruling to this Court.  *Hunt Control Sys. Inc. v. Koninkijke Philips. Elec. N.V.*, 98 U.S.P.Q. 1558 (TTAB 2011).  To somehow argue that Philips should have known the result of the TTAB's ruling (and in fact, that it should be able to predict the result of this Court's ruling on its § 1071(b) request) stretches credulity. Hunt has not attempted to combat any effects it perceives from Philips's alleged infringement with its own corrective advertising campaign, which is telling.  Hunt's briefing on this issue cites to no case

62

law contrary to the Court's conclusion.  For these reasons, the Court finds that Hunt is not entitled to corrective advertising, and judgment on this issue will be entered in favor of Philips.

**IV.  CONCLUSION**

For the foregoing reasons, the Court will deny Hunt's motions to exclude the testimony and expert reports of Michael Barone and Alex Simonson.  Further, the Court will deny Hunt's motion for summary judgment.  The Court will grant in part and deny in part Philips's motion for summary judgment, as described in this Opinion.  An appropriate Order will be filed herewith.

  s/ Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

Dated:  June 29, 2016

63