**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

|  |  |  |
|---|---|---|
| KONINKLIJKE PHILIPS ELECTRONICS N.V., | : : : | **Civil Action No. 11-3684 (SRC)(CLW)** |
| Plaintiff/Counterclaim Defendant, | : : : | **OPINION** |
| v. | : : | |
| HUNT CONTROL SYSTEMS, INC., AN ASSUMED TRADE NAME FOR CARIBE CORPORATION, | : : : : | |
| Defendant/Counterclaim Plaintiff. | : | |

---

**CHESLER**, District Judge

      This case arises out of a trademark dispute between two companies in the lighting industry, Defendant/Counterclaim Plaintiff Hunt Control Systems, Inc. ("Hunt") and Plaintiff/Counterclaim Defendant Koninklijke Philips Electronics N.V. ("Philips"). Philips initially brought an action before this Court to review a decision by the Trademark Trial and Appeal Board ("TTAB"), which denied Philips's trademark registration application with respect to six specific lighting goods. Hunt counterclaimed for trademark infringement, misappropriation, and unfair competition. This Court held a bench trial from June 6, 2017 through June 12, 2017. Upon hearing the evidence presented at trial, this Court reverses the TTAB's decision and concludes that Philips is not liable on Hunt's counterclaims. Judgment will be entered accordingly.

# I. BACKGROUND

This action is a trademark dispute between Hunt, the owner of the "Simplicity" trademark for goods related to its lighting business, and Philips, which sought to register the trademark "sense and simplicity" with the United States Patent and Trademark Office ("PTO") for goods related to its lighting business.

## a. THE PARTIES

Philips is a Dutch company, which has marketed a wide variety of products throughout its history, such as medical x-ray tubes, radios, televisions, electric shavers, and lighting products. (Final Pretrial Order at 4-9, Stip. Facts [hereinafter "Stip. Facts"] ¶¶ 1-3). Philips's United States lighting headquarters are located in New Jersey. (Stip. Facts ¶ 2). Until 2008, Philips's two main types of lighting products in the United States were lamps, more commonly known as light bulbs, and ballasts, which are devices that provide "the proper starting voltage for the lamp to start". (Stip. Facts ¶ 44; 6/8/17 PM Trial Tr. (Kerr) 10:3-18; 6/9/12 Trial Tr. (Bernecker) 118:9-25). It sold lamps under the PHILIPS brand name and ballasts under the ADVANCE brand name, since Philips had acquired its Advance business unit in 1959. (Stip. Facts ¶ 4; 6/8/7 PM Trial Tr. (Kerr) 13:8-14:13).

In 2008, Philips began expanding its lighting business. First, it rebranded the Advance business as PHILIPS ADVANCE. (Stip. Facts ¶¶ 4-5). Also in 2008, Philips acquired Genlyte, then one of the leading lighting companies in North America, and began to sell Genlyte's lighting controls, fixtures, emergency ballasts, wall box dimming controls, and panel dimming controls that Genlyte had sold under various brand names. (Stip. Facts ¶¶ 6-11). Philips continued to use some of Genlyte's trademarks, such as LIGHTOLIER, but over time, Philips's

2

housemark came to replace some of Genlyte's trademarks on certain products. (Stip. Facts ¶¶ 8-11). In 2009, Philips acquired two companies: Dynalite, a company that provides lighting control systems, and Teletrol, a leading supplier of integrated solutions for simultaneous multi-site management of lighting and energy uses. (Stip. Facts ¶¶ 12-13).

Philips sells lighting controls in the "professional" channel and it sells some lamps in the "consumer channel." (Stip. Facts ¶ 14; 6/7/17 PM Trial Tr. (Krebs) 69:14-70:2, 71:3-10, 73:18-74:1). When it sells in the professional channel, Philips is selling to lighting industry professionals, who buy lighting products to install in retail establishments, schools, hotels, restaurants, hospitals, and more. (6/8/17 PM Trial Tr. (Kerr) 10:7-11:6, 32:11-33:16). When it sells in the "consumer" channel, it sells to homeowners and end-users through stores like Home Depot. (6/7/17 PM Trial Tr. (Krebs) 71:16-18).

Caribe Corporation, which uses the trade names Hunt Control Systems, Inc., Hunt Dimming, Hunt Electronics, Diversified Products, Hunt, and Simplicity Lighting Solutions [hereinafter "Hunt"], is a corporation based in Fort Collins, Colorado. (Stip. Facts ¶¶ 15-16). Alan J. Glaser ("Mr. Glaser") is the sole owner of Hunt. (Stip. Facts ¶ 17). Hunt sells lighting controls, such as LED controllers and dimming systems, among other goods. (Stip. Facts ¶ 21). Hunt sells more than 90 percent of its dimming systems for commercial applications, and Hunt's sales to individual consumers may be less than 5 percent of its overall sales. (Stip. Facts ¶¶ 22, 45-46). Hunt does not sell its dimming systems at retail. (Stip. Facts ¶ 22).

### b. THE TWO MARKS

Philips holds an international trademark registration for its global tagline, "sense and simplicity," with a priority date of May 27, 2004. (KPTX-002 at 20). On September 3, 2004,

Philips filed a request to extend of its international registration to the United States, under the Madrid Protocol treaty. (KPTX-002 at 1).[1] Also in September 2004, Philips launched its "sense and simplicity" campaign worldwide and began using "sense and simplicity" in connection with many of its products. (Stip. Facts ¶ 35). From 2004 to 2009, Philips spent over $100 million in the United States on internal and external advertising related to "sense and simplicity", which it termed the "Simplicity Brand Campaign." (Stip. Facts ¶¶ 40-41; 6/8/17 PM Trial Tr. (Kerr) 57:22-58:3). From 2007 to 2014, Philips spent approximately $186 million on internal and external marketing costs. (Philips Findings of Fact ¶ 54).

Meanwhile, on June 8, 2004, Hunt had filed an application with the PTO to register "Simplicity" as a trademark for industrial and commercial lighting control panels. (Stip. Facts ¶ 23). Hunt had used the term "Simplicity" on its multi-thousand dollar dimming panel products since 1985 or 1986. (6/6/17 Trial Tr. (Glaser) 65:7-66:1; 6/7/17 AM Trial Tr. (Glaser) 53:4-54:18). The PTO issued Registration No. 3254393 to Hunt for "Simplicity" on June 26, 2007. (Stip. Facts ¶ 24). Thus, in 2007, Hunt began using the "Simplicity" mark on its wall box dimmers, and in 2008, Hunt launched its "Simplicity" LED Controller. (Stip. Facts ¶ 25; 6/6/17 Trial Tr. (Glaser) 65:7-23; 6/7/17 AM Trial Tr. (Glaser) 53:4-14; 54:14-18). Hunt also began operating a website, www.simplicitylightingsolutions.com, in 2007, which functioned as a portal

---

[1] Section 66(a) of the Lanham Act permits holders of international trademark registrations to request that the PTO extend their trademark protection to the United States, under the Madrid Protocol treaty's extension of protection rules. 15 U.S.C. § 1141 (2012). The Madrid Protocol treaty facilitates the international registration of trademarks between member nations, and the International Bureau of the World Intellectual Property Organization manages its implementation. 3 J. Thomas McCarthy, *McCarthy on Trademarks* § 19:31.20 (4th ed.). Requests for extension under the Madrid Protocol use the priority date of the underlying international registration, here May 27, 2004.

to a third-party online lighting retailer named Topbulb.com ("Top Bulb"). (Stip. Facts ¶¶ 26-27). In stark contrast to Philips's expenditure on advertising, Hunt only spent about $1.68 million on internal and external advertising of its "Simplicity" mark from 2003 to 2013. (Stip. Facts ¶ 42).

Mr. Glaser first discovered Philips's use of "sense and simplicity" at Lighfair, a lighting industry trade show, in 2006 and first asserted infringement in August 2006. (6/6/17 Trial Tr. (Glaser) 118:13-24, 140:23--144:20; 6/7/AM Trial Tr. (Glaser) 42:23-43:19, 47:3-15). On October 13, 2006, Hunt filed Opposition No. 91173417 before the Trademark Trial and Appeal Board ("TTAB") to Philips's application to extend its international registration for "sense and simplicity", alleging that Hunt was the senior user of the mark "Simplicity". (*Hunt Control Systems, Inc. v. Koninklijke Philips Electronics N.V,* Opp'n No. 91173417, TTABVUE No. 1 (T.T.A.B. Record)).

### c. PROCEDURAL HISTORY

On April 27, 2011, the TTAB sustained Hunt's Opposition, refusing to register Philips's mark, "sense and simplicity", for use on six specific goods that Philips sells, including: electrical light dimmers, electrical circuit boards, printed circuit boards, electrical circuits for electrical conduction, printed circuits, and electrical controllers. *Hunt Control Sys. Inc. v. Koninklijke Philips. Elec. N.V.*, 98 U.S.P.Q. 1558, 2011 WL 2318350, at *13 (T.T.A.B. 2011). The TTAB approved Philips's application for registration of "sense and simplicity" with respect to all other goods that Philips applied for, including lighting ballasts and specific kinds of lamps. *Id.*

Two months later, Philips filed a Complaint with this Court to review the portions of the TTAB decision adverse to Philips, pursuant to 15 U.S.C. § 1071(b). (Compl. ¶1). Hunt filed its Answer on September 6, 2011, and raised several counterclaims. Hunt asserted counterclaims of

trademark infringement, unfair competition, and misappropriation and demanded monetary and injunctive relief. (Countercl. ¶¶39, 49, 70-81). Hunt also requested from this Court an order affirming the TTAB decision and directing the TTAB to refuse registration for *all* of Philips's "lighting related and other products contained in said application", not just the six products that the TTAB considered. (Countercl. at 25-26, ¶ 9).

On October 23, 2015, both parties moved for summary judgment and Hunt moved to exclude certain expert reports and testimony [Docket Entries 179-191]. On June 29, 2016, this Court denied Hunt's motion for summary judgment and motions to exclude, and granted in part and denied in part Philips's motion for summary judgment [Docket Entry 215]. The Court found that there were genuine issues of material fact regarding whether there was a likelihood of confusion between the marks [Docket Entry 214 (hereinafter "Summ. J. Op.") at 46-47]. The Court, nevertheless, granted in part Philips's motion, concluding that Hunt was not entitled to monetary relief on any of its counterclaims. (Summ. J. Op. at 47-63). This decision left Hunt only able to seek injunctive relief. This Court then granted Philips's motion to strike the jury demand because only equitable issues remained [Docket Entries 224 & 225]. A bench trial was held from June 6, 2017 through June 12, 2017 to determine first, whether the TTAB decision should be overturned, and second, whether equitable relief should issue on the trademark infringement, unfair competition, and misappropriation counterclaims.[2]

---

[2] The parties both timely submitted their Proposed Findings of Facts and Conclusions of Law to the Court on July 10, 2017, and both timely submitted responses to one another's Proposed Findings of Facts and Conclusions of Law on July 13, 2017. The parties also electronically filed their papers, redacting the competitive information of all third parties [Docket Entry 309, 311, 312, & 316]. The parties then jointly moved to seal Legrand's confidential marketing information, and Judge Waldor granted this motion to seal [Docket Entry 315]. The parties later electronically submitted new redacted versions of their papers, only redacting the competitive

## II.  THE EVIDENCE AT TRIAL[3]

### a. TESTIMONY OF ALAN JOHN GLASER

Hunt first called Mr. Glaser to testify.  Mr. Glaser is the sole owner of Caribe

Corporation, also known throughout trial as "Hunt".  (6/6/17 Trial Tr. (Glaser) 31:6-8, 33:6-9).

Caribe Corporation actually has three operating entities: the first is Hunt Control Systems, also

known as Hunt Dimming, Hunt Electronics, and sometimes Hunt Controls; the second is

Simplicity Lighting Solutions; and the third is Diversified Components.  (6/6/17 Trial Tr.

(Glaser) 30:14-31:8).  Mr. Glaser testified that these operating entities are really just different

product lines.  (6/6/17 Trial Tr. (Glaser) 30:23-25).

The most relevant of these "product lines" to this case is Hunt Control Systems.  Through

this entity, Hunt manufactures lighting controls in the professional channel, including wall box

controls, architectural dimming panels, and other lighting controls.  (6/6/17 Trial Tr. (Glaser)

33:14-24; 77:21-24).[4]  Hunt markets these products mostly online, sometimes in magazines

through free press releases, and sometimes through targeted mailings.  (6/6/17 Trial Tr. (Glaser)

37:12-38:8).  Hunt has spent a total of between five and six hundred dollars total on print

---

information that belonged to Legrand and including the confidential information of other third
parties [Docket Entries 317 & 318].  Based on the parties' joint motion to seal, the Court
concludes that Legrand's competitive information is the only information that must be redacted
and sealed in this Opinion.  Additionally, although Judge Waldor granted Hunt's motion to seal
its Proposed Findings of Facts and Conclusions of Law, Hunt later filed a proper redacted
version of its Proposed Findings of Facts and Conclusions of Law on the electronic docket, and
that brief has not been sealed for purposes of this Opinion [Docket Entry 318].
[3] This Court granted Hunt's motion in limine regarding the order of trial and thus Hunt presented
its case-in-chief first, before Philips presented its case [Docket Entry 294].
[4] Mr. Glaser explained that Simplicity Lighting Solutions is a distributor that sells light bulbs and
that Diversified Components once sold neon dimmers and now sells electronic sign insulating
devices.  (6/6/17 Trial Tr. (Glaser) 34:1-14, 71:18).

advertising.  (6/12/17 PM Trial Tr. (Glaser) 4:16-20).  Hunt also attends trade shows, primarily a large show called Lightfair.  (6/6/17 Trial Tr. (Glaser) 38:15-17).

Mr. Glaser testified that "[t]he single biggest customer we have is really the lighting [manufacturer's] representatives, followed by electrical lighting distributors, and then the government, and you know, the lighting reps probably represent 40 percent of the driven business, if you will, electrical lighting distributors, 30, government 20.  And ten percent spread between the rest of the people . . . ."  (6/6/17 Trial Tr. (Glaser) 74:13-19).  Mr. Glaser explained that a lighting manufacturer's representative "is a commissioned sales agent specific to the lighting industry . . . they have a tremendous amount of control in what product gets bought or placed in service."  (6/6/17 Trial Tr. (Glaser) 78:22-79:8).  He testified that electrical engineers and electrical contractors "might be five percent" of the customer base.  (6/6/17 Trial Tr. (Glaser) 76:2-77:21).  Mr. Glaser admitted at his deposition, however, that many individuals take part in the decision-making process on what lighting products to buy, including: electrical engineers and electrical contractors, in addition to electrical wholesalers, end users, architects, other miscellaneous specifiers, and manufacturer's representatives.  (6/7/17 Trial Tr. (Glaser) 71:16-75:11).

Mr. Glaser discussed how Philips and Hunt have worked together on various projects since 2002.  (6/6/17 Trial Tr. (Glaser) 109:9-111:12, 112:23-114:17).  Hunt offers several products compatible with Philips ballasts and allows Hunt to market dimmers in conjunction with their ballasts.  (6/6/17 Trial Tr. (Glaser) 122:13-18, 125:2-126:4).

Mr. Glaser also discussed how Hunt and Philips compete.  The two companies both sell lighting controls, dimmers, systems, and panels.  (6/6/17 Trial Tr. (Glaser) 122:2-9).  Mr. Glaser

also stated that both companies sell lamps and ballasts; he testified that Hunt sells lamps and ballasts under the Simplicity Lighting Solutions product line.  (6/6/17 Trial Tr. (Glaser) 34:1-5).  But, Mr. Glaser admitted that Hunt did not manufacture its own lamps or ballasts.  (6/6/17 Trial Tr. (Glaser) 67:8-68:17; 6/7/17 Trial Tr. (Glaser) 29:21-32:5).  Mr. Glaser testified that a ballast is a lighting control and that the Lighting Controls Association defined a ballast as a control. (6/7/17 Trial Tr. (Glaser) 23:19-22).

Next, Mr. Glaser discussed the "Simplicity" mark.  Hunt has used the "Simplicity" mark on its multi-thousand dollar dimming panels since 1985 or 1986.  (6/6/17 Trial Tr. (Glaser) 65:7-66:1; 6/7/17 AM Trial Tr. (Glaser) 53:4-54:18).  Mr. Glaser applied for a trademark registration on June 8, 2004, and the "Simplicity" mark was registered in June 2007.  (6/6/17 Trial Tr. (Glaser) 140:10-22).  Mr. Glaser testified that in 2004, when trying to register the "Simplicity" trademark, he found out that Hubbell Corporation had a trademark for "Simplicity" and he got them to withdraw their mark.  (6/6/17 Trial Tr. (Glaser) 81:20-82:12; 6/7/17 AM Trial Tr. (Glaser) 40:11-19).  Mr. Glaser also testified that he was able to cancel the mark for "Simplicity Lighting" which belonged to a fixture company in New Mexico.  (6/6/17 Trial Tr. (Glaser) 128:3-129:4).  Finally, he stated that Osram and Lithonia jointly used the mark "SIMPLY 5" and that he thought he succeeded in getting them to eliminate that mark as well, but that there may have been "a short time where it trailed on and, of course, everything lives on in the internet." (6/6/17 Trial Tr. (Glaser) 129:9-130:7; 6/7/17 AM Trial Tr. (Glaser) 41:21-42:14).

Mr. Glaser testified that he became aware of Philips's use of their tagline at the 2006 Lightfair trade show in Las Vegas.  (6/6/17 Trial Tr. (Glaser) 118:13-24, 140:23-141:8).  Mr. Glaser testified that Philips's booth at Lightfair was one of the biggest booths at the trade show

and that it displayed "sense and simplicity" on it.  (6/6/17 Trial Tr. (Glaser) 119:4-22, 121:1-8).

He also claimed that the Hunt booth displayed "Simplicity" on it.  (6/6/17 Trial Tr. (Glaser) 119:23-120:14, 6/7/17 AM Trial Tr. (Glaser) 46:11-20).  Mr. Glaser testified that two or three individuals visiting Hunt's booth at Lightfair asked if Hunt and Philips were affiliated.  (6/6/17 Trial Tr. (Glaser) 142:21-144:20).  While Mr. Glaser claimed at trial that these incidents occurred at trade show in Las Vegas in 2006, (6/6/17 Trial Tr. (Glaser) 140:23-144:20), at his deposition Mr. Glaser testified that these conversations were held in New York in 2007. (6/7/AM Trial Tr. (Glaser) 42:23-43:19).  Mr. Glaser claimed that one of the individuals who asked about affiliations was an unidentified Northeast Regional Sales Manager from Leviton, a competing lighting company.  (6/7/17 AM Trial Tr. (Glaser) 42:18-22, 44:6-10).  He did not know who the other two people were.  (6/6/17 Trial Tr. (Glaser) 144:15-20).

After the Lightfair show, Mr. Glaser began to look into Philips's use of the word "Simplicity".  (6/6/17 Trial Tr. (Glaser) 150:22-25).  He learned of an email from Philips's CEO about "moving their company to Simplicity", that Philips held a "Simplicity Event", and that Philips's website had a link to "Today's Simplicity Products."  (6/6/17 Trial Tr. (Glaser) 154:2-9, 155:16-21, 166:10-15, 173:16-21).  He also learned of Philips's "Simplicity" campaign. (6/6/17 Trial Tr. (Glaser) 194:17-21).

On cross-examination, Mr. Glaser admitted that after learning of Philips's use of "sense and simplicity", Hunt began to use the "Simplicity" mark more often. (6/7/17 AM Trial Tr. (Glaser) 51:22-54:18).  Prior to 2007, Hunt sold architectural wall box dimmers under different names such as the Eclipsis Series and the Luminist Series.  (6/7/17 AM Trial Tr. (Glaser) 54:5-18).  Then, in 2007, Hunt began using the "Simplicity" mark on these wall box dimmers, and in

2008, Hunt launched its "Simplicity" LED Controller. (Stip. Facts ¶ 25; 6/6/17 Trial Tr.
(Glaser) 65:7-23; 6/7/17 AM Trial Tr. (Glaser) 53:4-14; 54:14-18).

Additionally, Mr. Glaser testified that in 2007, Hunt began operating a website called
www.simplicitylightingsolutions.com and that he made an agreement with a company called Top
Bulb so that this website could feed into a Top Bulb website. (6/6/17 Trial Tr. (Glaser) 67:8-
69:4; 6/7/17 AM Trial Tr. (Glaser) 47:9-52:12; Stip. Facts ¶¶ 26-27). Top Bulb agreed to pay
Hunt a commission for all the customers that bought light bulbs from Top Bulb after
www.simplicitylightingsolutions.com brought them to the Top Bulb site. (6/6/17 Trial Tr.
(Glaser) 68:12-21, 73:17-23). Hunt did not stock the lamps sold through the Top Bulb site.
(6/6/17 Trial Tr. (Glaser) 67:8-68:17). Instead, Top Bulb offered brand-name bulbs from
manufacturers like Philips, GE, and Osram/Sylvania. (6/6/17 Trial Tr. (Glaser) 70:23-71:13).
Mr. Glaser admitted that Top Bulb only received twelve orders from customers who had
accessed the site through www.simplicitylightingsolutions.com. (6/7/17 Trial Tr. (Glaser) 40:2-
10) (testifying that thirteen orders were placed and one was cancelled). Moreover, three of these
orders were for Philips light bulbs. (Stip. Facts ¶ 30). Mr. Glaser testified to the TTAB that Top
Bulb attached "Simplicity" labels to these orders, but on cross-examination at trial, he admitted
that he did not know whether Top Bulb actually attached the labels. (6/7/17 AM Trial Tr.
(Glaser) 64:22-71:10). He has since found out that Top Bulb did not affix any labels. (6/7/17
Trial Tr. (Glaser) 101:22-102:10). Mr. Glaser explained that Top Bulb never paid him
commissions for the orders made through the Simplicity Lighting Solutions website, and Mr.
Glaser never requested an accounting from Top Bulb. (Stip. Facts ¶¶ 30-31; 6/6/17 Trial Tr.
(Glaser) 68:12-69:13, 73:1-8).

### b.  TESTIMONY OF DR. JAMES V. CODY

Hunt then called Dr. James V. Cody, an expert on consumer characteristics and purchasing structures in the lighting industry.  (6/7/17 PM Trial Tr. (Cody) 11:17-12:14).  Dr. Cody explained that there are many different players in the lighting specification process, including: the lighting manufacturer, importers and contract manufacturers, manufacturer's representatives, specifiers such as architects, engineers, and designers, distributors, contractors, and facility owners or end-users.  (6/7/17 PM Trial Tr. (Cody) 12:16-14:16, 16:10-17:14).  He suggested that all of these individuals largely influence purchasing decisions for lighting products.  (6/7/17 PM Trial Tr. (Cody) 52:20-53:1).

Dr. Cody went into further detail in discussing the role of a manufacturer's sale representatives in the lighting industry – those individuals that Mr. Glaser had previously stated were Hunt's main customers.  Dr. Cody explained that manufacturer's representatives tend to represent one particular Tier I company, and they usually sell 65-90% of their products from that company.  (6/7/17 PM Trial Tr. (Cody) 17:16-18:16).  The manufacturer's representatives must satisfy their main Tier I company by selling its products, but they also buy and sell more specialized products from smaller companies.  (6/7/17 PM Trial Tr. (Cody) 17:16-20:9).  Dr. Cody suggested that while manufacturer's representatives have discretion in recommending products for a project, they cannot sell products unless a specifier, such as an electrical engineer, signs off that the products comport with the project's specifications.  (6/7/17 PM Trial Tr. (Cody) 12:20-13:8, 16:24-17:14, 20:10-20, 24:15-25:18).

He discussed what he called "show[ing] the love", a concept by which manufacturer's representatives buy products from various manufacturers that the specifier has deemed "or

12

equal" products. (6/7/17 PM Trial Tr. (Cody) 22:13-23:20, 25:20-27:13). He suggested that if a manufacturer's representative perceives a hidden vertical relationship between two companies, he might be less likely or more likely to buy products from the two manufacturers. (6/7/17 PM Trial Tr. (Cody) 27:2-28:11). He testified that as a manufacturer's representative, he considers company affiliations in making purchasing decisions and in determining markups and commissions; additionally, if one company is affiliated with another and he has experienced problems with a product from one of those companies, he may buy the product instead from a third unaffiliated company. (6/7/17 PM Trial Tr. (Cody) 25:6-18, 33:24-34:2, 56:12-21).

Dr. Cody then testified more specifically about Hunt and Philips. He testified that both companies sell dimmers and dimming control systems that are competitive "or equal" options. (6/7/17 PM Trial Tr. (Cody) 34:24-35:13, 40:20-41:5). He testified that both Philips's and Hunt's target consumers are lighting professionals. (6/7/17 PM Trial Tr. (Cody) 47:2-12).

Finally, Dr. Cody testified that he believed that ballasts are a control and that a dimming control is a ballast. (6/7/17 PM Trial Tr. (Cody) 32:13-22). He suggested that if Hunt wanted to expand its product line to sell another LED controller under its name, it could contract, manufacture, and complete a project in a twelve to fourteen week period. (6/7/17 PM Trial Tr. (Cody) 57:12-58:14).

### c. DEPOSITION TESTIMONY OF JEFFREY KREBS

Hunt next read into the record the deposition testimony of Jeffrey Krebs, a product manager involved in marketing at Philips. (6/7/17 PM Trial Tr. (Krebs) 67:17-68:6). Mr. Krebs testified that Philips sells lighting controls in the professional channel, and it sells some lamps in the consumer channel. (6/7/17 PM Trial Tr. (Krebs) 69:14-70:2, 71:3-10, 73:18-74:1). Mr.

Krebs defined the consumer channel as selling products "through Home Depot, target to end-users, homeowners." (6/7/17 PM Trial Tr. (Krebs) 71:16-18). He also stated that in some cases, Hunt's products are competitive with Philips's products and that in some cases, Hunt and Philips market products to the same people. (6/7/17 PM Trial Tr. (Krebs) 87:2-6).

He testified that Philips used the tagline "sense and simplicity" in ads targeted at both the consumer and professional channels. (6/7/17 PM Trial Tr. (Krebs) 73:20-9). Philips used its "Simplicity is a . . ." phrase in its advertisements to the professional channel. (6/7/17 PM Trial Tr. (Krebs) 74:20-75:1). Mr. Krebs explained that Philips stopped using "sense and simplicity" in November 2013; it did not use the phrase on any new printed materials and at the time of his deposition, it was in the process of pulling down spec sheets that included "sense and simplicity" from the Philips website. (Stip. Facts ¶ 49; 6/7/17 PM Trial Tr. (Krebs) 81:7-84:3).

### d. Deposition Testimony of Geert Van Kuyck

Next, Hunt read the deposition testimony of Geert Van Kuyck, the chief marketing officer of Philips. (6/7/17 PM Trial Tr. (Van Kuyck) 90:9-10). Mr. Van Kuyck testified regarding the implementation of the "sense and simplicity" tagline. (6/7/17 PM Trial Tr. (Van Kuyck) 91:21-94:22). First, he testified that Philips conducted a U.S. trademark search on March 26, 2004 and he was only aware that Philips found one company – Canon in Australia – that used "Simplicity" as a trademark or tagline. (KPTX-001; CCTX-142; 6/7/17 PM Trial Tr. (Van Kuyck) 108:16-109:13).

Philips featured the "sense and simplicity" tagline on advertising, promotional material, and sale materials. (6/7/17 PM Trial Tr. (Van Kuyck) 95:17-96:16, 107:12-108:14). Mr. Van Kuyck suggested that an important distinction was that "Philips" was the company's brand and

"sense and simplicity" was the company's brand promise.  (6/7/17 PM Trial Tr. (Van Kuyck) 95:3-16).

### e.  DEPOSITION TESTIMONY OF TERRY FASSBURG

Next, Hunt read in the deposition of Terry Fassburg, given before the TTAB.  (6/7/17 PM Trial Tr. (Fassburg) 109:20-110:1).  Terry Fassburg worked at Philips for eleven years and worked on the launch of the "sense and simplicity" campaign in 2004.  (6/7/17 PM Trial Tr. (Fassburg) 110:6-112:8).  Mr. Fassburg testified that "sense and simplicity" was "terribly important, and I can't think of a more important identifier . . . than of course the mark Philips".  (6/8/17 AM Trial Tr. (Fassburg) 3:23-5:7).  Mr. Fassburg also admitted to being familiar with the corporate advertising campaign in which Philips advertisements started its sentences with "Simplicity is  a. . .".  (6/8/17 AM Trial Tr. (Fassburg) 8:2-9:1, 10:8-20).  Mr. Fassburg testified that Philips spent twelve million euros in advertising in the United States in 2008 and included a reference to "sense and simplicity" on all of those advertisements.  (6/8/17 AM Trial Tr. (Fassburg) 8:23-11:22).

Mr. Fassburg testified that Philips did not use "sense and simplicity" to identify its various products and that Philips's brand identity guidelines prohibited the use of "sense and simplicity" on products or product packaging.  (6/7/17 PM Trial Tr. (Fassburg) 120:12-14, 131:5-11).  He testified that Phlips did not have a "simplicity" product line.  (6/7/17 PM Trial Tr. (Fassburg) 120:12-14).

Mr. Fassburg testified that the Simplicity Advisory Board was a group that advised Philips on how to make their products advanced but easy to use, and that the Simplicity Advisory Board had nothing to do with the "sense and simplicity" campaign.  (6/7/17 PM Trial Tr.

(Fassburg) 121:15-123:10).  Mr. Fassburg testified that Philips held a Simplicity Event to show off all of its products, including lighting products, and that at the event, Philips attempted to show both non-professionals and professionals how Philips delivers on the brand promise of "sense and simplicity."  (6/7/17 PM Trial Tr. (Fassburg) 133:14-134:18, 141:9-143:15).

### f.  DEPOSITION TESTIMONY OF STEVEN DOMBAR

Hunt's final deposition reading was that of Steven Dombar, the general manager of Top Bulb since 2001 or 2002.  (KPTX-506 (Dombar Dep.) 7:23-19, 10:24-25).  Philips later played a video of this same deposition.

Mr. Dombar testified that Top Bulb mostly sells light bulbs of various brands through their website to "basically anyone who needs a light bulb", in addition to businesses, schools, and hospitals.  (KPTX-506 (Dombar Dep.) 8:7-13, 11:2-16, 53:11-19, 54:4-13, 94:10-13).  Top Bulb sells name-brand bulbs from manufacturers such as Philips, GE, and Osram/Sylvania.  (KPTX-506 (Dombar Dep.) 54:4-13).  It does not carry any "Simplicity" brand bulbs from Hunt.  (KPTX-506 (Dombar Dep.) 31:3-12).

Mr. Dombar testified that his former boss, Phil Bonello, had exchanged emails with Mr. Glaser in September 2007, regarding their agreement in which www.simplicitylightingsolutions.com linked to the Top Bulb webpage.  (KPTX-506 (Dombar Dep.) 20:25-21:11, 71:9-19, 72:18-73:5).  The two agreed that Top Bulb would provide a five percent commission to Hunt for every sale that Top Bulb made to an individual who accessed the website through www.simplicitylightingsolutions.com.  (KPTX-506 (Dombar Dep.) 73:5).  There were only ten to twelve sales that occurred from customers linked to the Top Bulb site through the Simplicity Lighting Solutions site, and thus Top Bulb only owed Hunt $50 in

commission. (KPTX-506 (Dombar Dep.) 26:9-21). According to Mr. Dombar, Mr. Glaser told

Mr. Bonello not to worry about paying the commission. (KPTX-506 (Dombar Dep.) 26:9-21).

Mr. Dombar testified that to his knowledge, the products sold to Simplicity Lighting

Solutions web users were never marked as Simplicity products when shipped. (KPTX-506

(Dombar Dep.) 31:3-12, 87:9-87:20). He did not remember receiving any "Simplicity" labels

from Hunt. (KPTX-506 (Dombar Dep.) 87:14-20).

### g. TESTIMONY OF DR. ALEXANDER SIMONSON

Next, Philips presented its case. Philips's first witness was Dr. Alexander Simonson, an

expert in the field of consumer research and surveys for trademark litigation. (6/8/17 AM Trial

Tr. (A. Simonson) 39:2-40:9). Dr. A. Simonson surveyed 168 electrical contractors and 168

electrical engineers over the phone from October 16, 2013 to December 23, 2013. (6/8/17 AM

Trial Tr. (A. Simonson) 54:16-58:6; KPTX-077). He surveyed electrical engineers and electrical

contractors because Philips's attorneys told him that they these were an important part of Hunt's

customer base, and that in surveying customers in reverse confusion cases, an analyst must look

at the senior user's customer base. (6/8/17 AM Trial Tr. (A. Simonson) 41:6-9, 43:14-19). He

only selected electrical engineers and electrical contractors if they had worked for one year or

more and if they had experience specifying or choosing architectural dimming systems, controls,

or wall box dimmers. (6/8/17 AM Trial Tr. (A. Simonson) 46:22-48:20).

Dr. A. Simonson showed the respondents portions of Hunt's website and directed them to

multiple times where "Simplicity" appeared. (6/8/17 AM Trial Tr. (A. Simonson) 54:16-58:6;

KPTX-077). The participants saw the word "Simplicity" about twenty times on the website and

heard it aloud at least twice. (6/8/17 AM Trial Tr. (A. Simonson) 55:19-24; KPTX-077). He

told the participants to view the Hunt website as if they were considering buying Hunt's products. (6/8/17 AM Trial Tr. (A. Simonson) 56:9-10). Respondents had as much time as they wanted to review the Hunt webpage. (6/8/17 AM Trial Tr. (A. Simonson) 56:16-21).

Then, respondents were asked questions about ownership, source, or affiliation of Hunt, in order to test if there was any confusion between Hunt's use of "Simplicity" and Philips's use of "sense and simplicity". (6/8/17 AM Trial Tr. (A. Simonson) 40:17-41:20, 54:16-58:6, 60:22-62:25; KPTX-072). Out of all of the electrical engineers and all of the electrical contractors, only one electrical engineer mentioned Philips as to the source of the webpage. (6/8/17 AM Trial Tr. (A. Simonson) 64:7-10, 65:9-12; KPTX-075 at 11, 15-29, 44-58). One electrical engineer responded that "maybe Lightolier" had a relationship to Hunt and two of 168 electrical contractors mentioned "Lightolier or Lutron". (6/8/17 AM (A. Simonson) 42:4-15, 65:13-15; KPTX-075 at 9, 24-25, 53-54, 38). Dr. A. Simonson concluded from this survey that among electrical engineers and electrical contractors, there was no actual reverse confusion as to ownership or affiliation between Hunt and Philips and there was an insignificant – "potentially one percent" – level of confusion as to source. (6/8/17 AM Trial Tr. (A. Simonson) 75:3-8).

Dr. A. Simonson testified that he conducted an *Eveready* survey because the *Eveready* survey format was standard for reverse confusion cases. (6/8/17 AM Trial Tr. (A. Simonson) 57:14-60:6). As part of the *Eveready* design, he only showed the Hunt mark. (6/8/17 AM Trial Tr. (A. Simonson) 56:9-10). Dr. A. Simonson explained that if there was actual reverse confusion, respondents would answer open-ended questions by referring to the Philips mark because the Philips mark would have saturated the market. (6/8/17 AM Trial Tr. (A. Simonson) 57:14-60:6). He explained that *Squirt* surveys are not usually used in reverse confusion cases

18

and are only relevant when a consumer regularly sees both brands being sold next to one another at a store.  (6/8/17 AM Trial Tr. (A. Simonson) 94:13-95:19).

### h. TESTIMONY OF CAROLYN KERR

Philips next called Carolyn Kerr, "the director of marketing communications and brand at Philips Lighting United States."  (6/8/17 PM Trial Tr. (Kerr) 8:9-23).  Ms. Kerr testified that Philips began using the "sense and simplicity" tagline worldwide in 2004, and that she was concerned that it did not fit well as a tagline for selling lighting products.  (6/8/17 PM Trial Tr. (Kerr) 12:6-13:7, 14:14-15:8, 17:12-18).

Ms. Kerr testified that Philips sells some of its light bulbs in the "consumer" channel and others in the "professional" channel.  (6/8/17 PM Trial Tr. (Kerr) 10:7-21).  She testified that professional products are designed for office buildings, retail establishments, education, hospitality, restaurants, hospitals, and more, and that advertisements for the professional channel are aimed at architects, electrical engineers, lighting designers, electrical contractors, and/or distribution wholesalers.  (6/8/17 PM Trial Tr. (Kerr) 10:7-11:6, 32:11-33:16).  She testified that from 2004 to 2013, Philips Lighting advertised in print, online, on the radio, and on television.  (6/8/17 PM Trial Tr. (Kerr) 8:24-9:2).  Philips did not run TV commercials or radio ads for these professional lighting products, but often advertised to professionals through magazines.  (6/8/17 PM Trial Tr. (Kerr) 32:11-33:16, 81:8-17).

Ms. Kerr explained that Philips's "brand identity guide" instructed employees that the brand promise of "sense and simplicity" needed to always be placed in a "lock-up" configuration with the company wordmark of PHILIPS: PHILIPS and "sense and simplicity" could not be separated, and the proportions between them could not be adjusted.  (6/8/17 PM Trial Tr. (Kerr)

16:12-14, 17:19-19:10, 71:23-72:7, 88:6-13; KPTX-007 at 1, 3, 11-12).  The fonts and colors also could not be changed.  (6/8/17 PM Trial Tr. (Kerr) 16:4-11).  Additionally, Ms. Kerr testified that Philips had a company policy that "sense and simplicity" could not be used on packaging or products.  (6/8/17 PM Trial Tr. (Kerr) 19:11-25, 20:11-22).

Ms. Kerr testified that from September 2004 until June 2005, Philips spent about $33 million on advertisements in the U.S. for all of its products that contained the tagline "sense and simplicity".  (6/8/17 PM Trial Tr. (Kerr) 43:5-18).  Ms. Kerr admitted that the company was attempting to tie its brand to the idea of "simplicity".  (6/8/17 PM Trial Tr. (Kerr) 63:2-65:16).

In 2005, after the $33 million was spent on advertising, Philips hired an outside research company, called "i to i", to measure tagline recall.  (6/8/17 PM Trial Tr. (Kerr) 41:10-43:25; 57:10-16).  The report showed that in October through December of 2004, June 2005, and November 2005, only one to two percent of the surveyed individuals who responded that they had seen or heard of Philips's advertising could recall "sense and simplicity" as the tagline for Philips without aid.  (6/8/17 PM Trial Tr. (Kerr) 41:13-44:4; JTX-013 at 21).  Only two to three percent could recall a partially correct tagline.  (6/8/17 PM Trial Tr. (Kerr) 41:8-43:4).  Some of these partially correct answers were "sense and sensibility," "sensible" and "simplicity and simple".  (6/8/17 PM Trial Tr. (Kerr) 42:17-43:4).  The "i to i" report concluded that Philips's brand campaign "achieved very low [consumer] awareness" and that "[r]ecall of this tagline was almost non-existent."  (6/8/17 PM Trial Tr. (Kerr) 45:20-46:6).

Similarly, in November 2006, after Philips had spent a total of about $40-41 million on advertising "sense and simplicity", one percent of those who had seen or heard Philips's advertising could without aid correctly recall the tagline and two percent could partially recall

the tagline.  (6/8/17 PM Trial Tr. (Kerr) 47:9-48:10).  The "i to i" report also showed that in

2006, 37% of respondents who self-identified as very familiar with Philips (nine or ten on a scale

of one to ten) associated the brand statement "This brand stands for simplicity" with Philips.

(6/8/17 PM Trial Tr. (Kerr) 55:20-56:13; JTX-013 at 18).  Ms. Kerr explained, however, that

customers who said they were very familiar with Philips identified General Electric ("GE") and

Apple at higher rates than Philips when asked which brands they associated with "simplicity".

(6/8/17 PM Trial Tr. (Kerr) 82:6-21; JTX-013 at 18).  The customers were allowed to name as

many companies as they thought fit the statement "This brand stands for simplicity"; 40% of

consumers associated GE with "simplicity", and 65% associated Apple with it.  (6/8/17 PM Trial

Tr. (Kerr) 55:20-56:13, 82:6-21; JTX-013 at 18).  Neither Apple or GE had taglines that included

"Simplicity" in them.  (6/8/17 PM Trial Tr. (Kerr) 55:20-56:13, 82:6-21).  Moreover, the

consumers who were very familiar with Philips more strongly associated Philips with two other

statements.  (6/8/17 PM Trial Tr. (Kerr) 86:25-87:14; JTX-013 at 25).  52% of these customers

associated Philips with the statement "The products of this brand are developed based on

consumer needs" and 49% of these customers associated Philips with "This brand's products are

easy to use and install."  (6/8/17 PM Trial Tr. (Kerr) 86:25-87:14; JTX-013 at 25).

　　Ms. Kerr testified that in 2006, when the company learned that consumers were largely

not recognizing the "sense and simplicity" tagline or associating Philips with the idea of

"simplicity", the company released corporate guidelines encouraging her department to use the

"Simplicity is a . . ." model to advertise.  (6/8/17 PM Trial Tr. (Kerr) 29:16-20; 66:22-68:6).

Philips Lighting therefore adopted the "Simplicity is a . . ." model of advertising for a two-year

period starting in 2007.  (6/8/17 PM Trial Tr. (Kerr) 29:16-20; 66:22-67:17).  She testified that in

2008, Philips spent $171,080 on print advertising of professional lighting products, eight percent of which went to advertising emergency ballasts. (6/8/17 PM Trial Tr. (Kerr) 77:7-78:8). None of the print advertising was for dimming controls or lighting controls in 2008 or after. (6/8/17 PM Trial Tr. (Kerr) 77:7-78:24).

Ms. Kerr testified that Philips never used "Simplicity" alone as a tagline or as a brand. (6/8/17 PM Trial Tr. (Kerr) 21:7-15). She testified that the Simplicity Advisory Board was a panel of industry experts that advised Philips internally for two years. (6/8/17 PM Trial Tr. (Kerr) 21:18-22:1, 23:20-24:2, 24:9-22, 25:10-16). She also testified that Philips held five Simplicity Events in different countries to display its product innovations to key customers. (6/8/17 PM Trial Tr. (Kerr) 25:1-9, 25:17-27:2). The only Simplicity Event in the US was held in April 2006 in New York. (6/8/17 PM Trial Tr. (Kerr) 25:1-9, 25:17-27:2). Philips invited retail executives and professionals, as well as the press who wrote about Philips products. (6/8/17 PM Trial Tr. (Kerr) 25:1-9, 25:17-27:2).

### i. TESTIMONY OF DENISE LEE YOHN

Next, Denise Yohn testified as an expert in the field of brands and branding. (6/8/17 PM Trial Tr. (Yohn) 92:24-93:7). She testified that brands and taglines are not synonymous: a brand, she explained, "is a bundle of values and attributes that distinguish an offering, the product or service", while a tagline is "a message used in communications to promote an offering, such as a product or a service." (6/8/17 PM Trial Tr. (Yohn) 93:22-94:5). Ms. Yohn testified that Philips used "sense and simplicity" as a tagline, even though it had called "sense and simplicity" its brand promise. (6/8/17 PM Trial Tr. (Yohn) 94:12-17, 106:21-6).

Ms. Yohn commissioned a research firm called Russell Research to conduct an online questionnaire in March 2014, aimed at people who had seen "sense and simplicity" on Philips's advertising or Philips's website.  (6/8/17 PM Trial Tr. (Yohn) 95:13-19, 96:12-98:13).  The survey found that of the 211 qualified respondents, only two people – or one percent – recalled the tagline "sense and simplicity."  (6/8/17 PM Trial Tr. (Yohn) 98:21-99:2).  One person recalled the tagline as "sense and sensibility."  (6/8/17 PM Trial Tr. (Yohn) 99:3-18).  After reviewing Philips's own internal research and her own market research conducted by Russell Research, Ms. Yohn concluded that "sense and simplicity" was not a memorable tagline.  (6/8/17 PM Trial Tr. (Yohn) 94:18-95:16, 99:19-21, 106:10-19).

**j.  TESTIMONY OF DR. MICHAEL BARONE**

Philips next presented Dr. Michael Barone as an expert witness in consumer research and on surveys.  (6/8/17 PM (Barone) 121:24-122:13).  Dr. Barone conducted a survey on whether consumers would be confused between Philips's tagline "sense and simplicity" and Hunt's use of "Simplicity" on its www.simplicitylightingsolutions.com website.  (6/8/17 PM (Barone) 122:15-22).  In November 2013, he surveyed consumers who either purchased light bulbs online in the previous six months before the survey or planned to purchase light bulbs online within the next six months after the survey, because these were potential customers of www.simplicitylightingsolutions.com.  (6/8/17 PM (Barone) 123:4-125:3).

Dr. Barone showed half of the survey respondents Hunt's Simplicity Lighting Solutions webpage and the other half a webpage called "Lighting Solutions" without reference to "Simplicity", and then asked both groups questions on ownership, source, and affiliation of the web page.  (6/8/17 PM Trial Tr. (Barone) 123:4-125:3, 128:16-131:17; KPTX-079; KPTX-080;

KPTX-081).  Out of the test group – the individuals who saw the actual Simplicity Lighting

Solutions website, one person mentioned Philips with regard to ownership, three people

mentioned Philips with regard to source, and four people mentioned Philips with regard to

affiliation.  (6/8/17 PM Trial Tr. (Barone) 130:10-131:10; KPTX-083; KPTX-084).  Of the

control group – in which the participants only saw the Hunt website with no mention of

"Simplicity," one person also mentioned Philips as to ownership, five people mentioned Philips

as regard to source, and nobody mentioned Philips regarding affiliation.  (6/8/17 PM Trial Tr.

(Barone) 130:10-131:10; KPTX-083; KPTX-084).  Many of the same respondents who listed

Philips also listed other light bulb companies like GE or Sylvania, leading Dr. Barone to believe

that these individuals were naming light bulb companies as guesses.  (6/8/17 PM Trial Tr.

(Barone) 133:21-134:4).  Dr. Barone concluded from his survey that among online purchasers of

light bulbs, there was less than one percent of net confusion arising from the use of the term

"Simplicity" on www.simplicitylightingsolutions.com.  (6/8/17 PM Trial Tr. (Barone) 131:11-

17).

    Dr. Barone testified that he conducted an *Eveready* survey in order test reverse confusion.

(6/8/17 PM (Barone) 122:23-123:1, 123:13-18).  He testified that a sequential two-room survey

was inappropriate here because consumers did not encounter the two marks "side-by-side on a

retail shelf or in close proximity to each other online".  (6/8/17 PM (Barone) 128:23-129:15).

### k.  TESTIMONY OF DR. RONALD R. BUTTERS

    Next, Philips called an expert in linguistics, Dr. Ronald R. Butters, to testify.  (6/9/17 AM

Trial Tr. (Butters) 12:25-13:10).  Dr. Butters first testified that Philips's and Hunt's marks had

different appearances in the advertisements he looked at.  (6/9/17 AM Trial Tr. (Butters) 16:18-

17:6).  Although he admitted that there was some similarity between the marks in that both used the word "simplicity," he testified that the marks looked different because of the additional words "and" and "sense" in Philips's mark.  (6/9/17 AM Trial Tr. (Butters) 38:23-39:25).  Dr. Butters concluded that the likelihood of linguistic confusion, when looking at advertisements, was "virtually nil" because of the different "context[s]" and "semiotics" of the ads.  (6/9/17 AM Trial Tr. (Butters) 14:14-16, 37:10-39:15).

Next, he testified that the two marks differed in the way they sounded.  While both used the word "simplicity" and both phrases included the sibilant "S", the marks differed in the number of words, "sense and simplicity" used alliteration, and the phrase "sense and simplicity" had more syllables than "simplicity" alone.  (6/9/17 AM Trial Tr. (Butters) 17:7-18, 40:22-42:16, 45:17-46:9).

Dr. Butters also testified as to the meaning of the two marks.  (6/9/27 AM Trial Tr. (Butters) 17:19-23).  Dr. Butters testified that Hunt's brand of "Simplicity" was a "weakly descriptive word" that describes a quality.  (6/9/27 AM Trial Tr. (Butters) 17:19-18:14).  He explained that one could easily find the definition of "Simplicity" in a dictionary, but that one cannot find a dictionary definition of the term "sense and simplicity" and it is "far from clearly descriptive."  (6/9/27 AM Trial Tr. (Butters) 17:19-18:14).  Dr. Butters further testified that "sense and simplicity" is a unitary phrase strongly bound together by the conjunctive, rather than two distinct words.  (6/9/17 AM Trial Tr. (Butters) 17:25-18:7, 20:10-21:6).  He explained that the "and" in "sense and simplicity" made the term "really opaque": it did not have a clear meaning, and it was a unique phrase, not used by other parties other than Philips.  (6/9/27 AM Trial Tr. (Butters) 17:19-21:6).

Moreover, Dr. Butters testified that a "reader or hearer, or someone trying to remember the phrase if one wanted to will remember the 'sense' part" because "[i]t comes first, and psychologists of language have long held that the first word is the – in a compound or compound phrase is the most important." (6/9/17 AM Trial Tr. (Butters) 21:7-17). Dr. Butters stated that consumers remembering Philips's tagline might remember that the second part ended with "-ity", but that the word "sense" was more memorable than the second word. (6/9/17 AM Trial Tr. (Butters) 21:7-17).

In addition, Dr. Butters explained that the marks differed because "sense and simplicity" created a cultural allusion to Jane Austin's well-known novel *Sense and Sensibility*, which, according to Dr. Butters, "will come immediately to mind in hearing 'sense and simplicity' because they're very identical in sound structure." (6/9/17 AM Trial Tr. (Butters) 21:18-22:1). In fact, several journalists have referred to Philips's tagline accidentally as "sense and sensibility." (6/9/17 AM Trial Tr. (Butters) 22:2-22:12, 25:9-24; KPTX-107; KPTX-108; KPTX-109). Dr. Butters also testified that in one of Hunt's legal briefs, Hunt's lawyers even used the term "sense and sensibility" by mistake. (6/9/27 AM Trial Tr. (Butters) 22:17-25).

Dr. Butters testified that he looked at third-party usages of the term "Simplicity" as well. (6/9/27 AM Trial Tr. (Butters) 23:8-12). He testified that there are "scores" and "probably hundreds" of third-party uses of the word "simplicity." (6/9/27 AM Trial Tr. (Butters) 26:15-29:20). Dr. Butters admitted on cross-examination that he did not investigate how long these third parties used the "Simplicity" terms on their websites, whether they engaged in print advertising, or how much advertising they distributed. (6/9/27 AM Trial Tr. (Butters) 30:25-31:10). Nevertheless, Dr. Butters concluded that the many third-party uses of "Simplicity"

showed that the term is a descriptive term that is a weak identifier of a particular product. (6/9/27 AM Trial Tr. (Butters) 29:21-30:2).

### l. TESTIMONY OF DR. CRAIG A. BERNECKER

Dr. Craig Bernecker testified next as an expert in the field of lighting, lighting education, and lighting design. (6/9/17 AM Trial Tr. (Bernecker) 63:17-22). Dr. Bernecker did research into Hunt's lighting controls, the specification process to purchase Hunt products, and Hunt's channels of trade. (6/9/17 AM Trial Tr. (Bernecker) 63:24-64:11).

Dr. Bernecker began his testimony by describing Hunt's products. He testified that Hunt's products are complex because they make up parts of a larger lighting system in which all items must be compatible. (6/9/17 AM Trial Tr. (Bernecker) 63:12-19, 74:1-78:2, 92:10-93:21, 95:18-96:13). An electrical engineer needs to install complex wiring systems and configurations to ensure that the products work correctly and are safe. (6/9/17 AM Trial Tr. (Bernecker) 63:12-19, 74:1-78:2, 92:10-93:21, 95:18-96:13).

Dr. Bernecker testified that Hunt's products include wall box dimmers, panel systems and input devices, sensors, and control devices. (6/9/17 AM Trial Tr. (Bernecker) 63:12-19). He testified that Hunt sells architectural dimming controls and architectural dimming systems, but does not sell dimming controls or systems that were not architectural. (6/9/17 AM Trial Tr. (Bernecker) 63:20-64:5). Architectural lighting refers to lightings for buildings and exteriors. (6/9/17 AM Trial Tr. (Bernecker) 56:14-20). Dr. Bernecker testified that Hunt did not sell ballasts and that a ballast was not a control. (6/9/17 AM Trial Tr. (Bernecker) 102:10-109:9) ("Never, ever, ever before this case have I heard a ballast referred to as a control in the 41 years that I've been involved in lighting. . ."). He explained that a ballast "enables the operation of a

fluorescent light source." (6/9/17 AM Trial Tr. (Bernecker) 118:9-25). Dr. Bernecker explained that it indeed would be difficult for Hunt to sell a new line of Hunt ballasts because lighting specifiers would likely choose ballasts from other well-respected ballast brands. (6/9/17 AM Trial Tr. (Bernecker) 108:20-109:3, 15:6-21).

Dr. Bernecker testified that Hunt's products range in pricing from $100 to tens of thousands of dollars. (6/9/17 AM Trial Tr. (Bernecker) 64:6-12). Hunt's architectural dimming control systems and panels cost between $5,000 and over $12,000. (6/9/17 AM (Bernecker) 64:6-12). Hunt sells its wall box dimmers at a starting price point of $100. (6/9/17 AM Trial Tr. (Bernecker) 86:16-18; CCTX-115 at 12). Often purchasers order wall box dimmers in bulk and thus, these orders usually add up to several hundred to several tens of thousands of dollars. (6/9/17 AM Trial Tr. (Bernecker) 64:8-14, 86:1-18).

Dr. Bernecker then explained the complex process of choosing and purchasing dimming control products from a manufacturer, like Hunt. (6/9/17 AM Trial Tr. (Bernecker) 74:1-75:24; KPTX-501; KPTX-502). First, a client hires a lighting specifier, such as an electrical engineer, to design a project. (6/9/17 AM Trial Tr. (Bernecker) 74:7-13). The specifier then identifies the specific controls, components, and systems that are necessary. (6/9/17 AM Trial Tr. (Bernecker) 74:13-16). Electrical contractors then bid on the project. (6/9/17 AM Trial Tr. (Bernecker) 74:18-21). Once the client approves an electrical contractor, the electrical contractor sets out to obtain the specified products at the best price. (6/9/17 AM Trial Tr. (Bernecker) 74:22-75:5, 75:12-24). In many instances, the contractor can substitute equivalent products from different manufacturers. (6/9/17 AM Trial Tr. (Bernecker) 75:12-24). But, the contractor must check with the specifier before buying specific products for the project. (6/9/17 AM Trial Tr.

(Bernecker) 74:22-75:5).  Dr. Bernecker suggested that manufacturer's representatives provide technical information about the products to the electrical engineers (or specifiers) and facilitate the sale of products to electrical contractors.  (6/9/17 AM Trial Tr. (Bernecker) 68:18-69:2).  Manufacturer's representatives provide bids from the manufacturer to the electrical contractors for particular products.  (6/9/17 AM Trial Tr. (Bernecker) 68:18-69:2).  When the specifier approves the specific products, the electrical contractor orders the products from an electrical distributor, who orders the products from the manufacturer.  (6/9/17 AM Trial Tr. (Bernecker) 75:1-11, 81:23-82:24).  The manufacturer then generally ships the product directly to the contractor or to the job site.  (6/9/17 AM Trial Tr. (Bernecker) 75:1-11).  The contractor installs the products and fixes any problems.  (6/9/17 AM Trial Tr. (Bernecker) 77:18-78:2).

Dr. Bernecker looked at 7,209 Hunt invoices from 2009 to 2012 to determine who Hunt's customers were.  (6/9/17 AM Trial Tr. (Bernecker) 64:16-25, 65:25-66:8).  The invoices showed that electrical distributors usually paid Hunt, and Hunt usually shipped orders directly to electrical contractors.  (6/9/17 AM Trial Tr. (Bernecker) 80:4-83:3).  This was in line with Dr. Bernecker's description of the specification process.  Dr. Bernecker thus testified that although it looked like the electrical distributors were a large percentage of Hunt's business from the invoices, the electrical distributors were not the specifiers or the people choosing Hunt's products; rather, electrical engineers generally specify Hunt's dimming products, and electrical contractors primarily choose Hunt's products.  (6/9/17 AM Trial Tr. (Bernecker) 68:8-10, 82:4-91:10).

Dr. Bernecker lastly testified that Hunt's products are not typically described as "Simplicity" on the documents used during the specification process.  (6/9/17 AM Trial Tr.

(Bernecker) 69:12-72:9, 87:10-25, 88:1-91:12).  He found little evidence of the use of
"Simplicity" on manufacturer's representative's typical "line cards", on documents from the
electrical contractor identifying their desired products, or on submittal documents from a
contractor to an electrical engineer for the electrical engineer's approval.[5]  (6/9/17 AM Trial Tr.
(Bernecker) 69:12-72:9, 87:10-25, 88:1-91:12).

### m.  TESTIMONY OF DR. ITAMAR SIMONSON

Dr. Itamar Simonson testified next for Philips.[6]  Dr. I. Simonson is an expert in consumer
research and surveys in the field of trademarks, and he conducted a survey to determine whether
"sense and simplicity" had any impact on the perceptions and decisions of consumers of light
bulbs.  (6/9/17 PM Trial Tr. (I. Simonson) 8:21-9:10).

Dr. I. Simonson conducted a survey in July through August of 2014.  (6/9/17 PM Trial
Tr. (I. Simonson) 9:9-14).  He surveyed 317 consumers who had either purchased light bulbs
during the previous year or expected to purchase light bulbs in the following year.  (6/9/17 PM
Trial Tr. (I. Simonson) 9:15-19).  He surveyed consumers of light bulbs because these were
probably some of Philips Lightings' least sophisticated consumers and "if anyone was going to
influenced by this tag line, it would be consumers."  (6/9/17 PM Trial Tr. (I. Simonson) 9:20-
25).

To conduct the survey, Dr. I. Simonson showed one group a Philips Lighting television
commercial with the "sense and simplicity" tagline at the end and showed a second group the

---

[5] On one submittal, the "Simplicity" term was used for Hunt's LED controllers, one of their
newer products.  (6/9/17 AM Trial Tr. (Bernecker) 91:18-92:9).
[6] Dr. Itamar Simonson testified that he was not related to Dr. Alexander Simonson.  (6/9/17 PM
Trial Tr. (I. Simonson) 4:9-12).

same commercial without the tagline. (6/9/17 PM Trial Tr. (I. Simonson) 19:16-20:7). Both groups also saw GE and Sylvania commercials for lighting products. (6/9/17 PM Trial Tr. (I. Simonson) 20:22-25). The respondents were asked open-ended questions, including what the commercials' main messages were. (6/9/17 PM Trial Tr. (I. Simonson) 22:20-22, 23:2-16). The respondents were also asked to rate how persuasive each ad was and to explain their ratings. (6/9/17 PM Trial Tr. (I. Simonson) 23:17-24:9). Additionally, the respondents were asked which brand of light bulbs they would buy, why they would buy that brand, and what factors or considerations influenced their decision to buy that particular light bulb. (6/9/17 PM Trial Tr. (I. Simonson) 24:10-25:8). Dr. I. Simonson's goal in asking these questions was also to elicit whether consumers considered "simplicity" a factor in making purchasing decisions for light bulbs due to Philips's "sense and simplicity" tagline. (6/9/17 PM Trial Tr. (I. Simonson) 24:10-25:6).

The most common response to the question on what message the commercials conveyed was that customers would save money by buying the specific light bulb. (6/9/17 PM Trial Tr. (I. Simonson) 26:20-27:7). Another common response was that the particular light bulb was long lasting. (6/9/17 PM Trial Tr. (I. Simonson) 27:16-20). Three respondents mentioned "simplicity" as one of the messages that the Philips commercial which included the phrase "sense and simplicity" was communicating, but more people mentioned that Sylvania's commercial was attempting to convey "simplicity". (6/9/17 PM Trial Tr. (I. Simonson) 27:11-15; KPTX-093).

Dr. I. Simonson also looked at the results for the question of which brand the respondents would choose to buy light bulbs from and compared the responses of the viewers of the Philips

commercial with the "sense and simplicity" tagline to the viewers of the commercial without the

tagline.  (6/9/17 PM Trial Tr. (I. Simonson) 28:2-10).  Dr. I. Simonson concluded that there was

"virtually no difference, a tiny difference, point two . . . but I wouldn't attach any significance to

that" and that the tagline therefore made no real difference to the respondents' purchasing

preferences.  (6/9/17 PM Trial Tr. (I. Simonson) 28:2-10).  Moreover, no respondent mentioned

simplicity as a factor in deciding which light bulbs to purchase.  (6/9/17 PM Trial Tr. (I.

Simonson) 28:11-15).  About a third of the respondents mentioned brand name as a factor.

(6/9/17 PM Trial Tr. (I. Simonson) 28:16-29:3).

Dr. I. Simonson concluded, in his expert opinion, that the tagline "sense and simplicity"

had no measurable commercial impact on consumer behavior and did not affect the

persuasiveness of Philips's advertisements.  (6/9/17 PM Trial Tr. (I. Simonson) 23:2-25:8, 27:21-

30:24, 33:22-34:2; KPTX-089; KPTX-092; KPTX-093).  Dr. I. Simonson inferred from the

survey that professionals in the lighting industry were even less likely to be influenced by the

"sense and simplicity" tagline in their purchasing decisions than ordinary consumers were.

(6/9/17 PM Trial Tr. (I. Simonson) 29:4-30:8).  Additionally, he concluded that the tagline had

no impact on whether consumers attached Philips to the idea of simplicity.  (6/9/17 PM Trial Tr.

(I. Simonson) 30:18-24, 33:22-34:2).

**n.  DEPOSITION TESTIMONY OF CAMERON LOUIE**

Philips next presented several video depositions.  First, Philips presented the video

deposition of Cameron Louie, a former Hunt employee.  (KPTX-503 (Louie Dep.) 8:8-13).  Mr.

Louie was an electrical engineer employed at Hunt from October 2005 until he was fired in May

2010.  (KPTX-503 (Louie Dep.) 8:8-13, 9:19-22).  He testified that while at Hunt, the company

did not sell light bulbs or LEDs.  (KPTX-503 (Louie Dep.) 24:21-25).  Mr. Louie testified that he recalled that Philips sold dimming ballasts and that these were the "best or most compatible" with Hunt dimming systems.  (KPTX-503 (Louie Dep.) 13:22-14:19, 22:13-25).

His position involved designing digital systems and determining pricing for customers. (KPTX-503 (Louie Dep.) 9:19-10:6).  He testified that when customers would request a quote directly from Hunt, his job was to help them design the "controls layout" of how the lighting system should be set up.  (KPTX-503 (Louie Dep.) 16:14-17:7).  Then, the customer would put in an order and Mr. Louie would create submittal documents, including a diagram, load schedule, controls layouts, pictures of the system, and the specification.  (KPTX-503 (Louie Dep.) 17:8-14, 18:13-20).  The customers then needed to approve the submittals before Hunt would build the system and ship it out.  (KPTX-503 (Louie Dep.) 17:15-22).

He testified that Hunt's customers were either end-users, including churches, schools, business, and hotels, or manufacturer's sales representatives that Mr. Glaser hired to sell products.  (KPTX-503 (Louie Dep.) 19:13-20:11).  Although he had regular contact with Hunt customers during the design phase, no customer ever asked him whether Hunt was bought by Philips or whether the two companies were related or affiliated.  (KPTX-503 (Louie Dep.) 21:2-22:8).  Mr. Louie did not know whether Philips had a tagline.  (KPTX-503 (Louie Dep.) 22:20-22, 23:2-5).  He testified that no customer ever asked about trademark infringement, Mr. Glaser never mentioned Philips's use of "sense and simplicity" as a problem, and he never knew about any trademark infringement issues while employed at Hunt.  (KPTX-503 (Louie Dep.) 22:9-12, 23:6-20, 30:22-31:2).

### o. DEPOSITION TESTIMONY OF KATHLEEN SEIRUP

Philips next presented the video deposition of another former Hunt employee named

Kathleen Seirup. (KPTX-504 (Seirup Dep.) 13:20-14:16). Ms. Seirup worked at Hunt from July

2008 to September 2010. (KPTX-504 (Seirup Dep.) 13:20-14:16). She testified that her job was

to talk with general contractors, engineers, or other professional customers about product

installation and compatibility. (KPTX-504 (Seirup Dep.) 15:4-12, 20:21-21:10, 22:4-24:13).

Additionally, she received orders, and packaged and shipped orders. (KPTX-504 (Seirup Dep.)

15:13-16). Ms. Seirup also helped dissatisfied customers with items that did not work or with

returns. (KPTX-504 (Seirup Dep.) 15:19-24, 31:21-33:14). Ms. Seirup testified that when

homeowners called Hunt inquiring about products, Hunt employees usually discouraged them

from buying Hunt dimmers since Hunt dimmers were mostly for commercial use. (KPTX-504

(Seirup Dep.) 23:9-17).

At the time when Ms. Seirup worked at Hunt, Hunt sold wall box switch dimmers and

large control systems. (KPTX-504 (Seirup Dep.) 18:18-23). Hunt did not manufacture ballasts.

(KPTX-504 (Seirup Dep.) 21:19-20). Ms. Seirup mostly fielded questions regarding wall box

dimmers; she did not answer questions regarding the large control systems because those

questions were directed to an engineer. (KPTX-504 (Seirup Dep.) 18:18-19:7, 54:7-12). At the

time that Ms. Seirup worked at Hunt, Hunt sold the Eclipsis Series, the Omega Series, and the

Accent Series of wall box dimmers. (KPTX-504 (Seirup Dep.) 43:22-44:10).

Ms. Seirup did not recall whether she fielded any calls or saw any faxes in which

someone mentioned the word "simplicity". (KPTX-504 (Seirup Dep.) 31:8-16). She did not

recall whether anyone asked her whether Philips or Advance owned Hunt, whether the

companies were affiliated, or whether anyone indicated confusion about a relationship between Hunt and Philips. (KPTX-504 (Seirup Dep.) 46:22-48:10, 50:8-14). She was unaware of any trademark dispute between Hunt and Philips while she worked at Hunt. (KPTX-504 (Seirup Dep.) 50:4-7).

### p. DEPOSITION TESTIMONY OF RICHARD LAIRD

The next video deposition that Philips presented was that of Richard Laird, the president of EiKO – a company that sells lamps, ballasts, and fixtures. (KPTX-505 (Laird Dep.) 12:5-13:15, 58:18-59:5). Mr. Laird has worked at EiKO since March 2008 and has been the president since September 1, 2012. (KPTX-505 (Laird Dep.). EiKO's primary consumers are wholesale distributors. (KPTX-505 (Laird Dep.) 31:3-23). 12:9-12). EiKO's annual sales for lighting in the United States add to $60 million. (KPTX-505 (Laird Dep.) 14:13-21).

Mr. Laird testified that EiKO has used the motto "Selection. Solution. Simplicity" continuously since 2003 or 2004. (KPTX-505 (Laird Dep.) 18:4-22). He testified that this tagline has appeared on EiKO's website, in its catalog, on EiKO's specification sheets available for download from the EiKO website, as well as on brochures, envelopes that contain invoices, and business cards. (KPTX-505 (Laird Dep.) 16:4-17:10, 20:20-21:10, 26:14-29:3, 33:5-35:13, 37:11-44:25). Mr. Laird estimated that EiKO distributes 20,000 paper copies of its catalog each year, sends hundreds of thousands of invoices in envelopes each year, and that EiKO employees have given out hundreds of thousands of business cards. (KPTX-505 (Laird Dep.) 29:4-31:2, 43:7-45:14). Additionally, Mr. Laird explained that he has attended Lightfair as a representative of EiKO and that he believed that while he worked at EiKO, EiKO's booth at Lightfair displayed the slogan "Selection. Solutions. Simplicity" every year that EiKO participated in Lightfair.

(KPTX-505 (Laird Dep.) 53:8-55:8).  He testified that he was unaware of any confusion arising from EiKO's use of the "Selection. Solutions. Simplicity" tagline.  (KPTX-505 (Laird Dep.) 55:18-21, 73:14-74:11).

### q. DEPOSITION TESTIMONY OF KRAIG KASLER

Philips next played the video deposition of Kraig Kasler.  Mr. Kasler has worked at Cooper Lighting, LLC since August 2008, and has served as the vice president of marketing since early 2009.  (KPTX-507 (Kasler Dep.) 7:16-8:1).  He testified that Cooper manufactures and sells lighting fixtures and controls using sub-brands.  (KPTX-507 (Kasler Dep.) 10:8-16).  Mr. Kasler stated that Cooper markets to end-users, electrical contractors, distributors, lighting designers, and engineers.  (KPTX-507 (Kasler Dep.) 35:24-37:9).  Eaton acquired Cooper Industries in November 2012.  (KPTX-153 at 1; JPTX-152 at 1; KPTX-507 (Kasler Dep.) 13:5-15:11).  Eaton's website describes the company as a "power management company with 2014 sales of $22.6 billion."  (KPTX-152 at 1).

Mr. Kasler testified that Cooper used the phrase "the sophistication of simplicity" on the 2005 brochure for one of its product families and in a catalog, still used today, for one of its sub-brands. (KPTX-507 (Kasler Dep.) 12:23-15:18, 29:10-31:23).  Cooper distributed about 16,000 of the 2005 brochures in paper form and from April 2011 to early February 2014, the brochure was downloaded 750 times.  (KPTX-507 (Kasler Dep.) 12:23-15:18).  Cooper distributed about 18,712 of the catalogs, and it was downloaded 2,255 times between April 2011 and early February, 2014.  (KPTX-507 (Kasler Dep.) 29:10-31:23).  Cooper also printed and distributed reprinted copies of one of its acquired company's catalogs, which included the term "=simplicity" on a page with a schematic drawing of a lighting control panel, relay panel, and

junction box. (KPTX-507 (Kasler Dep.) 17:10-18:8, 19:18-20:21, 21:18-22:4, 22:9-23:3).

Cooper distributed 5,000 of these catalogs. (KPTX-507 (Kasler Dep.) 19:18-20:21).

Additionally, Cooper printed two other brochures for two of its sub-brands in July 2012, which

included the phrase "versatility and simplicity". (KPTX-507 (Kasler Dep.) 23:15-24:3, 24:22-

25, 26:18-28:2). It distributed 22,000 paper copies of one of these brochures and about 12,600 of

the other. (KPTX-507 (Kasler Dep.) 24:22-25:19, 26:18-27:14). Despite these uses of

"simplicity", Mr. Kasler testified that he did not recall any instances of confusion over Cooper

products. (KPTX-507 (Kasler Dep.) 32:17-25).

### r. DEPOSITION TESTIMONY OF AMY MEREDITH

Next, Philips read in the deposition of Amy Meredith, the director of marketing at Traxon

Technologies ("Traxon") in North America since 2010. (6/12/17 AM Trial Tr. (Meredith)

18:18-12:5, 13:16-21). She has had responsibilities in marketing at Traxon since November

2007. (6/12/17 AM Trial Tr. (Meredith) 18:18-12:18). Ms. Meredith testified that Traxon is a

manufacturer of lighting fixtures and controls and that its customers are mostly lighting

designers, architects, facility managers, and business owners. (6/12/17 AM Trial Tr. (Meredith)

12:25-13:12, 44:22-45:9, 60:5-17). Traxon's annual gross sales in the United States are roughly

$11 million. (6/12/17 AM Trial Tr. (Meredith) 59:21-23). In 2014, Traxon spent approximately

$300,000 on advertising. (6/12/17 AM Trial Tr. (Meredith) 59:24-60:4).

Ms. Meredith testified that Traxon used the phrase "Flexibility, Simplicity, and

Innovation" in its 2008 and 2009 catalogs distributed as hard copies at trade shows, customer

meetings, and to sales agents. (6/12/17 AM Trial Tr. (Meredith) 15:14-17:24, 19:22-20:11,

21:16-23:8). The catalog used the phrase "Flexibility, Simplicity, and Innovation" in describing

Traxon's mission and values. (6/12/17 AM Trial Tr. (Meredith) 17:2-18:25). She estimated that between 2,000 and 4,000 copies of the 2008 catalog were distributed, and between 2,000 and 4,000 copies of the 2009 catalog were distributed. (6/12/17 AM Trial Tr. (Meredith) 20:18-24, 22:13-25). Ms. Meredith testified that Traxon used the "Flexibility, Simplicity, and Innovation" phrase on the cover of its 2010 and 2012 catalogs, at least one time on its Lightfair booth between 2010 and 2013, as well as on its website, showcase documents that serve as marketing materials, business cards, brochures, fliers, its iPad app, newsletters, press releases, and PowerPoint presentations to sales representatives. (6/12/17 AM Trial Tr. (Meredith) 23:9-25:7, 30:1-32:4, 33:13-34:20, 36:1-56:22). She approximated that Traxon distributed between 2,500 and 4,500 copies of the 2010 catalog, between 2,000 and 3,000 hard copies of the 2012 catalog, and stated that the 2012 catalog was available for download. (6/12/17 AM Trial Tr. (Meredith) 27:8-16, 34:21-35:23). She testified that she did not know of any instances of actual confusion with other company's products because of the word "Simplicity." (6/12/17 AM Trial Tr. (Meredith) 59:12-20).

### s. DEPOSITION TESTIMONY OF DONALD TORRANT

Philips continued by reading in the deposition of Donald Torrant, the director of marketing communications for the electrical wiring systems division of Legrand North America ("Legrand"). (6/12/17 AM Trial Tr. (Torrant) 66:7-17). Mr. Torrant has worked at Legrand for 20 years and has been in his current position for at least five years. (6/12/17 AM Trial Tr. (Torrant) 66:7-17). Mr. Torrant testified that Legrand has used various taglines for its lighting and dimming products, including: "Experience a New Level of Simplicity", "Where Simplicity Meets Style", "conquer complexity. choose simplicity." and "Simplicity|Flexibility|Scalability".

(KPTX-509 (Torrant Dep. 6:10-19, 7:16-8:13, 13:23-14:3, 19:2-21:7, 21:18-23:7, 31:3-32:25, 33:14-34:2, 35:7-11; KPTX-122 at 1-2; KPTX-123 at 3; KPTX-124; KPTX-149; KPTX-151 at 2; KPTX-316; KPTX-317 at 3; KPTX-319; KPTX-320; KPTX-323). It has used these taglines on its website, brochures, PDF brochures, emails, t-shirts, and on a banner at a trade show. (KPTX-509 (Torrant Dep. 6:10-19, 7:16-8:13, 13:23-14:3, 19:2-21:7, 21:18-23:7, 31:3-32:25, 33:14-34:2, 35:7-11; KPTX-122 at 1-2; KPTX-123 at 3; KPTX-124; KPTX-149; KPTX-151 at 2; KPTX-316; KPTX-317 at 3; KPTX-319; KPTX-320; KPTX-323).

From June 11, 2013 through January 21, 2014, a Legrand webpage which contained the phrase "Experience a New Level of Simplicity" had ██████ page views. (KPTX-509 (Torrant Dep.) 8:7-10:3). Another one of Legrand's webpages with a promotional video containing the phrase "Experience a New Level of Simplicity" had █████ views. (KPTX-509 (Torrant Dep.) 16:3-17:3). Since June 2013, Legrand additionally distributed approximately █████ brochures with the phrase "Where Simplicity Meets Style" to consumers, which included electrical contractors and distributors. (KPTX-509 (Torrant Dep.) 11:8-12:15, 13:10-19). Website viewers downloaded that same brochure █████ times between June 2013 and January 2014. (KPTX-509 (Torrant Dep.) 13:23-15:3). From April 22, 2012 to June 17, 2012, Legrand printed ████ promotional t-shirts to give to dealers and installers of its products with the phrase "conquer complexity. choose simplicity". (KPTX-509 (Torrant Dep.) 24:11-25:19). Legrand also sent out █████ emails to dealers and installers using this same "conquer complexity. choose simplicity" slogan; █████ of these emails were opened. (KPTX-509 (Torrant Dep.) 33:14-35:11).

### t. TESTIMONY OF DR. MICHAEL RAPPAPORT

The last witness called at trial was Dr. Michael Rappaport, an expert in market and survey research and in consumer and litigation surveys. (6/12/17 AM Trial Tr. (Rappaport) 92:9-23). Hunt called Dr. Rappaport as a rebuttal witness.

Dr. Rappaport criticized the surveys by Dr. A. Simonson and Dr. Barone because they assumed that Philips's tagline was "top of mind" knowledge. (6/12/17 AM Trial Tr. (Rappaport) 95:10-99:6, 103:10-25). He argued that the researchers never tested whether Philips's "sense and simplicity" tagline was "top of mind" knowledge and that this was a fatal flaw. (6/12/17 AM Trial Tr. (Rappaport) 96:16-99:6, 102:18-104:10).

Dr. Rappaport also testified that Dr. Simonson and Dr. Barone erred by conducting one-room surveys, in which they showed the Hunt "Simplicity" mark and asked what it brought to mind. (6/12/17 AM Trial Tr. (Rappaport) 99:24-100:8). Dr. Rappaport suggested that he would have instead conducted a two-room survey in which he would have shown half of the respondents Philips's tagline first and half of the respondents Hunt's mark first. (6/12/17 AM Trial Tr. (Rappaport) 99:7-102:10).

Dr. Rappaport suggested that this was a case in which both direct and reverse confusion were at issue. (6/12/17 AM Trial Tr. (Rappaport) 100:2-15). Dr. Rappaport did not conduct his own survey to disprove the surveys he criticized. (6/12/17 AM Trial Tr. (Rappaport) 109:23-110:11).

## III.   DISCUSSION

This Court has subject matter jurisdiction over the federal trademark causes of action and common law claims in this case pursuant to 28 U.S.C. §1331 and 28 U.S.C. §§ 1338(a-b). Venue is proper in this judicial district pursuant to 28 U.S.C. §1391.

### a.   REVIEW OF THE TTAB DECISION

On September 3, 2004, Philips filed a request to extend its international registration of "sense and simplicity" to the United States, under the Madrid Protocol treaty.  (KPTX-002 at 1). On October 13, 2006, Hunt filed Opposition No. 91173417 before the Trademark Trial and Appeal Board ("TTAB") to Philips's application.  (*Hunt Control Systems, Inc. v. Koninklijke Philips Electronics N.V,* Opp'n No. 91173417, TTABVUE No. 1 (TTAB Record)).  In April 2011, the TTAB sustained Hunt's opposition, thereby refusing the registration of "sense and simplicity" for six specific lighting goods, namely: electrical circuit boards, printed circuit boards, electrical circuits for electrical conduction, printed circuits, electrical controllers, and electrical light dimmers.  *Hunt Control Sys. Inc.*, 2011 WL 2318350, at *13.  Now, Philips asks this Court to reverse the TTAB's denial of Philips's trademark registration with respect to the six goods.  Hunt, on the other hand, seeks an order affirming the TTAB and directing the TTAB to refuse registration for *all* of Philips's lighting products in its trademark application, including lamps and lighting ballasts.

A dissatisfied party can seek review of a TTAB decision by appealing it to either a federal district court or the Federal Circuit.  15 U.S.C. § 1071(b).  If the party elects to bring the appeal in federal district court, litigants can provide new evidence to the trial court.  3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 21:20 (4th ed.) (citing *CAE, Inc.*

*v. Clean Air Engineering, Inc.*, 267 F.3d 660, 673 (7th Cir. 2001) ("In an appeal to the Federal

Circuit, the case proceeds on the closed administrative record and no new evidence is permitted.

… In contrast, an appeal to the district court is both an appeal and a new action, which allows the

parties to request additional relief and to submit new evidence."); *Kellogg Co. v. Toucan Golf*,

Inc., 337 F.3d 616, 623 (6th Cir. 2003) ("A disappointed party may present new evidence before

the district court that was not presented to the T.T.A.B."); *Glendale Intern. Corp. v. U.S. Patent

& Trademark Office*, 374 F. Supp. 2d 479, 484 n.7 (E.D. Va. 2005) ("The principal difference

between challenging a TTAB decision through an appeal to the Federal Circuit and through a

civil action in federal district court is that the latter route affords a party the opportunity to

introduce new evidence in support of its claims.").  When the parties present new evidence to the

district court, the Court reviews the new evidence and the TTAB record under a de novo

standard of review.  3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*

§§ 21:20, 21:21 (4th ed.); *B & B Hardware, Inc. v. Hargis Indus., Inc.,* 135 S. Ct. 1293, 1310

(2015) ("The importance of registration is undoubtedly why Congress provided for *de novo*

review of TTAB decisions in district court."); *Kappos v. Hyatt*, 566 U.S. 431, 444-445 (2012)

(holding that when a federal district court reviews a decision of the USPTO Board of Patent

Appeals and Interferences, the district court must make "de novo" factual findings based on the

new evidence and the administrative record).

   The Supreme Court has held that in reviewing a TTAB registration decision, the district

court should use the same "likelihood of confusion" test that it uses in analyzing infringement.  *B

& B Hardware, Inc. v. Hargis Indus., Inc.,* 135 S. Ct. at 1307 ("There is no reason to think that

the same district judge in the same case should apply two separate standards of likelihood of

confusion."); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 20:14 (4th ed). The Third Circuit has adopted a non-exhaustive ten-factor test known as the "*Lapp* factors" to determine whether there is a likelihood of confusion between two marks. *Interspace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983).

Here, this Court undertakes a de novo review of the new evidence and the TTAB record in order to determine whether the TTAB erred in denying Philips' registration with regard to the six specified goods. [7] The Court considers this new evidence and the TTAB record in answering the question of whether there is a likelihood of confusion between the two marks. The Court will go through each of the *Lapp* Factors, as described below, in order to determine if there is a likelihood of confusion between the two marks.

### b. HUNT'S COUNTERCLAIMS

When a party appeals a registration decision of the TTAB to the district court, the adverse party can expand the scope of litigation by bringing counterclaims. 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 21:20 (4th ed.) (citing *B & B Hardware, Inc. v. Hargis Indus., Inc.,* 135 S. Ct. at 1307). Here, Hunt has counterclaimed for trademark infringement, misappropriation, and unfair competition – and it asserts these counterclaims under federal, state, and common law.[8] Although Hunt brought claims for monetary and injunctive relief, the Court concluded at summary judgment that monetary relief was not available on any

---

[7] Hunt argues that this Court should only apply a de novo standard for disputed facts or new evidence and everything else should be reviewed under a substantial evidence standard. The Court finds, however, that the parties either dispute the facts in the TTAB decision or present new evidence, and thus it applies de novo review.

[8] This Court denied Hunt's motion in limine to apply Colorado law to its non-federal claims [Docket Entry 294] because Hunt never demonstrated that there was a conflict between Colorado law and New Jersey law on these claims. (5/16/17 Hr'g Tr. 59:25-61:20).

of Hunt's counterclaims. (Summ. J. Op. at 47-63). This decision left Hunt only able to seek a permanent injunction for its counterclaims.

Under the Lanham Act, courts may use injunctions against trademark violations "according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). "In deciding whether to grant a permanent injunction, the district court must consider whether: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest." *Gucci Am., Inc. v. Daffy's Inc.*, 354 F.3d 228, 236-37 (3d Cir. 2003) (quoting *Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir. 2001)).

In order for Hunt to show that it will succeed on the merits, it must prove trademark infringement and unfair competition under the Lanham Act.[9] To prove trademark infringement

---

[9] "[T]he elements for a claim for trademark infringement under the Lanham Act are the same as the elements for a claim of unfair competition under the Lanham Act and for claims of trademark infringement and unfair competition under New Jersey statutory and common law". *J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 374 (D.N.J. 2002); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 454-55 (D.N.J. 2009) (citing *Buying For The Home, LLC v. Humble Abode, LLC*, 459 F. Supp. 2d 310, 317-18 (D.N.J. 2006). Therefore, by proving the elements of trademark infringement and unfair competition under the Lanham Act, Hunt would be able to also prove trademark infringement and unfair competition under state and common law. As for Hunt's misappropriation claims, Courts in this district have held that "[n]o cause of action exists for misappropriation of a trademark." *Duffy v. Charles Schwab & Co.*, 97 F. Supp. 2d 592, 598 (D.N.J. 2000) (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 10:72, at 10–136 to –137 (2000). *See also* 2 J. Thomas McCarthy*, McCarthy on Trademarks and Unfair Competition* § 10:50 (4th ed.). Another district court in this circuit, however, has held that a plaintiff can proceed with a misappropriation claim if it shows a likelihood of confusion. *Eagle's Eye, Inc. v. Ambler Fashion Shop, Inc.*, 627 F. Supp. 856, 861 (E.D. Pa. 1985). In turn, even if a plaintiff could bring a misappropriation claim here, the misappropriation claim would turn on the same "likelihood of confusion" analysis as the trademark infringement and unfair competition claims.

and unfair competition under the Lanham Act, Hunt must show: (1) it owns the mark; (2) the mark is valid and legally protectable; and (3) the other party's use of the mark to identify goods or services is likely to create confusion. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 269 F.3d 270, 279 (3d Cir. 2001) (citing *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.,* 214 F.3d 432, 437–38 (3d Cir. 2000)); *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990)). The parties do not dispute that Hunt owns the "Simplicity" mark or that it is a valid and legally protectable mark. Thus, the only question before this Court is whether there is a likelihood of confusion between the Hunt mark and the Philips mark.

### c.  LIKELIHOOD OF CONFUSION

"A likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 211 (3d Cir. 2000) (quoting *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992) (quotation marks omitted)). The relevant inquiry for the court is whether confusion is likely, not whether confusion is merely a possibility. *Id.* at 198.

The Third Circuit has recognized two types of likelihood of confusion claims: direct confusion claims and reverse confusion claims. *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005). In a direct confusion claim, a trademark owner alleges facts where "a junior user of a mark attempts to free-ride on the reputation and goodwill of the senior user by adopting a similar or identical mark." *Id.* at 470 (citing *A & H Sportswear*, 237 F.3d at 228). Therefore, "the consuming public may assume that the established, senior user is the

source of the junior user's goods." *Id.* (quoting *Checkpoint*, 269 F.3d at 301). Conversely, reverse confusion "occur[s] when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services. Thus, the 'junior' user is junior in time but senior in market dominance or size." *Id.* at 471. Hunt alleges reverse confusion here. (6/6/17 Tr. 10:17-20, 14:18-22, 16:8-9).

To determine whether there is a likelihood of confusion between two marks, the Third Circuit has adopted a non-exhaustive ten-factor test known as the "*Lapp* factors." *Lapp*, 721 F.2d at 463. The *Lapp* test is used for trademarks on both competing and non-competing goods,[10] and in direct and reverse confusion cases. *A & H Sportswear*, 237 F.3d at 212-15; *Freedom Card*, 432 F.3d at 472. Logically, though, "economic reality and common sense require that some of the *Lapp* factors be analyzed differently when reverse [confusion] is at issue." *Freedom Card*, 432 F.3d at 472.

The *Lapp* factors, as applied in a reverse confusion case, are:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;
(2) the strength of the two marks, weighing both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior user's favor;
(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
(4) the length of time the defendant has used the mark without evidence of actual confusion arising;
(5) the intent of the defendant in adopting the mark;
(6) the evidence of actual confusion;

---

[10] The Third Circuit has indicated that district courts are not required to use the *Lapp* factors in situations where products are directly competing and the marks are very similar. In that scenario, the district court may consider only the similarity of the marks themselves. *See, e.g.*, *Opticians Ass'n*, 920 F.2d at 195; *A & H Sportswear*, 237 F.3d at 215.

(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10) other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market.

*A & H Sportswear*, 237 F.3d at 234. The *Lapp* factors "are tools to guide a qualitative decision," and thus are "not to be mechanically tallied" by the Court or given pre-determined weights in the Court's analysis. *Id.* at 215-16, 234. No one factor is dispositive, and depending on the facts of a particular case, one or more of the factors may not be probative on the issue of likelihood of confusion. *Id.*

The Third Circuit explained that there are several factors that should be analyzed in the same manner for direct confusion and reverse confusion claims:

First, the attentiveness of consumers does not change ([*Lapp*] factor (3)); in both direct and reverse confusion, the question is whether this is the kind of product consumers will care enough about to notice the differences, or purchase hastily with only a limited impression. Second, and similarly, the degree to which the channels of trade and advertisement overlap ([*Lapp*] factor (7)) should be analyzed in the same fashion. Finally, *Lapp* factors (8) and (9), considering the similarity of the targets of the parties' sales efforts and the similarity of products, are also analyzed no differently in the reverse confusion context.

*A & H Sportswear*, 237 F.3d at 229 (citations omitted). *Lapp* factors (2), (4), (5), (6), and (10) may need to be analyzed differently for a reverse confusion claim versus a direct confusion claim, and these differences will be explored where appropriate as the Court examines each factor. *Id.* at 231-34.

The Lapp factors are non-exclusive factors that direct the finder of fact to use common

sense on whether a consumer is likely to confuse two products. Here, analyzing all of these factors, common sense leads to the conclusion that no consumer would be likely to confuse a Philips product for a Hunt product or visa versa. The non-jury trial brought out that despite Philips's extensive effort to promote "sense and simplicity" across its diverse products in multiple markets, its promotional effort was a complete failure. All of the credible testimony presented at trial demonstrated that "sense and simplicity" simply failed to make any impact in market overall, in particular in the market for the relevant lighting controls. Thus, there was no realistic likelihood of confusion between Philips's use of "sense and simplicity" and Hunt's "Simplicity" mark on a reverse confusion theory. Nevertheless, this Court analyzes each Lapp factor in turn.

### 1. SIMILARITY OF THE MARKS (*LAPP* FACTOR (1))

The "degree of similarity of the marks may be the most important of the ten factors in *Lapp*." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 476 (3d Cir. 1994). This factor is not necessarily dispositive of the likelihood of confusion analysis, however. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 104 F. Supp. 2d 427, 457 (D.N.J. 2000). "[M]arks need not be identical, only confusingly similar." *Id.* at 477.

The Court's assessment of the similarity of the marks should include a comparison of the "appearance, sound and meaning of the marks." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 713 (3d Cir. 2004). The Third Circuit's "test for such similarity is whether the labels create the same overall impression when viewed separately." *A & H Sportswear*, 237 F.3d at 216 (quotation omitted). In particular, the court should examine how the marks are presented to consumers. *A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, 167 F. Supp. 2d 770, 782

(E.D. Pa. 2001). Should the overall impression from the marks be "essentially the same, it is very probable that the marks are confusingly similar." *Opticians Ass'n*, 920 F.2d at 195.

The Federal Circuit has held that "the similarity or dissimilarity of marks should be compared 'in their entireties as to appearance, sound, connotation and commercial impression'". *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1371 (Fed. Cir. 2015), *cert. denied,* 136 S. Ct. 982 (2016). Marks "should not be dissected and considered piecemeal; rather, [they] must be considered as a whole in determining likelihood of confusion." *Juice Generation, Inc. v. GS Enterprises LLC*, 794 F.3d 1334, 1340-41 (Fed. Cir. 2015). This analysis requires the Court to abide by "the common-sense fact that the message of a whole phrase may well not be adequately captured by a dissection and recombination." *Id.*[11]

Given that Philips's tagline, "sense and simplicity", incorporated Hunt's registered mark "Simplicity", there was at least some degree of similarity in sight and sound between the marks. But, the evidence at trial showed that when viewing the marks in their entireties, there were significant differences between the two marks.

### a. APPEARANCE

First, the two marks were visually distinct because the marks were a different number of words, and they appeared in advertisements in different fonts, colors, and capitalizations. As Philips's linguistic expert, Dr. Butters, testified, the marks looked different because of the additional words "and" and "sense" in Philips's mark. (6/9/17 AM Trial Tr. (Butters) 38:23-

---

[11] Federal Circuit precedent is binding authority on this Court's analysis of the TTAB's decision and persuasive authority for this Court's analysis of the trademark infringement and unfair competition claims brought under the Lanham Act.

39:25).  Moreover, Hunt's mark was typically displayed in ordinary black or blue, italicized script with a capitalized first letter and often appeared before the word "Series" or "Lighting Controls" or a different type of product.  (CCTX-003; CCTX-027; CCTX-062; CCTX-285; CCTX-344; CCTX-346; CCTX-396; CCTX-397; CCTX-398; CCTX-401).  In contrast, Philips's tagline, "sense and simplicity," was typically displayed in lowercase sans serif typeface (Gil Sans font), with the words "sense" and "simplicity" in grey, and with the conjunction "and" in a blue color.  (KPTX-007 at 13-14, 40-41).

This Court also finds it relevant to its analysis on the appearances of the marks that both parties used their housemarks alongside the marks at issue.  "Conflicting marks must be compared in their entirety, including any housemark which either party appends to its mark." *A & H Sportswear*, 167 F. Supp. 2d 770, 780 (citing 4 *McCarthy on Trademarks* §23:43).  A party's use of a housemark in connection with its mark may affect the general commercial impression of the mark.  *See A & H Sportswear*, 237 F.3d at 229-30.  In a direct confusion case, the presence of a well-known housemark alongside a trademark may diminish the likelihood of confusion.  *Id.* at 218.  In the reverse confusion context, however, the Third Circuit has noted that a housemark may aggravate reverse confusion by reinforcing a link between the mark and the junior user.  *See A & H Sportswear*, 237 F.3d at 230.  Nevertheless, several courts have found that in reverse confusion cases, the use of a housemark may still reduce the likelihood of confusion, like in direct confusion cases.  *See Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 412-413 (D.N.J. 2011) (Debevoise, J.) (order vacated) (finding, in a reverse confusion case, that consumers would not be confused as to whom a mark belonged when the more dominant junior user placed its mark near its well-known housemark); *Kinbook, LLC v. Microsoft Corp.*,

866 F. Supp. 2d 453, 464 (E.D. Pa. 2012), *aff'd*, 490 F. App'x 491 (3d Cir. 2013) (finding that the likelihood of reverse confusion was diminished by marketing and affixing a more well-known and dominant mark belonging to the junior user next to the mark at issue); *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 521-22 (S.D.N.Y. 2008) (explaining that the two marks at issue in the reverse confusion case were not confusingly similar because the junior user consistently presented its well-known brand name and logo alongside the mark); *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002) ("A critical factor here is that both parties use the trademark merely as a tagline to their distinctive business names . . . The emphasis on these housemarks 'has the potential to reduce or eliminate likelihood of confusion.'") (internal citation and quotation omitted).

Here, the use of the housemarks distinguished the two marks because "Hunt" usually appeared with "Simplicity" on products as a brand name, and "sense and simplicity" was placed together with PHILIPS as a tagline. Philips's "brand identity guide" instructed its marketing communication employees that "sense and simplicity" was always to be placed in a "lock-up" configuration with PHILIPS and a shield logo, the PHILIPS mark and the tagline "sense and simplicity" could not be separated, and the proportions between PHILIPS and "sense and simplicity" could not be adjusted. (6/8/17 PM Trial Tr. (Kerr) 16:12-14, 19:5-10, 71:23-72:7, 88:6-13; KPTX-007 at 11-12). Hunt's "Simplicity" mark also always appeared near the HUNT housemark and usually near the logo. (CCTX-003; CCTX-027; CCTX-062; CCTX-285; CCTX-344; CCTX-346; CCTX-396; CCTX-397; CCTX-398; CCTX-401). Hunt also often used both its housemark, "HUNT", and the word "Simplicity" together as a brand name for specific product lines, such as the "HUNT Simplicity Series Digital Dimming Systems" and the "HUNT

Dimming Simplicity Series". (CCTX-003; CCTX-027; CCTX-344; CCTX-346). Because "Simplicity" was always next to "HUNT" and "sense and simplicity" was attached to PHILIPS, consumers could easily tell which mark belonged to which company. Thus, the Court finds that the use of the housemarks actually reduced confusion here. Because of the differing number of words, fonts, colors, capitalizations, and the use of housemarks, the Court concludes that the two marks differed in terms of appearance.

### b. SOUND

Next, the marks differed in sound. This Court finds Dr. Butters' testimony convincing that the marks differed in sound because they had a different number of words, "sense and simplicity" used alliteration, and the phrase "sense and simplicity" had more syllables than "simplicity" alone. (6/9/17 AM Trial Tr. (Butters) 17:7-18). Dr. Butters stated that consumers remembering Philips's tagline would remember the "sense part" and might remember that the second part ended with "-ity", but that the word "sense" was more memorable than "simplicity". (6/9/17 AM Trial Tr. (Butters) 21:7-17). Dr. Butters testified that "psychologists of language have long held that the first word is the – in a compound or compound phrase is the most important." (6/9/17 AM Trial Tr. (Butters) 21:7-17). Based on this testimony, this Court finds that the two marks did sound differently than one another.

### c. MEANING

The marks also differed in meaning. First, the two companies used the marks in different ways. Whereas Philips used "sense and simplicity" as a tagline or brand promise, (6/8/17 PM Trial Tr. (Kerr) 18:19-23; 6/8/17 PM Trial Tr. (Yohn) 94:15-17; 6/7/17 PM Trial Tr. (Van Kuyck) 95:3-6; 6/12/17 AM Trial Tr. (Rappaport) 106:5-9; KPTX-007 at 11; KPTX-010 at 2),

Hunt used "Simplicity" as a brand name for specific product lines. (CCTX-003; CCTX-027; CCTX-062; CCTX-344; CCTX-346; CCTX-396; CCTX-397; CCTX-398; CCTX-401). Philips did not use "sense and simplicity" to identify its various products and their brand identity guidelines prohibited them from using "sense and simplicity" on products or product packaging. (6/8/17 PM Trial Tr. (Kerr) 21:16-25; KPTX-007 at 13; 6/7/17 PM Trial Tr. (Fassburg) 131:5-11).

Next, the two marks did not convey the same idea. Here, Dr. Butters' testimony was crucial. Dr. Butters testified that "Simplicity" was a "weakly descriptive word" that described a quality and that one could look it up in a dictionary. (6/9/27 AM Trial Tr. (Butters) 17:19-18:14). The term "sense and simplicity", on the other hand, had no dictionary definition and was "far from clearly descriptive." (6/9/27 AM Trial Tr. (Butters) 17:19-18:14). He explained that the term of "sense and simplicity" was "really opaque", it did not have a clear meaning, and that no third parties used the phrase. (6/9/27 AM Trial Tr. (Butters) 17:19-20:9).

Moreover, Dr. Butters testified that "sense and simplicity" was distinguished from "simplicity" alone because "sense and simplicity" created a cultural allusion to Jane Austin's well-known novel *Sense and Sensibility*, which, according to Dr. Butters, "will come immediately to mind in hearing 'sense and simplicity' because they're very identical in sound structure." (6/9/17 AM Trial Tr. (Butters) 21:18-22:1). In fact, several journalists referred to Philips's tagline accidentally as "sense and sensibility." (6/9/17 AM Trial Tr. (Butters) 22:2-22:12, 25:9-24; KPTX-107; KPTX-108; KPTX-109). Because of this common association, "sense and simplicity" brought up a completely different connotation than the mark "Simplicity" alone.

Dr. Butters' testimony stands in contrast to TTAB's findings, which determined that the "sense" part of the phrase meant that the products "make sense" for consumers. *See Hunt Control Sys. Inc.*, 2011 WL 2318350, at *11-12. Dr. Butters looked at the phrase as a whole, and determined that the phrase was vague. (6/9/27 AM Trial Tr. (Butters) 17:19-21:6). This Court must consider the phrase in its entirety, as Dr. Butters did. *Jack Wolfskin*, 797 F.3d at 1371; *Juice Generation*, 794 F.3d at 1340-41. Hunt did not present evidence at trial to contradict Dr. Butters's testimony. Based upon Dr. Butters's testimony, which was not before the TTAB, the Court rejects the TTAB's findings and is satisfied that the two marks do not share the same meaning.

Hunt argues that Philips sometimes abbreviated its tagline to the word "Simplicity" alone, and used this mark in the same way that Hunt used its mark. The Court simply does not find that Philips's use of the term "Simplicity" was all that similar to the way Hunt used the term, nor does the Court find Philips's use of "Simplicity" alone to be significant in the likelihood of confusion analysis. Hunt first takes issue with Philips's Simplicity Advisory Board. The Simplicity Advisory Board was a five-member board comprised of industry experts, who advised Philips internally for two years. (6/8/17 PM Trial Tr. (Kerr) 21:18-22:1, 23:20-24:2, 24:9-22, 25:10-16). There was no evidence that Hunt's customers were aware of the Simplicity Advisory Board since it was internal to Philips. Therefore, this Court is satisfied that Philips's internal Simplicity Advisory Board did not contribute to any likelihood of confusion.

Hunt also argues that Philips used its mark in a very similar way to the way that Hunt used it when it hosted Simplicity Events. Only one Simplicity Event was held in the United States; it took place in New York in 2006. (Stip. Facts ¶¶ 37; 6/8/17 PM Trial Tr. (Kerr) 25:1-9,

25:17-27:2).  Approximately 800 people attended, most of whom were retail executives and professionals across industries that comprise Philips's corporate profile.  (Stip. Facts ¶¶ 37-38; 6/8/17 PM Trial Tr. (Kerr) 25:1-9, 25:17-27:2).  By calling the event a "Simplicity Event," however, Philips was still not using "Simplicity" to identify a particular product line in the way that Hunt did.

This Court acknowledges that Philips used the words "Today's Simplicity Products" on one occasion on its website.  (CCTX-129; 6/6/17 Trial Tr. (Glaser) 173:16-21).  Additionally, the Court acknowledges that Philips launched its "Simplicity Brand Campaign", an advertising campaign in which it used the words "Simplicity is a. . ." in many of its advertisements.  Philips argues that these advertisements employed descriptive fair uses of the ordinary word "simplicity", but Hunt makes a colorable argument that in some ways Philips used the word "simplicity" as a brand.  After all, "Simplicity is a lamp" is not ordinary English.  (6/7/17 PM Trial Tr. (Fassburg) 113:3-19, 120:4-11).  Nevertheless, Philips did not use "Simplicity" to describe a particular product and it only used the term "Today's Simplicity Products" once.  The Court finds that generally Philips used its tagline and any abbreviated version of it in a different way from the way that Hunt used "Simplicity".  To the extent that Philips did not follow its own brand guidelines of placing "sense and simplicity" in a lock-up with PHILIPS, its departures were merely de minimus.  In sum, Hunt's "Simplicity" mark and Philips's "sense and simplicity" mark differed in sight, sound, and largely in meaning and thus, the first Lapp factor weighs in favor of Philips.

## 2. Strength of the Marks (*Lapp* Factor (2))

The second *Lapp* factor directs the Court to evaluate a mark's strength by assessing "(1) the [plaintiff's] mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) its commercial strength (factual evidence of marketplace recognition)." *Freedom Card*, 432 F.3d at 472. The Lanham Act provides greater protection to stronger marks, given that stronger marks will likely have greater consumer recognition. *A & H Sportswear*, 237 F.3d at 222 (internal citation omitted). "'Strong' marks are given "strong" protection—protection over a wide range of related products and services and variations on visual and aural format. . . . Conversely, relatively weak marks are given a relatively narrow range of protection both as to products and format variations." 2 J. Thomas McCarthy, *McCarthy on Trademarks* § 11:73 (4th ed.). The presence of a commercially strong junior mark, along with a conceptually strong senior mark, favor the senior user on this factor. *A & H Sportswear*, 237 F.3d at 234. Therefore, the Court will examine the conceptual strength of the Hunt senior mark and the commercial strength of the Philips junior mark in turn.

### a. Distinctiveness/Conceptual Strength

First, the Court must determine whether Hunt's mark is conceptually strong, such that this factor would weigh in Hunt's favor. *A & H Sportswear*, 237 F.3d at 232. Courts often use a four-part spectrum to classify trademark distinctiveness: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic. *Id.* at 221 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). Arbitrary or fanciful marks "use terms that neither describe nor suggest anything about the product; they bear no logical or suggestive relation to the actual characteristics of the goods." *Id.* (quotation and citation omitted). A suggestive mark requires a

consumer to use "imagination, thought, or perception" to determine what the product bearing the suggestive mark may be. *Id.* at 221-22 (quoting *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986)). A descriptive mark gives the consumer an idea of the product's ingredients, qualities, or features. *Id.* at 222 (citation omitted). Generic marks are marks that operate "as the common descriptive name of a product class." *Id.* (citation omitted). To qualify for protection under the Lanham Act, a mark must be arbitrary, fanciful, suggestive, or descriptive with secondary meaning—generic marks receive no protection, and in fact may not be registered as trademarks. *Id.* (citation omitted).

"Simplicity" is not literally descriptive of Hunt's products, but it does describe a quality Hunt seeks to associate with its products. Indeed, Dr. Butters' testified that the word "Simplicity" is linguistically descriptive. (6/9/17 AM Trial Tr. (Butters) 17:19-18:14). Moreover, the mark seems purposefully descriptive because Hunt markets its products alongside the sentence "Simple solutions to your complex dimming problems", (KPTX-450 at 44; CCTX-001), and Hunt admits that its mark "suggests how simple its goods are to use". (Hunt Proposed Findings of Fact ¶ 98). Nevertheless, Hunt's registration of "Simplicity" with the PTO indicates that the mark is not descriptive without secondary meaning or generic, given that registration is reserved for distinctive marks. *See A & H Sportswear*, 167 F. Supp. 2d at 790. Furthermore, registration serves as *prima facie* evidence of the validity of a mark, meaning that Hunt is entitled to "a strong prima facie presumption that its registered mark is either not merely descriptive or if descriptive, that secondary meaning is presumed, which amounts to the same thing." 15 U.S.C. § 1115(a); 2 J. Thomas McCarthy, *McCarthy on Trademarks* § 11:43 (4th

ed.).[12]  While Hunt argues that its "Simplicity" mark is suggestive, this Court finds that the mark is bordering on descriptive.[13]

"Although the conceptual strength of a mark is often associated with the particular category of 'distinctiveness' into which a mark falls (i.e., arbitrary, suggestive, or descriptive), that is not the only measure of conceptual strength." *A & H Sportswear*, 237 F.3d at 222. Arbitrary or suggestive marks may in fact be "weak" marks, especially when used on a range of different products or by a large number of competitors. *Id.* "[A]s a general rule, widespread use of even a distinctive mark may weaken the mark." *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 123 (3d Cir. 2004) (citing *Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93-94 (4th Cir. 1997).

Here, Hunt's mark has been conceptually weakened by widespread third-party usage of the mark "Simplicity".  Philips provides twenty-seven third-party trademark registrations for the "SIMPLICITY" and other similar marks owned by lighting and non-lighting companies. (KPTX-235 at 19, 60; KPTX-353 at 1; KPTX-354 at 1; KPTX-355 at 1; KPTX-356 at 1; KPTX-357 at 1; KPTX-358 at 1; KPTX-359 at 1; KPTX-360 at 1; KPTX-361 at 1; KPTX-362 at 1; KPTX-363 at 1; KPTX-364 at 1; KPTX-365 at 1; KPTX-366 at 1; KPTX-367 at 1; KPTX-368 at

---

[12] Just because Hunt's "simplicity" is registered on the USPTO's Principal Register and is incontestable does not mean that the mark is conceptually strong. *See Am. Cyanamid Co. v. S.C. Johnson & Son, Inc.*, 729 F. Supp. 1018, 1024 (D.N.J. 1989) ("[A] mark, though incontestable, may also be found to be weak.") (internal citation omitted).

[13] Hunt argues that its "Simplicity" mark has achieved secondary meaning through continuous nationwide use over a twenty-year period and thus it is a strong and distinctive mark.  But, Hunt presented no evidence at trial to show that "Simplicity" is a well-known mark.  In fact, Hunt spent a minimal amount of money on advertising and the evidence at trial showed that Hunt's customers usually did not use the "Simplicity" name when ordering specific "Simplicity" Products.  (6/12/17 PM Trial Tr. (Glaser) 4:16-20; KPTX-059; 6/9/17 AM Trial Tr. (Bernecker) 87:4-7; 87:21-25).

1; KPTX-369 at 1; KPTX-370 at 1; KPTX-371 at 1; KPTX-372 at 1; KPTX-373 at 1; KPTX-374 at 1; KPTX-375 at 1; KPTX-376 at 1; KPTX-377 at 1; KPTX-378 at 1; KPTX-425 at 2-3; KPTX-426 at 1; KPTX-427 at 1; KPTX-428 at 1; KPTX-429 at 1; KPTX-430 at 1; KPTX-431 at 1; KPTX-432 at 1; KPTX-433 at 1; KPTX-434 at 1; KPTX-435 at 1; KPTX-436 at 1; KPTX-437 at 1; KPTX-438 at 1; KPTX-439 at 1; KPTX-440 at 1; KPTX-441 at 1; KPTX-442 at 1; KPTX-443 at 1; KPTX-444 at 1; KPTX-445 at 1; KPTX-446 at 1; KPTX-447 at 1).  Philips also points to evidence showing that lighting companies EiKO, Traxon, Legrand, Cooper, Acuity, and others have used marks that include the word "Simplicity" in their advertising campaigns.  While most of the evidence of third-party usage to the TTAB related to goods not within the lighting industry, Philips presented this Court with numerous examples of third-party use within the lighting industry.

For example, Philips presented evidence that EiKO, a manufacturer of lamps and lighting products, has used the tagline "Selection. Solutions. Simplicity" since 2003 or 2004 on its website, catalogs, product literature, spec sheets, fliers, invoices, business cards, and more. (KPTX-185; KPTX-278; KPTX-282; KPTX-283; KPTX-284; KPTX-285; KPTX-286; KPTX-287, KPTX-288; KPTX-289; KPTX-291; KPTX-293; KPTX-294; KPTX-500 at 17; KPTX-505 (Laird Dep) 12:15-13:2, 20:7-10, 28:16-20).  It also displayed the tagline "Selection. Solutions. Simplicity" at its Lightfair trade show booth every year that it attended Lightfair.  (KPTX-505 (Laird Dep.) 54:3-55:8).  Although EiKO differs from Hunt in that EiKO focuses its business on selling light bulbs, ballasts, and fixtures, (KPTX-505 (Laird Dep.) 12:5-13:15, 58:18-59:5), the Court finds EiKO's tagline to be extremely similar to Hunt's and very relevant.

Similarly, Traxon, a lighting and controls manufacturer, used the tagline "Flexibility,

Simplicity, and Innovation" in its catalogs, on its Lightfair booth, in brochures, marketing materials, business cards, its website, email signatures, fliers, and PowerPoint presentations to customers. (KPTX-120; KPTX-301 at 2; KPTX-303 at 4; KPTX-305 at 2-4; KPTX-307 at 2-3, 11, 42-56; KPTX-308; KPTX-310; KPTX-311; KPTX-508 (Meredith Dep.) 9:19-25, 16:4-17:3, 23:23-24:17, 27:14-17, 35:7-37:19; 50:21-51:25; 59:3-61:22; 63:6-13; 65:23-66:3; 69:9-74:17, 78:4-79:21; 90:5-90:18). Additionally, Legrand North America, Inc., which makes lighting and dimming controls, has used various taglines for different product ranges and divisions, including: "Experience a New Level of Simplicity", "Where Simplicity Meets Style", "conquer complexity. choose simplicity." and "Simplicity|Flexibility|Scalability". (KPTX-122 at 1-2; KPTX-123 at 3; KPTX-124; KPTX-149; KPTX-151 at 2; KPTX-316; KPTX-317 at 3; KPTX-319; KPTX-320; KPTX-323; KPTX-509 (Torrant Dep.) 6:10-19, 7:16-8:13, 13:23-14:3, 19:2-21:7, 21:18-23:7, 31:3-32:25, 33:14-35:11). It has used these taglines on its website, brochures, PDF brochures, in its emails, on t-shirts, and on a banner at trade show. (KPTX-122 at 1-2; KPTX-123 at 3; KPTX-124; KPTX-149; KPTX-151 at 2; KPTX-316; KPTX-317 at 3; KPTX-319; KPTX-320; KPTX-323; KPTX-509 (Torrant Dep.) 6:10-19, 7:16-8:13, 13:23-14:3, 19:2-21:7, 21:18-23:7, 31:3-32:25, 33:14-35:11). Cooper, a lighting and control manufacturer, similarly has used taglines such as "The Sophistication of Simplicity" as well as phrases such as "Simplicity", "=Simplicity", and "Advanced Simplicity" to promote its lighting control panels. (KPTX-131 at 3, 7, 34; KPTX-152 at 1; KPTX-153 at 1; KPTX-187 at 8; KPTX-188 at 2; KPTX-272 at 2; KPTX-273 at 3, 5; KPTX-507 (Kasler Dep.) 13:5-15:11, 17:19-25, 22:9-22). It has also used the phrase "versatility and simplicity" and "versatility with simplicity" in its brochures and catalogs, and the phrase "versatility, simplicity and performance" on other marketing materials. (KPTX

173 at 1; KPTX-191 at 6; KPTX-274 at 7; KPTX-275 at 6; KPTX-507 (Kasler Dep.) 23:15-25:4, 27:2-8). The Court finds it significant that various companies in the lighting industry, selling products similar to Hunt's, used "simplicity" in some form.

Philips also presented this Court with evidence that Acuity Brands Lighting, a producer of lighting and dimming controls, had a product line of lighting fixtures called "SIMPLY 5". (KPTX-510 (Taylor Dep.) 8:6-10; 8:20-22; 15:18-25). Acuity's representative, Jeffrey S. Taylor, testified at his deposition that Acuity used "SIMPLY 5" from before January 2010 until January 2014, and it has distributed brochures and attended Lightfair using the mark "SIMPLY 5". (KPTX-510 (Taylor Dep.) 16:2-10, 16:15-18, 29:4-7, 29:12-30:3, 40:8-41:18). Although Mr. Glaser claimed he succeeded in his effort to eliminate the "SIMPLY 5" mark, (6/6/17 Trial Tr. (Glaser) 130:4-137:21; 6/7/17 AM Trial Tr. (Glaser) 41:21-42:17), Mr. Taylor stated that "SIMPLY 5" was still in use until at least 2014. Hunt presented no evidence that it attempted to enforce its "Simplicity" mark against any of the other above-mentioned third parties.

Hunt argues that Philips did not present enough information on the extent of the third-party uses. It argues that Traxon did not use "simplicity" as a brand or a trademark, that Philips did not present information on how many Acuity materials were distributed, and there was no investigation about confusion in the marketplace over the use of "Simplicity". Hunt also argues that these third parties do not have the same market strength, recognition, presence, and saturation as Philips has in the industry. The Federal Circuit has held, however, that "such extensive evidence of third-party use and registrations is 'powerful on its face,' even where the specific extent and impact of the usage has not been established." *Jack Wolfskin*, 797 F.3d at 1373-74 (citing *Juice Generation,* 794 F.3d at 1339). The "real evidentiary value of third party

*registrations* per se is to show the sense in which a mark is used in ordinary parlance." *Juice Generation,* 794 F.3d at 1339 (citing 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:90 (4th ed. 2015)). This widespread use shows that "some segment that is common to both parties' marks may have 'a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak.'" *Jack Wolfskin*, 797 F.3d at 1373-74 (citing *Juice Generation,* 794 F.3d at 1339). This Court finds that there was significant third-party use of the term "Simplicity" in the lighting industry and a significant number of third-party trademark registrations of similar marks.[14] This Court concludes that Hunt's "Simplicity" mark was relatively conceptually weak because even if it was "suggestive," it was extremely weakened by third-party use and registrations.

### b. Commercial Strength

In a reverse confusion case, courts analyzing commercial strength should focus on determining whether the junior user has been able to "'overwhelm' the marketplace, diminishing the value of the senior user's mark." *Checkpoint*, 269 F.3d at 303. Thus, "a court should analyze the 'commercial strength' factor in terms of (1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark." *A & H Sportswear*, 237 F.3d at 231 (citing *Fisons*, 30 F.3d at 474, 479).

The parties do not dispute that there is a significant disparity in the relative economic

---

[14] Hunt's argument that these third-party uses did not weaken the mark because Philips's witness, Carolyn Kerr, was unaware of third-party uses is not convincing. The Court does not look to what a witness was or was not aware of in determining whether there was significant third-party use.

power of the parties: Philips is a multinational corporation and Hunt is a small business. Additionally, Philips concedes that it has spent over $100 million on advertising related to "sense and simplicity" from 2004 to 2009. (Stip. Facts ¶ 41). Philips also concedes that from 2007 to 2014, Philips spent approximately $186 million on internal and external marketing costs. (Philips Findings of Fact ¶ 54). By comparison, from 2003 to 2013, Hunt only spent about $1.68 million on advertising. (Stip. Facts ¶ 42).

Nevertheless, Hunt has been unable to show that Philips's advertising overwhelmed the marketplace or saturated public awareness. Instead, the evidence at trial showed that Philips's advertising campaign to spread the "sense and simplicity" tagline was an absolute failure. When tagline recall was measured in 2004 through 2006, only about one to two percent of respondents claiming to be familiar with Philips could recall, without aid, the full Philips tagline "sense and simplicity," and only two to four percent of respondents gave a partially correct tagline. (6/8/17 PM Trial Tr. (Kerr) 41:8-43:4; 47:9-48:10; JTX-013 at 21). Additionally in March 2014, another research report found that out of 211 people who had seen "sense and simplicity" on Philips's advertising or Philips's website, only two people – or one percent – recalled the tagline "sense and simplicity." (6/8/17 PM Trial Tr. (Yohn) 95:13-19, 96:12-98:13, 98:21-99:2). Dr. Rappaport, Hunt's own expert, even testified that it would be "far-fetched" to think that non-professional consumers would remember "sense and simplicity" as a tagline. (6/12/17 AM Trial Tr. (Rappaport) 111:8-17).

Additionally, Philips's expert, Dr. I. Simonson, ran a survey that showed that the tagline "sense and simplicity" had no measurable commercial impact on consumer behavior and did not affect the persuasiveness of Philips's advertisements. (6/9/17 PM Trial Tr. (I. Simonson) 23:2-

25:8, 27:21-30:24, 33:22-34:2; KPTX-089; KPTX-092; KPTX-093).  Dr. I. Simonson surveyed
317 consumers who had either purchased light bulbs during the previous year or expected to
purchase light bulbs in the following year.  (6/9/17 PM Trial Tr. (I. Simonson) 9:15-19).  He
showed one group a Philips Lighting television commercial with the "sense and simplicity"
tagline at the end and showed a second group the same commercial without the tagline, and then
showed both groups two other commercials from different lighting companies.  (6/9/17 PM Trial
Tr. (I. Simonson) 19:16-20:7, 20:22-25).  The respondents were asked open-ended questions,
including what the commercials' main messages were and which brand of light bulbs they
wanted to buy after seeing the commercials.  (6/9/17 PM Trial Tr. (I. Simonson) 22:20-22, 23:2-
16, 24:10-25:8).  Dr. I. Simonson concluded that there was "virtually no difference, a tiny
difference, point two . . . but I wouldn't attach any significance to that" and that the tagline
therefore made no real difference to the respondents' purchasing preferences.  (6/9/17 PM Trial
Tr. (I. Simonson) 28:2-10).  Moreover, no respondent mentioned simplicity as a factor in
deciding which light bulbs they would purchase.  (6/9/17 PM Trial Tr. (I. Simonson) 28:11-15).
The Court is satisfied from Dr. I. Simonson's survey that "sense and simplicity" had no real
commercial impact on lay consumer's preferences and thus it had not saturated the market.

    Not only did most consumers not remember the tagline, most Philips consumers also did
not associate the company with the idea of "simplicity."  In market research conducted by Philips
in 2006, only about three percent of respondents who had seen Philips's advertising
spontaneously associated "simplicity" with Philips.  (6/8/17 PM Trial Tr. (Kerr) 82:6-21, 84:16-
85:1; JTX-013 at 17).  Dr. Alexander Simonson's survey also confirmed that Philips's
consumers did not associate the "simplicity" mark with Philips.  Dr. A. Simonson showed

electrical engineers and electrical contractors portions of Hunt's website and directed them to multiple times where "Simplicity" appeared. (6/8/17 AM Trial Tr. (A. Simonson) 40:18-41:9, 54:16-58:6; KPTX-077). The participants saw the word "Simplicity" about twenty times on the website and heard it aloud at least twice. (6/8/17 AM Trial Tr. (A. Simonson) 55:19-24; KPTX-077). Then, respondents were asked questions about ownership, source, or affiliation of Hunt. (6/8/17 AM Trial Tr. (A. Simonson) 40:17-41:20, 54:16-58:6, 60:22-62:25; KPTX-072). Only one electrical engineer mentioned Philips. (6/8/17 AM Trial Tr. (A. Simonson) 63:23-64:1, 64:7-65:15; KPTX-072; KPTX-075 at 11, 15-29, 44-58). If consumers associated Philips with "simplicity", respondents would have answered open-ended questions by referring to the Philips mark. (6/8/17 AM Trial Tr. (A. Simonson) 57:14-60:6).

Hunt asserts that Philips saturated the market with its advertising by focusing on one survey that showed that showed that 37% of respondents who self-identified as very familiar with Philips associated the brand statement "This brand stands for simplicity" with Philips. (6/8/17 PM Trial Tr. (Kerr) 55:20-56:13; JTX-013 at 18). Hunt's reliance on this survey is unpersuasive, however, because the customers who said they were very familiar with Philips identified GE and Apple at higher rates than Philips when asked which brands they associated with "simplicity". (6/8/17 PM Trial Tr. (Kerr) 82:6-21; JTX-013 at 18). Additionally, the respondents more strongly associated Philips with two other statements. (JTX-013 at 25). Thus, Hunt's focus on this survey is misplaced. Hunt failed to prove the Philips's tagline saturated public awareness and Philips's survey evidence showed that consumers were generally unaware of Philips's tagline. In sum, Hunt's mark was conceptually weak and Philips's mark was commercially weak. This factor therefore weighs in Philips's favor.

### 3. Price of Goods, Sophistication of Purchasers, and Attention Expected of Reasonable Customers (*Lapp* Factor (3))

On the third *Lapp* factor, a trier of fact must determine whether consumers care enough about the products at issue to distinguish between them, or whether consumers purchase the products with a limited impression of them. *Fisons*, 30 F.3d at 476 n.12. "As common sense dictates, the law provides that confusion is unlikely if the products or services at issue are complex and expensive, the purchasers highly sophisticated, and the purchase process one that is lengthy and requires close attention and analysis by the purchasers." *Checkpoint*, 104 F. Supp. 2d at 460 (citations omitted).

Evidence was presented throughout trial as to the complexity and high price of Hunt's products and Philips's similar products, leading the Court to believe that purchasers utilize care in making purchasing decisions. Although the TTAB concluded based on the evidence before it that Hunt sells many products at retail that are inexpensive, the new evidence presented to the Court showed quite the contrary. First, Hunt's dimming control systems and panels cost between $5,000 and over $12,000. (6/9/17 AM (Bernecker) 64:6-12; CCTX-121, CCTX-122; CCTX-123; CCTX-124; CCTX-125; KPTX-059; KPTX-503 (Louie Dep.) 12:7-13:3). Second, even though Hunt's "Simplicity" wall box dimming products range from $100 to several hundred dollars per unit, most of these orders are purchased in bulk and the orders generally add up to several hundred to several tens of thousands of dollars. (6/9/17 AM Trial Tr. (Bernecker) 64:8-14, 86:1-18; KPTX-059; KPTX-503 (Louie Dep.) 15:21-23; CCTX-264, CCTX-099). Hunt's wall box dimmers are not sold at retail and customers may not return them. (6/9/17 AM Trial Tr. (Bernecker) 86:16-18; CCTX-115 at 12). Moreover, these products are complex because they make up part of a larger lighting system in which all items need to be compatible, and an

66

electrical engineer must install complex wiring systems and configurations so that the products work correctly. (6/9/17 AM Trial Tr. (Bernecker) 63:12-19, 74:1-78:2, 95:18-96:13). Thus, it is likely that a purchaser would pay close attention in deciding what products to purchase because the products are expensive and need to be compatible in a complex system.

Hunt argues that many of Hunt's Simplicity products are not complex, but cites no evidence to back up this statement. Perhaps Hunt is referring to the light bulbs it sells through the website www.simplicitylightingsolutions.com. Nevertheless, only thirteen orders were placed through this website as of October 2013, one of which was cancelled. (Stip. Facts ¶¶ 26, 27 29; 6/7/17 Trial Tr. (Glaser) 40:2-10). No commissions have ever been paid to Hunt and Mr. Glaser never requested an accounting from Top Bulb. (Stip. Facts ¶¶ 30-31). Moreover, these light bulbs were not "Simplicity" brand light bulbs, but light bulbs manufactured by other companies. (6/6/17 Trial Tr. (Glaser) 67:8-68:21, 70:23–71:13; KPTX-506 (Dombar Dep.) 31:3-12, 54:4-13; Stip. Facts ¶ 28). The products were also never marked as "Simplicity" products when shipped. (6/6/17 Trial Tr. (Glaser) 67:8-68:21; 6/7/17 AM Trial Tr. (Glaser) 64:22-68:24, 70:7-71:10; KPTX-448; KPTX-506 (Dombar Dep.) 31:3-12, 87:9-87:20). In turn, the Court does not consider Hunt's twelve light bulb sales of other manufacturers' bulbs significant in determining whether Hunt's products were complex or expensive. The Court concludes that consumers take particular care in buying the products at issue because they are generally expensive and complex.

In addition to Philips showing that the products are complex and expensive, Philips showed that the purchasers of Philips's and Hunt's competitive products are sophisticated and thus give careful attention to the purchase of lighting products. Dr. Bernecker explained the

roles of lighting specifiers such as electrical engineers, as well as the roles of electrical contractors, electrical distributors, and manufacturer's representatives in buying commercial lighting products. (6/9/17 AM Trial Tr. (Bernecker) 74:1-78:2; KPTX-501; KPTX-502). Dr. Bernecker explained that the specifier is the person selecting the specific products or approving equivalent products made by different manufacturers, and the contractor searches for the best-priced item. (6/9/17 AM Trial Tr. (Bernecker) 75:12-24). He determined that these individuals are likely involved in the purchase of Hunt products after reviewing over 7,000 Hunt invoices. (6/9/17 AM Trial Tr. (Bernecker) 82:4-24, 83:24-84:5). Dr. Bernecker explained that the electrical distributors who paid Hunt needed to ask the electrical contractor to check with the electrical engineer or specifier if the product was acceptable for the project. (6/9/17 AM Trial Tr. (Bernecker) 82:4-91:10). The Court found Dr. Bernecker's testimony very credible and very insightful as to who makes decisions on buying Hunt products.

Dr. Cody, Hunt's own expert, also described the specification process and like Dr. Bernecker, suggested that electrical engineers and contractors play a key role in the selection process. (6/7/17 PM Trial Tr. (Cody) 12:20-13:8). Dr. Cody confirmed that manufacturer's representatives focus on sales to electrical contractors, who could only buy products that were within the parameters of the specifications defined by the electrical engineers and designers. (6/7/17 PM Trial Tr. (Cody) 16:24-17:14). The testimony of both Dr. Cody and Dr. Bernecker undercuts Mr. Glaser's testimony that electrical contractors and electrical engineers were not key buyers of Hunt's products. (6/6/17 Trial Tr. (Glaser) 74:13-19, 76:2-77:21). The Court concludes that electrical contractors and engineers were indeed a significant group of sophisticated purchasers, and that they, along with other lighting professionals, took part in the

buying process.

Hunt attempted to show, through Dr. Cody, that sophisticated purchasers may be "more aware of unidentified affiliations in the industry", and thus this factor cuts against Philips. Dr. Cody explained that vertical integration is common in the lighting industry and that Philips has engaged in vertical relationships by acquiring several lighting companies in the past. (6/7/17 PM Trial Tr. (Cody) 32:5-12, 32:23-33:10). Dr. Cody testified that manufacturer's representatives may be less likely to buy and sell Hunt products if they thought Philips and Hunt were affiliated because manufacturer's representatives try to "show the love" by selling equivalent products from various manufacturers that are not affiliated. (6/7/17 PM Trial Tr. (Cody) 25:20-27:13).

Hunt did not prove, however, that manufacturer's representatives would assume that Hunt and Philips were affiliated. Hunt's theory here is a stretch because the two taglines differed significantly and because "sense and simplicity" had not saturated the market enough for professionals in the lighting industry to base purchasing decisions on the tagline. Moreover, Dr. Bernecker testified that professionals in the lighting industry generally did not refer to "simplicity" or "sense and simplicity" when purchasing products. (6/9/17 AM Trial Tr. (Bernecker) 69:12-72:9, 87:10-25, 88:1-91:12) (finding minimal evidence of the use of "Simplicity" on manufacturer's representatives' typical "line cards", documents from the electrical contractor identifying desired products, and submittal documents from a contractor to an electrical engineer for the electrical engineer's approval). Thus, the Court is not convinced that sophisticated purchasers knew of the two companies' marks or that the marks would cause confusion as to affiliations. Due to the high price and complexity of the lighting products, the highly sophisticated purchasers, and the complex purchasing process, the Court finds that

purchasers of Hunt's and Philips's competing products pay close attention when buying products, and thus this factor weighs in Philips's favor.

### 4. Actual Confusion and Length of Time without Actual Confusion (*Lapp* Factors (4), (6))

*Lapp* factors (4) and (6) require the Court to determine the length of time, if any, the mark has been used without actual confusion, and whether the party claiming trademark infringement can provide evidence that consumers are actually confused by the marks at issue. These factors are necessarily interrelated, and the Court will examine them together.

Any evidence of actual confusion between the parties is significant to this analysis and is highly probative of likelihood of confusion, but such evidence is neither necessary nor determinative to find likelihood of confusion, given the potential difficulties of collecting evidence of actual confusion. *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 187 (3d Cir. 2010); *Checkpoint*, 104 F. Supp. 2d at 460-61; *Versa*, 50 F.3d at 205; *see also Fisons*, 30 F.3d at 476. The "most relevant evidence of actual confusion is the testimony of a reasonably prudent purchaser who was in fact confused by defendant's trademark." *Checkpoint*, 104 F. Supp. 2d at 464 (internal quotations omitted). Courts should view actual confusion evidence collected by a party's employees with skepticism, because of the tendency for such evidence to be self-serving or biased, and because of the inability to cross-examine the allegedly confused consumers. *Citizens Fin. Grp.*, 383 F.3d at 122 (citing *Checkpoint*, 269 F.3d at 298; *A & H Sportswear*, 237 F.3d at 227).

Hunt argues that it has demonstrated actual confusion between its brand and Philips's tagline because Mr. Glaser testified at trial that he had several conversations with individuals visiting Hunt's booth at a trade show, who mentioned the similarity between "Simplicity" and

70

"sense and simplicity." Nevertheless, the Court finds that Mr. Glaser's testimony on this point was not credible. At trial, Mr. Glaser claimed that two or three individuals asked him if Hunt was affiliated with Philips at a trade show in Las Vegas in 2006. (6/6/17 Trial Tr. (Glaser) 140:23-144:20). In the past, however, Mr. Glaser testified that these conversations took place in New York in 2007. (6/7/AM Trial Tr. (Glaser) 42:23-43:19). Additionally, Mr. Glaser claimed that one of these individuals was a Northeast Regional Sales Manager from Leviton, but Mr. Glaser did not know this sale manager's name. (6/7/17 AM Trial Tr. (Glaser) 42:18-22, 44:6-10). He did not know who the other two people were at all. (6/6/17 Trial Tr. (Glaser) 144:15-20). Because Hunt was unable to identify the individuals, Philips was unable to cross-examine these individuals. Moreover, Hunt offers nothing to corroborate that these conversations took place. The Court does not consider Mr. Glaser's unsubstantiated and seemingly self-serving testimony as credible evidence of actual confusion.

Hunt also fails to present any survey evidence of actual confusion, when it had the financial means to conduct a survey.[15] Philips argues that this leads to an adverse inference that the results of such a survey would be unfavorable to Hunt, as the trademark holder. *See Eagle Snacks Inc. v. Nabisco Brands, Inc.,* 625 F. Supp. 571, 583 (D.N.J 1985) ("Failure of a trademark owner to run a survey to support its claim[ ] of ... likelihood of confusion, where it has the financial means of doing so, may give rise to the inference that the contents of the survey would be unfavorable, and may result in the court denying relief."). Hunt responds that the

---

[15] Hunt offered a "business survey" conducted and designed by Mr. Glaser but this Court found it inadmissible in its prior Opinion because Mr. Glaser has no experience in designing consumer trademark surveys, and there was no indication that the survey accounted for marketplace conditions, or that it surveyed consumers looking to buy relevant lighting products. (Summ. J. Op. at 39-40].

International Trademark Association and Restatement of Unfair Competition do not advocate such an inference, but Hunt cites no precedent to support this position. The Court need not decide this issue in view of Hunt's virtually non-existent evidence of actual confusion and the compelling evidence submitted by Philips to the contrary, as discussed below.

In contrast to Hunt, which failed to present any evidence of actual confusion, Philips presented two survey experts to show that there was no actual confusion between "sense and simplicity" and "Simplicity". The first of these surveys was an *Eveready* survey conducted by Dr. A. Simonson. (6/8/17 AM Trial Tr. (A. Simonson) 57:10-58:12). Dr. A. Simonson surveyed 168 electrical contractors and 168 electrical engineers, showing them portions of Hunt's website which included the word "Simplicity" multiple times. (6/8/17 AM Trial Tr. (A. Simonson) 54:16-58:6; KPTX-077). After the participants saw the word "Simplicity" about twenty times on the website and heard it aloud at least twice, they were asked questions on whether Hunt was owned by, affiliated with, or shared a source with another company. (6/8/17 AM Trial Tr. (A. Simonson) 40:17-41:20, 54:16-58:6, 60:22-62:25; KPTX-072; KPTX-077). Only one respondent in both groups mentioned Philips in response to the questions. (6/8/17 AM Trial Tr. (A. Simonson) 64:7-10, 65:9-12; KPTX-075 at 11, 15-29, 44-58). Dr. A. Simonson's survey results showed that among electrical engineers and electrical contractors, there no actual reverse confusion as to ownership or affiliation between Hunt and Philips and there was an insignificant – "potentially one percent" – level of confusion as to source. (6/8/17 AM Trial Tr. (A. Simonson) 75:3-8). Although Hunt argues that electrical engineers and electrical contractors are not Hunt's primary customers, Dr. Bernecker and Dr. Cody, two experts in the lighting industry, both confirmed that the two groups play a key role in deciding what products to purchase for

large projects from manufacturers like Hunt. (6/9/17 AM Trial Tr. (Bernecker) 74:22-75:5; 6/7/17 PM Trial Tr. (Cody) 16:24-17:14). The Court thus finds Dr. A. Simonson's testimony remarkably credible and significant. Although his survey may not have examined the full universe, he examined an essential part of Hunt's customer base. The Court is satisfied that Dr. A. Simonson's survey showed that there was very little evidence of actual confusion among a key group of Hunt's customers.

Philips also supported its argument that there was no reverse confusion by presenting Dr. Michael Barone's *Eveready* survey at trial. Dr. Barone surveyed consumers of light bulbs who purchased light bulbs online in the last six months or planned to do so in the following six months. (6/8/17 PM (Barone) 123:4-125:3). Dr. Barone showed half of the survey respondents the homepage of www.simplicitylightingsolutions.com, which displayed Hunt's "Simplicity" trademark several times, and the other half the same homepage, except that all references to "Simplicity" had been removed. (6/8/17 PM (Barone) 125:14-127:3). Both groups were then asked questions on ownership, source, and affiliation of the web page. (6/8/17 PM Trial Tr. (Barone) 128:16-130:4; KPTX-079; KPTX-080; KPTX-081). Dr. Barone found less than one percent of net confusion among online purchasers of light bulbs. (6/8/17 Trial Tr. (Barone) 131:11-17). Hunt correctly suggests that online purchasers of light bulbs were not a major portion of Hunt's customer base, but this survey still showed that "sense and simplicity" had not saturated the minds of online light bulb purchasers.[16] Although this survey is not as strong as

---

[16] Hunt contends that through its Simplicity Lighting Solutions website, Philips and Hunt were direct competitors in the light bulb area, but some of Hunt's conceivably minimal sales through this website were actually sales of Philips bulbs. (Stip. Facts ¶ 30). Thus, the survey also shows that "sense and simplicity" did not impact some buyers of Philips bulbs.

Dr. A. Simonson's in terms of finding the correct customer base, it does provide some support for Philips's argument that consumers were not likely confused by the marks.

The Court did not find Dr. Rappaport's testimony criticizing the surveys of Dr. A. Simonson and Dr. Barone particularly credible. Dr. Rappaport's first indication that he was not credible was his suggestion that this was a case in which both direct and reverse confusion were at issue. (6/12/17 AM Trial Tr. (Rappaport) 100:2-15). Only reverse confusion is at issue here, leading the Court to believe that Dr. Rappaport had a limited understanding of this case. Moreover, the Court was not convinced by Dr. Rappaport's testimony that Dr. A. Simonson and Dr. Barone erred in assuming that Philips's tagline was "top of mind" knowledge. (6/12/17 AM Trial Tr. (Rappaport) 95:10-99:6, 103:10-25). These surveys were assuming that Philips tagline had saturated the market purposefully, because reverse confusion is dependent on the idea that consumers would easily confuse the senior user's mark with a well-known junior user's mark. *See A & H Sportswear,* 237 F. 3d at 228 ("[R]everse confusion occurs when 'the junior user saturates the market with a similar trademark and overwhelms the senior user'"). Dr. Rappaport's determination that Philips's tagline may not have been "top of mind" knowledge for customers actually helps Philips prove that "sense and simplicity" had not saturated the market. Additionally, Dr. Rappaport did not conduct a survey of his own to show that the other surveys were inaccurate. Dr. Rappaport's criticism of the reports would have been aided, perhaps significantly, by a demonstration that Dr. Rappaport's suggested methodology would have given different results on the issue of likelihood of reverse confusion. *See, e.g.*, *Whirlpool Props., Inc. v. LG Elecs. U.S.A., Inc.*, No. 3-414, 2006 WL 62846, at *3 (W.D. Mich. Jan. 10, 2006). In sum, Dr. Rappaport's critique of Philips's expert surveys was not persuasive.

74

Hunt also criticizes the Philips surveys by arguing that they should have been conducted in the *Squirt* or sequential or two-room format because Philips and Hunt were side-by-side at trade shows.  Hunt, however, presented no evidence that trade show attendees would have seen the two booths in a row, considering there were hundreds of booths.  (6/7/17 AM Trial Tr. (Glaser) 45:20-46:20).  Moreover, the *Eveready* format is the standard for determining whether there has been reverse confusion because the point is to test whether the junior user's mark has saturated the market.  (6/8/17 AM Trial Tr. (A. Simonson) 57:10-60:6; 6/8/17 PM Trial Tr. (Barone) 123:4-18, 127:23-128:15); *see also Parks LLC v. Tyson Foods, Inc.*, 2017 WL 3014273 (3d Cir. July 6, 2017) (citing articles and cases that describe the *Ever-Read*y format as the 'gold standard' for likelihood of confusion surveys; criticizing *Squirt* surveys, generally used to show likelihood of confusion when the marks have a high degree of proximity in the marketplace, because *Squirt* surveys can lead survey respondents to "search for any connection, no matter how attenuated . . . instead of permitting participants to make their own associations.") (internal citations omitted).  Hunt was therefore unable to undermine Philips's expert surveys.

Philips's survey testimony is substantially bolstered by the contemporaneous in-house evaluations by Philips of its lack of success with the "sense and simplicity" mark.  Those evaluations consistently showed that the "sense and simplicity" mark had been unable to make a substantial impression on consumers in any of the fields in which Philips sold its products. (6/8/17 PM Trial Tr. (Kerr) 41:8-43:4; 47:9-48:10; JTX-013 at 21) (showing Philips's own PowerPoint on its brand campaign and explaining that from 2004 through 2006, only one to two percent of respondents claiming to be familiar with Philips could recall, without aid, the full Philips tagline "sense and simplicity," and only two to four percent of respondents gave a

partially correct tagline).  As to Philips's light bulb customers more specifically, Dr. I. Simonson showed that the "sense and simplicity" tagline had no commercial impact on consumer behavior and did not affect the persuasiveness of Philips's advertisements.  (6/9/17 PM Trial Tr. (I. Simonson) 23:2-25:8, 27:21-30:24, 33:22-34:2; KPTX-089; KPTX-092; KPTX-093).  Thus, there was likely to be no actual reverse confusion between the two marks since consumers did not remember the Philips mark and customers were also not influenced by it in making purchasing decisions.  Because Hunt's evidence of actual confusion was uncorroborated and not credible and Philips presented credible evidence showing that there was minimal actual confusion, this Court finds that this factor weighs in Philips's favor.

**5. Intent of Philips in Adopting "sense and simplicity" as a Tagline (*Lapp* Factor (5))**

"When reverse, rather than direct, confusion is alleged, 'intent to confuse' is unlikely to be present.  However, though perhaps unusual, should an intent to confuse exist, it would be relevant to the likelihood of confusion analysis in the same manner as it would for a direct confusion claim."  *A & H Sportswear*, 237 F.3d at 232 (internal citation omitted).  In a reverse confusion case, the trier of fact typically assesses whether the junior user "deliberate[ly] inten[ded] to push the senior user out of the market."  *Freedom Card*, 432 F.3d at 479.  "[M]ere carelessness, as opposed to deliberate intent to confuse . . . does not shed any light" on whether confusion is likely in a reverse confusion case.  *A & H Sportswear*, 237 F.3d at 232-33.  Intent to infringe, however, is not required in order to find overall likelihood of confusion.  *Checkpoint*, 104 F. Supp. 2d at 465 (citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986)).

This Court determined on summary judgment that Hunt did not present sufficient

evidence such that a reasonable trier of fact could find that Philips acted in bad faith by adopting

the "sense and simplicity" tagline.  This Court found that Hunt failed to present any evidence

that the Philips personnel who developed the "sense and simplicity" tagline knew about Hunt or

Hunt's "Simplicity" trademark, or that they selected the tagline with Hunt in mind.  At trial,

Philips presented evidence that it conducted a U.S. trademark search on March 26, 2004, and at

the time, Hunt had not yet applied for its "Simplicity" mark.  (KPTX-001; CCTX-142; 6/7/17

PM Trial Tr. (Van Kuyck) 108:16-109:13).  Additionally, at summary judgment, this Court

found that there was evidence of collaboration between Philips and Hunt to ensure compatibility

of goods and that this cuts against a conclusion that Philips acted in bad faith.  (Summ. J. Op. at

42-43).  Hunt concedes that Lapp Factor (5) is not at issue in this case.  (Hunt Proposed

Conclusions of Law ¶ 314).[17]  This Court reiterates its findings in its summary judgment

Opinion: this factor weighs in Philips's favor because Philips's actions in general do not rise to

the level of "purposeful manipulation of the junior mark to resemble the senior" mark.  *A & H

Sportswear*, 237 F.3d at 225-26.

### 6. Marketing Channels, Sales Efforts and Targeting of Consumers, Relationship of Services in the Minds of Consumers, and Other Relevant Factors (*Lapp* Factors (7)-(10))

Finally, the Court will consider *Lapp* factors (7), (8), (9), and (10) together.  The seventh

*Lapp* factor considers whether Philips and Hunt sell their products through overlapping or the

---

[17] Although Hunt admits that this factor does not apply to the likelihood of confusion analysis, Hunt includes in its Proposed Findings of Fact the argument that Philips showed bad faith because it continued to use "sense and simplicity" and versions of "simplicity" after Hunt expressed that this use could be infringing and after the USPTO rejected Philips' registration as to six specific goods.  This Court already rejected this argument in its summary judgment Opinion.  There, the Court found that Philips's continued use of "sense and simplicity" was not necessarily indicative of bad faith.  (Summ. J. Op. at 43-44).

same channels of trade. The eighth *Lapp* factor considers whether the parties target the same consumers with their sales efforts, given that "when parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion." *Checkpoint*, 269 F.3d at 289. For the ninth *Lapp* factor, the Court must determine whether the products offered under the "Simplicity" and "sense and simplicity" marks are "similar enough that a consumer could assume they were offered by the same source." *Kos Pharms.*, 369 F.3d at 723 (quotation and citation omitted). Finally, *Lapp* factor (10) "is necessarily transformed in the reverse confusion context to an examination of other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market." *A & H Sportswear*, 237 F.3d at 234. These categories are important to the likelihood of confusion analysis in this case, because likelihood of confusion must be determined with respect to the actual marketplace conditions, based on the respective marks and how they are used on the relevant goods and services that consumers encounter. *See, e.g.*, *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1569 (Fed. Cir. 1983). The Third Circuit noted that *Lapp* factors seven, nine and ten may not be apposite for determining whether a likelihood of confusion exists in actions between direct competitors because "[b]y definition, the goods are competing, their function is the same, and the senior and junior user are already in each other's markets." *A & H Sportswear*, 237 F.3d at 212.

Some of Hunt's and Philips's lighting products directly compete, but Philips sells far more types of lighting goods than Hunt does. Hunt is primarily a dimming company as evidenced by its tagline: "Dimming. It's All We Do. Since 1960." (KPTX-450 at 1-101). Both

78

companies manufacture lighting controls, wall box dimmers, and dimming systems in the professional channel. (Stip. Facts ¶¶ 6-14, 21, 22, 44, 50; 6/6/17 Trial Tr. (Glaser) 65:7-23; 6/7/17 AM Trial Tr. (Glaser) 53:4-14; 54:14-18). Therefore, the Court finds that the two companies sell some overlapping products.

Philips also sells lamps and ballasts, (Stip. Facts ¶ 44), and Hunt attempts to show that the two companies also compete with respect to these products. But, Hunt failed to show direct competition on the sale of lamps and ballasts. First, in terms of ballasts, Hunt argues that while it does not manufacture ballasts, it sells ballasts of other companies and it hinted that it may, at some point, want to expand into manufacturing ballasts. Hunt argues that it has trademark rights for "Simplicity" for ballasts because it has trademark rights in lighting controls and it argues that a ballast is a control. Yet, Dr. Bernecker stated: "Never, ever, ever before this case have I heard a ballast referred to as a control in the 41 years that I've been involved in lighting. . . ." (6/9/17 AM Trial Tr. (Bernecker) 102:10-12). Dr. Bernecker also explained that a specifier would be unlikely to choose a new Hunt ballast "over a well-respected and understood name, whether it's Philips or General Electric or some other major manufacturer". (6/9/17 AM Trial Tr. (Bernecker) 108:21-109:4). The Court relies on Dr. Bernecker's testimony and concludes that Hunt has failed to show that its "Simplicity" trademark should extend to ballasts.

Additionally, Hunt fails to show that it directly competes with Philips in selling non-professional lamps. Hunt sells light bulbs through www.simplicitylighitingsolutions.com, a website that only completed twelve orders from when it was set up in 2007 until October 2013. (6/7/17 Trial Tr. (Glaser) 40:2-10). Moreover, these light bulbs were not "Simplicity" brand light bulbs, but light bulbs manufactured by other companies. (6/6/17 Trial Tr. (Glaser) 67:8-

68:21, 70:23–71:13; KPTX-506 (Dombar Dep.) 31:3-12, 54:4-13; Stip. Facts ¶ 28).  In fact,

three of the orders placed through www.simplicitylightingsolutions.com were actually orders for

Philips brand light bulbs sold through the site.  (Stip. Facts ¶ 30).  Finally, Hunt's "Simplicity"

mark was never placed on product packaging of its lamps sold through the Top Bulb website.

(6/6/17 Trial Tr. (Glaser) 67:8-68:21; 6/7/17 AM Trial Tr. (Glaser) 64:22-68:24, 70:7-71:10;

KPTX-448; KPTX-506 (Dombar Dep.) 31:3-12, 87:9-87:20).  Thus, Hunt and Philips did not

seriously compete in non-professional light bulbs sales.

 Hunt argues that the two companies target the same clients and thus there is a higher

likelihood of confusion.  As to the companies' overlapping professional lighting products

(namely: lighting controls, wall box dimmers, and dimming systems), Hunt is correct: the two

companies target professionals in the lighting industry such as architects, electrical engineers,

lighting designers, electrical contractors, and distribution wholesalers.  (6/8/17 PM Trial Tr.

(Kerr) 32:11-33:16; 6/7/17 PM Trial Tr. (Cody) 12:20-13:8; 6/9/17 AM Trial Tr. (Bernecker)

65:1-3; KPTX-502).  Philips concedes that both companies produce technical literature on these

products intended for their target customers.  (Philips Proposed Conclusions of Law ¶ 591).

Philips advertises in professional trade magazines, (6/8/17 PM Trial Tr. (Kerr) 32:11-33:16), and

Hunt claims it advertises through the same media.  In turn, the Court concludes that to some

extent, the companies advertised to the same target clients in the same ways.

 Nevertheless, the overlap in the two companies' advertising is somewhat undercut by the

fact that Philips did not spend money on print ads for dimming controls or lighting controls in

2008 or after.  (6/8/17 PM Trial Tr. (Kerr) 77:7-78:24; KPTX-346 at 21).  Moreover, Philips

often did not use the phrases "sense and simplicity" or "Simplicity is a. . ." in advertising

dimming control products.  (6/8/17 PM Trial Tr. (Kerr) 34:12-36:16; KPTX-027; KPTX-036; KPTX-045; KPTX-046; KPTX-047; KPTX-048; KPTX-049; KPTX-346 at 18-19).  Instead, Philips's dimming controls were often advertised under their sub-brand names, such as Lightolier Sunrise, Philips Lightolier Optio, and Occuswitch.  (KPTX-045; KPTX-049; CCTX-746).  Philips focused instead on print advertisements for lamps, lighting fixtures, emergency ballasts, and outdoor lighting.  (6/8/17 PM Trial Tr. (Kerr) 77:7-79:15; KPTX-346 at 21; CCTX-715).  Thus, many of the print advertisements were not for overlapping products.

Hunt was also unable to demonstrate that the overlap in advertising at trade shows, such as Lightfair, was significant.  Hunt never presented testimony as to the size of its "Simplicity" display, whether the mark was on the booth, and whether it was visible.  Additionally, Mr. Glaser admitted that Lightfair was a very large trade show and it could take a long time to walk through the hundreds of booths.  (6/7/17 AM Trial Tr. (Glaser) 45:20-46:20).  Hunt presented no evidence that a lighting professional at Lightfair was likely see both booths at the show.  Thus, the fact that both parties advertise at Lightfair is underwhelming evidence of overlapping advertising.

Even though some of the Philips's print advertisements were not for overlapping products and the fact that both companies attended Lightfair was underwhelming evidence of overlapping advertising, the Court acknowledges that Hunt and Philips marketed some overlapping products to the same professionals, through the same lines of distribution, and through similar methods of advertising.[18]  Thus, as to the directly competitive products, *Lapp* factors seven through ten

---

[18] Hunt finally argues that a relevant "other fact" to consider, as instructed by *Lapp* factor (10), is that Philips keeps its acquisitions hidden, which may have caused lighting professionals to believe that Philips owned Hunt or that the two companies were affiliated.  But, Hunt fails to

weigh somewhat in favor of Hunt.  As to the non-competing products, such as lamps and ballasts, the Court concludes that *Lapp* factors seven through ten are neutral.

### d. Conclusion as to Hunt's Counterclaims

Based on the ten *Lapp* factors, this Court concludes that Hunt has overwhelmingly failed to meet its burden of proof in establishing a likelihood of confusion with regard to any of the products that it contends were infringed by Philips's activity.  First, there were significant differences in sight, sound, and meaning between "sense and simplicity" and "Simplicity", and the parties used the marks in completely different ways.  Additionally, Hunt's "Simplicity" mark, which was already descriptively weak, was significantly weakened by third-party use.  Expert testimony showed that Philips's mark did not saturate the market at all and thus Philips's mark was not commercially strong.  Next, the evidence showed that both companies sell expensive items to sophisticated lighting professionals who take care when purchasing products and distinguish between products in order to ensure that the lighting products they buy are compatible and safe.  Importantly, the Court accepts Philips's surveys demonstrating a lack of actual confusion among various consumers.  Finally, although this Court acknowledges that both companies sometimes target similar consumers through similar advertising strategies, these factors are hardly compelling in view of the other likelihood of confusion factors.  In sum, based on the evidence at trial, this Court finds that *Lapp* factors one through six weigh in Philips's favor, and that factors seven through ten weigh slightly in Hunt's favor.  Factors seven through

---

prove that "sense and simplicity" affected the consuming public so that they associated it with "Simplicity".  All of the survey evidence in this case showed otherwise, and Hunt has not shown that Philips's tagline "sense and simplicity" saturated the market enough to make a professional believe that the two companies were related.  The Court thus does not accept Hunt's final argument as to *Lapp* factor ten.

ten, however, do not outweigh the fact that all of the other factors point to no likelihood of confusion. The Court will enter judgment in favor of Philips on all of Hunt's counterclaims for trademark infringement, unfair competition, and misappropriation.

### e. Conclusion on the Review of the TTAB Decision

This Court was presented with significant new evidence at trial, which was not presented to the TTAB, and thus this Court draws different conclusions than those drawn by the TTAB. The Court differs from the TTAB's conclusions on the similarity of the marks, the conceptual strength of Hunt's mark, the price of goods and the sophistication of purchasers, evidence of actual confusion, and the overlapping channels of trade.

First, in contrast to TTAB, this Court does not find that "sense and simplicity" and "simplicity" were similar. While the TTAB determined that the "sense" part of "sense and simplicity" was not ambiguous and that the overall the phrase "sense and simplicity" meant that products were easy-to-use and practical, *Hunt Control Sys. Inc.*, 2011 WL 2318350, at *11-*12, this Court relied on evidence from Dr. Butters, a linguistics expert who did not testify before the TTAB, that "sense and simplicity" as a whole was unclear in meaning. *See Jack Wolfskin*, 797 F.3d at 1371 (holding that Courts must consider marks in their entirety); *Juice Generation*, 794 F.3d at 1340-41. Moreover, Dr. Butters's testimony as to the cultural allusion of "sense and simplicity" to *Sense and Sensibility* was not considered by the Board, nor was the fact that the two marks appeared in advertisements in different fonts, colors, capitalizations, and in close proximity to their respective housemarks. Additionally, this Court found that Philips and Hunt generally used their marks in different ways: Philips's mark was a tagline and Hunt's was an identifier of particular products. Based upon evidence not considered by the TTAB – including

Dr. Butters's testimony, the different appearances of the marks, and how the companies used their marks differently – the Court rejects the TTAB's findings that the two marks portrayed the same overall commercial impression and instead, the Court concludes that the marks were not all that similar.

Next, this Court was presented with new evidence that companies within the lighting industry often used marks similar to "Simplicity", leading this Court to conclude that Hunt's mark was weak conceptually. The TTAB considered 58 third-party registrations of marks with the "SIMPL-formative term", but it noted that very few of these registrations belonged to companies that sell similar products to those of Hunt and Philips. *Hunt Control Sys. Inc.*, 2011 WL 2318350, at *11. At trial, however, Philips presented this Court with numerous examples of third-party use within the lighting industry from companies like that EiKO, Traxon, Cooper, Legrand, and Acuity. This Court thus finds that the Hunt mark was conceptually weaker than the TTAB described it to be. *See Jack Wolfskin*, 797 F.3d at 1373-74 (citing *Juice Generation,* 794 F.3d at 1339) ("such extensive evidence of third-party use and registrations is 'powerful on its face,' even where the specific extent and impact of the usage has not been established.").

This also Court differed from the TTAB in its findings on the price and sophistication of the goods at issue. The TTAB based its findings on this factor on Mr. Glaser's testimony. Mr. Glaser suggested in front of the TTAB that Hunt sold expensive systems, but that it also sold less complex, less expensive products at retail for individual non-sophisticated homeowners. *Hunt Control Sys. Inc.*, 2011 WL 2318350, at *8. Nevertheless, Hunt conceded for purposes of this trial that it does not sell its dimming systems at retail, that over 90% of Hunt's dimming systems are used in commercial applications, and that Hunt's sales to non-professional consumers

84

constitute less than five percent of its overall sales. (Stip. Facts ¶ 22, 45-46). At trial, Philips also presented evidence that Hunt's wall box dimmers are not sold at retail and that wall box dimmers are usually ordered in bulk so the orders cost hundreds or tens of thousands of dollars. Kathleen Seirup, one of Hunt's former employees, testified that when homeowners called Hunt, Hunt usually discouraged them from buying Hunt's dimmers since Hunt dimmers were mostly for commercial use. The Court was also presented at trial with two expert witnesses who outlined the complex specification process for Hunt products and explained the role that lighting specifiers such as electrical engineers, architects, and designers, electrical contractors, electrical distributors, manufacturers, manufacturer's representatives, and facility owners all play in buying commercial lighting products. Therefore, in contrast to TTAB, this Court finds that non-sophisticated purchasers were indeed a de minimus portion of Hunt's customers and that the professional consumers to whom Hunt sold its products were likely to take care in making decisions on which complex and expensive products to buy.

Additionally, this Court differed from the TTAB in its analysis of the evidence of actual confusion. The TTAB did not find this factor important in its likelihood of confusion analysis. *Hunt Control Sys. Inc.*, 2011 WL 2318350, at *12. Nevertheless, the Board was not presented with Philips's survey evidence. This Court had the benefit of hearing the testimony of Dr. A. Simonson and Dr. Barone, who both conducted surveys that showed virtually no actual confusion. Philips also provided evidence to this Court that consumers did not remember the term "sense and simplicity" at all in order for them to be able to confuse it with Hunt's mark. Thus, in contrast to TTAB, the Court finds that there was minimal actual confusion and that this factor was significant.

85

Finally, this Court makes different findings than the TTAB did on the parties' marketing channels. The TTAB relied on Mr. Glaser's evidence that purchasers of Hunt's products could range from commercial building owners to homeowners. *Hunt Control Sys. Inc.*, 2011 WL 2318350, at *7. As explained above, this Court was presented with contrary evidence at trial.[19] Additionally, while the TTAB found that both parties' attendance at trade shows showed that their marketing channels overlapped, *id.* *8, this Court found that there was little evidence that a consumer would encounter both marks at extremely large trade shows like Lightfair. This Court, however, acknowledges that the companies directly competed regarding some goods and targeted some of the same professional consumers in their respective technical literature. This Court finds that while *Lapp* factors seven through ten provide some support for likelihood of confusion, they do not outweigh all of the other *Lapp* factors, which provide more substantial evidence that there was no likelihood of confusion here. In sum, because the Court was presented with new evidence on each *Lapp* factor at trial, this Court draws different conclusions from the TTAB and reverses the TTAB decision.

## IV.    CONCLUSION

For the foregoing reasons, the Court will reverse the TTAB decision and deny Hunt's request for injunctive relief. An appropriate Order will be filed herewith.

---

[19] The TTAB was also presented with testimony by Mr. Glaser that Hunt sold lamps bearing a "Simplicity" mark on www.simplicitylightingsolutions.com, but at trial he admitted that this was an unsupported statement to the TTAB. (6/7/17 AM Trial Tr. (Glaser) 64:22-71:10).

s/ Stanley R. Chesler

                                 STANLEY R. CHESLER

                                 United States District Judge

Dated:  August 29, 2017